**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
Fort Worth Division**

| | |
|---|---|
| OUTSOURCING FACILITIES ASSOCIATION, et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 4:24-cv-00953-P |
| UNITED STATES FOOD AND DRUG ADMINISTRATION, et al., | |
| Defendants. | |

**Plaintiffs' Memorandum of Law in Support of a
<u>Temporary Restraining Order and Preliminary Injunction</u>**

# **Table of Contents**

Introduction ................................................................................................................1

Background .................................................................................................................2

    A.   Congress Authorizes Compounding as an Essential Mechanism to Ensure Patient Needs Are Met During Drug Shortages ............................................................2

    B.   FDA Acknowledges an Existing Shortage of Tirzepatide but Removes It From the Shortage List Without Notice, Comment, or a Reasoned Decision ..................................5

    C.   Plaintiffs and Their Members Are Immediately Stifled in Their Efforts to Ensure Patients Receive Important Treatments at Reasonable Prices .........................................7

Argument .................................................................................................................8

    I.   Plaintiffs Are Likely To Succeed on the Merits .................................................9

        A.   Plaintiffs Are Likely To Prevail on Their Claim that FDA Unlawfully Promulgated the Delisting Action by Failing To Undertake Notice and Comment ................................................................................9

        B.   Plaintiffs Are Likely To Prevail on Their Claims That the Delisting Action Is Arbitrary and Capricious Decisionmaking Without a Reasoned Basis ..............13

            1.   The Delisting Action Is Unreasoned .............................................14

            2.   The Delisting Action Is Internally Inconsistent and Incoherent ..................18

    II.   The Equitable Factors Favor an Injunction and TRO ....................................19

Conclusion ................................................................................................................22

## Table of Authorities

**Cases**

*Anne Arundel County, Md. v. U.S. EPA,*
   963 F.2d 412 (D.C. Cir. 1992).................................................................11

*Am. Fed'n of Gov't Emps., Loc. 2924 v. Fed. Lab. Rels. Auth.,*
   470 F.3d 375 (D.C. Cir. 2006)...............................................................18

*Am. Rivers v. FERC,*
   895 F.3d 32 (D.C. Cir. 2018)................................................................14

*Apter v. Dep't of Health & Hum. Servs.,*
   80 F.4th 579 (5th Cir. 2023).................................................................10

*Ass'n of Data Processing Serv. Orgs. v. Bd. of Governors of Fed. Rsrv. Sys.,*
   745 F.2d 677 (D.C. Cir. 1984)...............................................................12

*Athenex Inc. v. Azar,*
   397 F. Supp. 3d 56 (D.D.C. 2019) ...........................................................4

*Benson v. St. Joseph Reg'l Health Ctr.,*
   No. 04-cv-04323, 2005 WL 6459109 (S.D. Tex. Dec. 22, 2005) ...........................21

*BNSF Ry. Co. v. Fed. R.R. Admin.,*
   62 F.4th 905 (5th Cir. 2023)................................................................14

*Bos. Heart Diagnostics Corp. v. Health Diagnostics Lab'y, Inc.,*
   2014 WL 2048436 (D. Mass. May 16, 2014) ..............................................21

*Center for Biological Diversity v. U.S. Fish and Wildlife Service,*
   698 F.Supp.3d 39 (D.D.C. 2023)...........................................................11

*Center for Biological Diversity v. Everson,*
   435 F.Supp.3d 69 (D.D.C. 2020) ..........................................................11

*Chamber of Com. of United States of Am. v. United States Dep't of Lab.,*
   885 F.3d 360 (5th Cir. 2018)................................................................18

*Citizens for Resp. & Ethics in Washington v. FEC,*
   993 F.3d 880 (D.C. Cir. 2021)..............................................................13

*Dep't of Commerce v. New York,*
   588 U.S. 752 (2019)....................................................................13, 17

*Dep't of Homeland Sec. v. Regents of the Univ. of California,*
   591 U.S. 1 (2020)..................................................................2, 14, 17

*Dumanian v. Schwartz*,
  No. 19-cv-6771, 2022 WL 2714994 (N.D. Ill. July 13, 2022)................................20

*GameFly, Inc. v. Postal Regul. Comm'n*,
  704 F.3d 145 (D.C. Cir. 2013).................................................................................19

*Green Rock LLC v. Internal Revenue Service*,
  104 F.4th 220 (11th Cir. 2024).................................................................................11

*Idaho Farm Bureau Federation v. Babbitt*,
  58 F.3d 1392 (9th Cir. 1995)....................................................................................11

*Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*,
  407 F.3d 1250 (D.C. Cir. 2005)................................................................................21

*Interox Am. v. PPG Indus., Inc.*,
  736 F.2d 194 (5th Cir. 1984)....................................................................................20

*Ladd v. Livingston*,
  777 F.3d 286 (5th Cir. 2015)......................................................................................9

*Lake Carriers' Ass'n v. EPA*,
  652 F.3d 1 (D.C. Cir. 2011)......................................................................................12

*Mann Constr., Inc. v. United States*,
  27 F.4th 1138 (6th Cir. 2022).................................................................11, 12, 13

*Marcello v. Bonds*,
  349 U.S. 302 (1955).................................................................................................12

*Med-Cert Home Care, LLC v. Azar*,
  365 F. Supp. 3d 742 (N.D. Tex. 2019).....................................................................20

*Michigan v. EPA*,
  576 U.S. 743 (2015).................................................................................................14

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)..............................................................................13, 14, 15, 16

*Nat'l Ass'n of Farmworkers Organizations v. Marshall*,
  628 F.2d 604 (D.C. Cir. 1980)..................................................................................11

*Nat'l Min. Ass'n v. McCarthy*,
  758 F.3d 243 (D.C. Cir. 2014)..................................................................................11

*Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*,
  894 F.3d 95 (2d Cir. 2018).......................................................................................21

*Nat. Res. Def. Council v. Wheeler*,
    955 F.3d 68 (D.C. Cir. 2020).......................................................................12

*Nken v. Holder*,
    556 U.S. 418 (2009)...................................................................................20

*NRDC v. EPA*,
    658 F.3d 200 (2d Cir. 2011) ......................................................................16

*Ohio v. EPA*,
    144 S. Ct. 2040 (2024)...............................................................13, 16, 17, 18

*Perez v. Mortgage Bankers Ass'n*,
    575 U.S. 92 (2015).................................................................................9, 10

*Pub. Citizen, Inc. v. Mineta*,
    340 F.3d 39 (2d Cir. 2003) ........................................................................16

*Puerto Rico Higher Educ. Assistance Corp. v. Riley*,
    10 F.3d 847 (D.C. Cir. 1993)................................................................15, 16

*R.J. Reynolds Vapor Co. v. FDA*,
    65 F.4th 182 (5th Cir. 2023)..............................................................16, 17, 20

*Shell Offshore Inc. v. Babbitt*,
    238 F.3d 622 (5th Cir. 2001) .....................................................................10

*Sw. Elec. Power Co. v. EPA*,
    920 F.3d 999 (5th Cir. 2019) ................................................................18, 19

*Texas v. Becerra*,
    577 F. Supp. 3d 527 (N.D. Tex. 2021) .........................................................20

*Texas v. EPA*,
    829 F.3d 405 (5th Cir. 2016) .....................................................................19

*Texas v. United States*,
    40 F.4th 205 (5th Cir. 2022).......................................................................21

*Texas v. United States*,
    787 F.3d 733 (5th Cir. 2015) .......................................................................9

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) ................................................................10, 12

*Texas v. U.S. Dep't of Homeland Sec.*,
    700 F. Supp. 3d 539 (W.D. Tex. 2023).........................................................20

*Thompson v. W. States Med. Ctr.*,
  535 U.S. 357 (2002)....................................................................................................2

*Trottie v. Livingston*,
  766 F.3d 450 (5th Cir. 2014)......................................................................................9

*U.S. Dep't of Labor v. Kast Metals Corp.*,
  744 F.2d 1145 (5th Cir. 1984)....................................................................................9

*Wages & White Lion Invs., LLC v. United States Food & Drug Admin.*,
  16 F.4th 1130 (5th Cir. 2021)..............................................................................19, 20

*Washington State Pharmacy Ass'n v. Gregoire*,
  2009 WL 1259632 (W.D. Wash. Mar. 31, 2009) .....................................................21

*Wenner v. Tex. Lottery Comm'n*,
  123 F.3d 321 (5th Cir. 1997)....................................................................................19

*Whole Woman's Health v. Paxton*,
  264 F. Supp. 3d 813 (W.D. Tex. 2017)......................................................................9

**Statutes**

5 U.S.C. § 553...........................................................................................................10, 12

5 U.S.C. § 559.............................................................................................................9, 12

21 U.S.C. § 351................................................................................................................3

21 U.S.C. § 353a................................................................................................... *passim*

21 U.S.C. § 353b.....................................................................................................3, 4, 22

21 U.S.C. § 356c.........................................................................................................4, 15

21 U.S.C. § 356e.........................................................................................................4, 15

**Other Authorities**

Ania M. Jastreboff, et al., Tirzepatide Once Weekly for the Treatment of Obesity,
  New England Journal of Medicine (June 4, 2022) .....................................................5

Food and Drug Administration, Compounding when Drugs are on FDA's Drug
  Shortages List.............................................................................................................5

## Introduction

The Court's immediate intervention is necessary to preserve the status quo and ensure patient access to necessary medicine that is in shortage and has been made unavailable due to arbitrary, non-transparent, and unlawful decisionmaking by the Food and Drug Administration ("FDA") four business days ago. FDA recognized in December 2022 that Tirzepatide, an active ingredient in FDA-approved drugs that treat type-2 diabetes and obesity, is in shortage, and that determination triggered provisions of the Food, Drug, and Cosmetic Act ("FDCA") that loosened restrictions on compounding Tirzepatide. Compounding is the process by which a doctor, pharmacist, or licensed outsourcing facility combines, mixes, or alters ingredients to create medicines tailored to patient needs. From December 2022 until October 2, 2024, patient needs and market demand for Tirzepatide were fulfilled in meaningful part by lawful compounding by pharmacies and outsourcing facilities.

But last Wednesday, FDA changed all that with a post to its website, abruptly depriving patients of much needed treatment and artificially raising drug prices. Ignoring evidence that the shortage persists, FDA removed Tirzepatide from the shortage list without notice, without soliciting input from affected parties and the public, and without meaningful explanation. Indeed, the agency *confirmed* that there remains a Tirzepatide shortage. The only basis FDA offered for its declaration of victory over the shortage was the "stated product availability and manufacturing capacity" of the drug's manufacturer—the company that is self-interested in monopolizing the market by shutting out compounders. The sole factual assertion FDA made concerning a shortage was that it *persists*: "Patients and prescribers may still see intermittent localized supply disruptions as the products move through the supply chain from the manufacturer and distributors to local pharmacies." Put simply, FDA knows its action will leave many patients with no effective treatment but persisted anyway on an expedited basis and without warning.

FDA's action is unlawful under the Administrative Procedure Act on multiple grounds. Most obviously, it is agency rulemaking undertaken without notice and comment, as the APA requires. On that basis alone, FDA's action is almost certain to be set aside at final judgment in

this case. Moreover, the APA requires reasoned decisionmaking, but FDA provided next to no explanation for its decision, and its own assertions confirm that the shortage has not ended. The APA secures the foundational principle that "the Government should turn square corners in dealing with the people," just as regulated parties "must turn square corners when the deal with the Government." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 24 (2020) (citations omitted). FDA has violated this principle.

Plaintiffs are a pharmacy that engages in compounding and a trade organization of licensed outsourcing facilities, and they have been immediately impacted by FDA's action, which forbids them from continuing to compound Tirzepatide as they have for nearly two years. Without this Court's prompt intervention they will be irreparably harmed, as will the general public. The equities in this case are entirely clear-cut and one-sided: an injunction will continue the state of affairs FDA has recognized as legitimate since December 2022 by enabling safe and effective compounding that serves public needs, and it will impose no cognizable harm on FDA, which has no legitimate interest in secretive rulemaking that is entirely unexplained.

The Court should act now. It should enter an immediate temporary restraining order to permit compounding pending briefing on Plaintiffs' preliminary-injunction motion, and it should subsequently enter a preliminary injunction to preserve the status quo pending litigation. The Court should also order an expedited response from FDA to move the preliminary-injunction motion to conclusion as soon as possible, for the benefit of the parties and the public.

## Background

### A. Congress Authorizes Compounding as an Essential Mechanism to Ensure Patient Needs Are Met During Drug Shortages

1. Drug compounding, "a process by which a pharmacist or doctor combines, mixes, or alters ingredients to create a medication," is "a traditional component of the practice of pharmacy, and is taught as part of the standard curriculum at most pharmacy schools." *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 360–61 (2002) (citation omitted). "Many States specifically regulate compounding practices as part of their regulation of pharmacies," and "[s]ome require all

licensed pharmacies to offer compounding services." *Id.* The Federal Food, Drug, and Cosmetic Act (FDCA) regulates drug compounding in two provisions, Section 503A and Section 503B.

Titled "Pharmacy compounding," Section 503A exempts compounding at licensed pharmacies from certain FDCA requirements, including the new-drug-approval prerequisites for selling drugs in interstate commerce, if multiple standards are met. 21 U.S.C. § 353a(a). Among other things, a drug must be compounded at a licensed pharmacy "on the prescription order for [an] individual patient made by a licensed physician or other licensed practitioner authorized by State law to prescribe drugs" or, if it occurs "before the receipt of a valid prescription order for such individual patient," it must be "based on a history of the licensed pharmacist or licensed physician receiving valid prescription orders for the compounding of the drug product." *Id.* § 353a(a)(2)(A) and (B). Section 503A authorizes compounding from "bulk drug substances," which are active ingredients typically of FDA-approved drugs, so long as the pharmacy "does not compound regularly or in inordinate amounts (as defined by the Secretary) any drug products that are essentially copies of a commercially available drug product." *Id.* § 353a(b)(1)(D).

Section 503B separately governs "outsourcing facilities" and exempts their compounding from the FDCA's new-drug-approval process and other restrictions if those facilities fulfil registration, inspection, and reporting requirements and satisfy 11 conditions. *Id.* § 353b(a)(1) and (b). Compliant facilities need not compound in response to patient prescriptions or a historical pattern of prescriptions and need not be licensed pharmacies. *Id.* § 353b(d)(4)(B) and (C). Outsourcing facilities, however, must conform with good manufacturing practices that do not apply to Section 503A pharmacies. *Compare id.* § 353a(a) *with id.* § 353b(b); *id.* § 351(a)(2)(B).

2.    Compounding under Sections 503A and 503B serves vital national interests, especially in the case of drug shortages. *See* Declaration of Lee Rosebush ¶ 7 ("Rosebush Decl."), App. 7. To ensure that patient needs are met, Congress established a system to permit compounding to help meet demand not met by drug manufacturers during shortages.

Another FDCA provision, Section 506E, requires FDA to "maintain an up-to-date list of drugs that are determined by the Secretary [of Health and Human Services] to be in shortage in

3

the United States." 21 U.S.C. § 356e(a). The provision requires that FDA identify for "each drug on such list" "[t]he name of the drug in shortage," "[t]he name of each manufacturer of such drug," "[t]he reason for the shortage" from an enumerated list of seven categories, and "[t]he estimated duration of the shortage as determined by the Secretary." *Id.* § 356e(b)(1)–(4). The FDCA defines "drug shortage" to mean "means a period of time when the demand or projected demand for the drug within the United States exceeds the supply of the drug." *Id.* § 356c(h)(2).

Compounding a drug on the shortage list is lawful in circumstances where the same compounding would be unlawful if the drug were not on the shortage list. For outsourcing facilities, compounding from bulk drug substances (i.e., active ingredients) is impermissible under Section 503B unless the "drug substance appears on the drug shortage list … at the time of compounding, distribution, and dispensing" or, alternatively, the bulk drug substance appears on a separate list of ingredients for which there is a "clinical need." *Id.* § 353b(a)(2)(A)(ii). FDA has construed the "clinical need" requirement narrowly. *See Athenex Inc. v. Azar*, 397 F. Supp. 3d 56 (D.D.C. 2019). As a result, a shortage listing is typically a prerequisite to compounding from many active ingredients in FDA-approved drugs by outsourcing facilities.

Shortage listing has an additional consequence under Section 503B, which prohibits compounding of a drug that is "essentially a copy of one or more approved drugs." *Id.* § 353b(a)(5). The statute defines "essentially a copy of an approved drug" *not* to include any drug that "appears on the drug shortage list … at the time of compounding, distribution, and dispensing." *Id.* § 353b(d)(2)(A). Consequently, if an FDA-approved drug appears on the shortage list, an outsourcing facility may compound drugs that are essentially copies of that drug. Rosebush Decl. ¶ 7, App. 7. Otherwise, essential-copy compounding is unlawful, even if the active ingredient appears on the clinical-need list or if compounding begins with the FDA-approved drug itself (rather than its active ingredients).

The effect of a drug-shortage listing is similar under Section 503A. As noted, compounding "in inordinate amounts" of "any drug products that are essentially copies of a commercially available drug product" does not qualify for protection under Section 503A. *Id.* § 353a(b)(1)(D).

But FDA reads the term "commercially available drug product" not to include drugs listed on the shortage list, since such drugs are by definition not commercially available. *See* Food and Drug Administration, Compounding when Drugs are on FDA's Drug Shortages List.[1] As a result, Section 503A pharmacies may compound copies of FDA-approved drugs that are on the shortage list.

### B.    FDA Acknowledges an Existing Shortage of Tirzepatide but Removes It From the Shortage List Without Notice, Comment, or a Reasoned Decision

1.    Tirzepatide is the active ingredient of FDA-approved prescription drugs that treat type-2 diabetes and obesity. "Obesity is the most prevalent chronic disease worldwide, affecting approximately 650 million adults," which "impose[s] a considerable economic burden and constitute major contributors to global morbidity and mortality."[2] Tirzepatide is administered via injection and sold under the brand names Mounjaro for diabetes treatment and Zepbound for weight loss. Tirzepatide has been proven effective and is in exceptionally high demand. Rosebush Decl. ¶ 4, App. 6.

On or about December 15, 2022, FDA listed Tirzepatide on the Section 506E shortage list, identifying 10 forms of injection that are in shortage. *See* ECF 1-3 (Exhibit B). The listing enabled pharmacies and outsourcing facilities to satisfy demand and patient needs through compounding, including of drugs that are essentially copies of FDA-approved versions of Tirzepatide. Rosebush Decl. ¶ 8, App. 7. Since December 2022, market demand has been met in meaningful part by compounded products. Rosebush Decl. ¶ 9 (App. 7) and Exs. 5–7 (App. 44–63). In fact, notwithstanding pharmacies' and outsourcing facilities' compounding of Tirzepatide, some patient needs went unfulfilled or met delays. Rosebush Decl. ¶ 21, App. 9. The FDCA's compounding permission during the shortage added a secondary benefit to consumers: compounded versions of

---

[1] *Available at* https://www.fda.gov/drugs/human-drug-compounding/compounding-when-drugs-are-fdas-drug-shortages-list.

[2] *See* Ania M. Jastreboff, et al., Tirzepatide Once Weekly for the Treatment of Obesity, New England Journal of Medicine, *available at* https://www.nejm.org/doi/full/10.1056/NEJMoa2206038 (June 4, 2022).

Tirzepatide run from one half to one quarter the cost of brand-name versions. Rosebush Decl. ¶¶ 14–15 (App. 8) and Exs. 4–5 (App. 35–48).

The shortage persists to this day. Various industry participants have recently presented FDA information showing extremely high demand for Tirzepatide, inability of its manufacturer to keep up, scarcity in various regions and at the national level, and delays in filling prescriptions. Rosebush Decl. ¶¶ 30–31, App. 12. News outlets have continued to report that "the drugs' makers have been struggling to keep up with skyrocketing demand" and that patients "are still having trouble at the pharmacy counter" in getting prescriptions filled. *See* Ex. 12, App. 87. Online message boards reflect complaints that prescriptions for Tirzepatide cannot be filled. *See* Ex. 15, App. 118.

2.     Despite the evidence, FDA abruptly declared on its website on October 2, 2024, that "the shortage of tirzepatide injection … has been resolved" and removed Tirzepatide from the shortage list. ECF 1-2 (Exhibit A) (the "Delisting Action"). FDA provided no notice of this decision before it took legal effect. Market participants did not know before that moment that their ongoing compounding activities would immediately become unlawful. FDA provided no opportunity for public comment on whether Tirzepatide remains subject to a shortage as defined by statute. Rosebush Decl. ¶¶ 32–34, App. 12.

FDA's notice provides almost no explanation for the Delisting Action. FDA supported its decision with one statement: "FDA confirmed with the drug's manufacturer that their stated product availability and manufacturing capacity can meet the present and projected national demand." ECF 1-2 (Exhibit A). But the next sentence of the notice states: "Patients and prescribers may still see intermittent localized supply disruptions as the products move through the supply chain from the manufacturer and distributors to local pharmacies." *Id.* For each of the 10 Tirzepatide injections formerly listed as in shortage, FDA made the following finding (or a substantial equivalent):

> Even When A Medication Is Available, Patients May Not Always Be
> Able To Immediately Fill Their Prescription At A Particular

> Pharmacy. That Is Especially True For Refrigerated Products And Products With Multiple Dose Strengths, Due To Factors Like Ordering Practices And Incentives, Cold Chain Logistical Considerations, And Retailer Capacity Constraints. Patients May Experience Variability At A Particular Pharmacy Location Regardless Of Whether A Drug Is In Shortage.

ECF 1-3 (Exhibit B).

Further down, the notice offered a generic assertion that FDA typically "considers a variety of factors, including the company's ability to meet current and historical demand, the amount in a manufacturer's stock, affected market share, ability of alternate manufacturers to cover the demand, and confirmed market stabilization." ECF 1-2 (Exhibit A). But the notice says nothing of FDA's findings (even at a high level) under any of those criteria (or any others) concerning Tirzepatide. FDA's notice contains no finding or even assertion that patient needs and market demand for Tirzepatide will be fulfilled beginning October 2, 2024. FDA's notice cites no evidence of anything.[3]

### C.   Plaintiffs and Their Members Are Immediately Stifled in Their Efforts to Ensure Patients Receive Important Treatments at Reasonable Prices

Plaintiff North American Custom Laboratories, LLC, doing business as FarmaKeio Custom Compounding ("FarmaKeio"), is Section 503A compounding pharmacy located in Richardson, Texas. Declaration of Dan DeNeui ("DeNeui Decl.") ¶ 3, App. 1. FarmaKeio compounded Tirzepatide pursuant to Section 503A and in reliance on Tirzepatide's drug-shortage status. With Tirzepatide removed from the shortage list, FarmaKeio will be unable to continue accepting prescriptions for Tirzepatide and filling them with compounded Tirzepatide. DeNeui Decl. ¶ 19, App. 1. If the Delisting Action stands, FarmaKeio will be unable to continue compounding Tirzepatide. App. 1.

---

[3] FDA's decision came one day after port workers from Maine to Texas commenced a strike that threatened imports nationwide across economic sectors. FDA officials were aware of an article reporting "that critical medical devices and drug components for the booming, expensive weight-loss and diabetes drugs," including products containing Tirzepatide, "are among the trade casualties in the ILA union port work stoppage." Rosebush Decl. Exs. 16 and 17, App. 124–136. The Delisting Action does not mention the strike or explain any basis for FDA to conclude it would not impact the shortage status of Tirzepatide.

Plaintiff Outsourcing Facilities Association (OFA) is a trade association representing outsourcing facilities registered under Section 503B. Rosebush Decl. ¶ 2, App. 5. All members of OFA are outsourcing facilities or affiliates of outsourcing facilities that compound drugs within the Section 503B framework. *Id.* Because FDA removed Tirzepatide from the shortage list, and because Tirzepatide is not on the clinical need list, bulk compounding of Tirzepatide is now categorically unavailable under Section 503B and thus is prohibited to all OFA's members. Rosebush Decl. ¶ 37, App. 13.

FDA's delisting decision closes off an important source of market supply that met a sweeping scope of demand up until the decision. OFA members have produced hundreds of thousands of doses of compounded Tirzepatide in September 2024 alone, which moved promptly from their storage to pharmacies and other lawful purchasers, reflecting continued high demand and short supply. Rosebush Decl. ¶ 39, App. 13. OFA members are aware of thousands of unique customers in recent weeks unable to access branded forms of Tirzepatide. Rosebush Decl. ¶ 40, App. 13. There is every reason to believe cutting off supply through compounding will leave patient needs unfilled on a large scale, which will in turn exacerbate the public-health crises of obesity and diabetes. *Id.* Not one word of FDA's notice contradicts that point.

<u>**Argument**</u>

The Court should immediately enjoin the Delisting Action because it is likely to be found to violate the Administrative Procedure Act, and the equities are entirely clear-cut in favor of temporary relief pending final judgment. FDA did not undergo notice-and-comment rulemaking, failed to provide an adequate explanation for its decision, and made finding that only confirm a drug shortage persists. The APA forbids government agencies from acting in this rash and uninformed manner. But, without immediate intervention, FarmaKeio and OFA's members will be unable to fill patient needs with safe and effective medicines that FDA permitted just last week, and the ultimate losers will be innumerable patients with serious medical conditions that compounded Tirzepatide can treat. The Court should act now to prevent this intolerable state of affairs.

A plaintiff seeking a temporary restraining order or preliminary injunction "must establish (1) a likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction will not disserve the public interest." *Ladd v. Livingston*, 777 F.3d 286, 288 (5th Cir. 2015) (quoting *Trottie v. Livingston*, 766 F.3d 450, 452 (5th Cir. 2014)). The standards for securing a temporary restraining order or preliminary injunction are substantively the same. *Whole Woman's Health v. Paxton*, 264 F. Supp. 3d 813, 818 (W.D. Tex. 2017). To preserve the status quo, federal courts have regularly enjoined federal agencies from implementing and enforcing new regulations pending litigation challenging them. *See, e.g.*, *Texas v. United States*, 787 F.3d 733 (5th Cir. 2015) (enjoining executive order inconsistent with immigration statutes).

## I.      Plaintiffs Are Likely To Succeed on the Merits

### A.      Plaintiffs Are Likely To Prevail on Their Claim that FDA Unlawfully Promulgated the Delisting Action by Failing To Undertake Notice and Comment

FDA's failure to follow the APA's notice-and-comment procedures is unlawful. The Delisting Action is plainly a substantive rule—it makes previously lawful conduct unlawful—and therefore subject to the APA's notice-and-comment mandate. Nothing in Section 506E (or anywhere else) even suggests that a delisting action is exempt from the APA's notice-and-comment requirement, let alone "expressly" provides as much, as the APA requires. 5 U.S.C. § 559.

Congress imposed the APA's notice-and-comment procedures "to give the public an opportunity to participate in the rule-making process" and "enable[] the agency promulgating the rule to educate itself" before taking actions that "have a substantial impact on those who are regulated." *U.S. Dep't of Labor v. Kast Metals Corp.*, 744 F.2d 1145, 1153 n.17 (5th Cir. 1984) (quotation marks omitted).

To those ends, the APA prescribes a "three-step procedure" for rulemaking. *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96 (2015). "First, the agency must issue a '[g]eneral notice

of proposed rule making,' ordinarily by publication in the Federal Register." *Id*. (quoting 5 U.S.C. § 553(b)). Second, "the agency must 'give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments.'" *Id*. (quoting 5 U.S.C. § 553(c)). The agency then "must consider and respond to significant comments." *Id*. And, third, the final rule must include "'a concise general statement of [its] basis and purpose.'" *Id*. (quoting 5 U.S.C. § 553(c)). These procedures are generally applicable and are required for the promulgation of what are known as "substantive" or "legislative" rules—that is, "those which create law." *Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 628 (5th Cir. 2001). The APA exempts from notice-and-comment requirements certain other kinds of rules—including "interpretative rules" and "general statements of policy"—and those "exemptions must be narrowly construed." *Texas v. United States*, 809 F.3d 134, 171 (5th Cir. 2015) (quotation marks omitted).

Rather than solicit the facts it needed to make an informed decision on the supply and availability of Tirzepatide, the FDA simply posted the Delisting Action on its website, without undertaking any of APA-mandated procedures.

1.      The Delisting Action is a substantive rule subject to the APA's notice-and-comment mandate. To begin with, it is a rule. The APA defines "rule" to include "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy," 5 U.S.C. § 551(4), and that reaches "virtually every statement an agency may make," *Apter v. Dep't of Health & Hum. Servs*., 80 F.4th 579, 590 (5th Cir. 2023). The Delisting Action is a statement of general applicability—it applies, *inter alia*, to all compounders—that prescribes law by legally prohibiting most compounding of Tirzepatide.[4]

The Delisting Action is a substantive rule because, in so doing, it has "the 'force and effect of law.'" *Perez*, 575 U.S. at 96. In other words, it "affect[s] individual rights and obligations." *Shell Offshore*, 238 F.3d at 628 (quotation marks omitted); *see also Mann Constr., Inc. v. United*

---

[4] As described above, the action prohibits all compounding of Tirzepatide by Section 503B outsourcing facilities and prohibits Section 503A pharmacies from compounding drugs that are essentially a copy of Tirzepatide.

*States*, 27 F.4th 1138, 1143 (6th Cir. 2022) (explaining that a substantive rule is one that "impose[s] new rights or duties and change[s] the legal status of regulated parties"). Specifically, the Delisting Action changed the law, and affected the rights of compounders, by making a previously lawful activity (compounding Tirzepatide) unlawful on a prospective basis, no different in terms of its force and effect than if Congress had enacted a statute prohibiting that activity. This is a substantive rule.

That conclusion should be obvious. As a general matter, an agency action that erects a new legal prohibition is the classic example of a substantive rule. *See Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014). More specifically, many statutory schemes trigger legal consequences based on agencies' adding or removing items from lists through actions that have consistently been recognized as substantive rules subject to notice and comment. For example, recent decisions of the Sixth and Eleventh Circuits hold that the IRS's actions adding new items to a list of presumptively abusive transactions, which in turn triggered reporting requirements, were substantive rules and therefore invalid because of the agency's failure to follow the APA's notice-and-comment procedures. *Green Rock LLC v. Internal Revenue Service*, 104 F.4th 220 (11th Cir. 2024); *Mann Constr.*, 27 F.4th at 1138. The EPA's adding a site on the CERCLA "national priorities list," which then triggers various remedial obligations, is a substantive rule subject to the APA's notice-and-comment procedures. *See generally Anne Arundel County v. U.S. EPA*, 963 F.2d 412 (D.C. Cir. 1992). So too are actions adding species to the lists of threatened and endangered species under the Endangered Species Act. *See generally Idaho Farm Bureau Federation v. Babbitt*, 58 F.3d 1392, 1401–04 (9th Cir. 1995); *Center for Biological Diversity v. U.S. Fish and Wildlife Service*, 698 F. Supp. 3d 39 (D.D.C. 2023); *Center for Biological Diversity v. Everson*, 435 F.Supp.3d 69 (D.D.C. 2020). And so too are actions adding pesticides to the list of those safe to use around younger workers. *Nat'l Ass'n of Farmworkers Organizations v. Marshall*, 628 F.2d 604 (D.C. Cir. 1980). Removing items from lists, where doing so changes the law, is identically subject to notice-and-comment procedures; that includes, for example, EPA's action suspending the listing of hydrofluorocarbons as an unsafe substitute for ozone-depleting

11

substances prohibited under Clean Air Act. *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 85 (D.C. Cir. 2020) (vacating action on that basis).

It makes sense that the law treats such listing and delisting actions as substantive rules. There is, after all, no difference between an agency rule providing that "compounding of Tirzepatide is prohibited," and an agency action removing it from a list of drug substances that may lawfully be compounded. In either instance, the agency has changed the law by establishing a new legal prohibition. And to change the law, as the Delisting Action purports to do, an agency must follow the notice-and-comment procedures that the APA prescribes.

2.      There is no colorable argument that the Delisting Action is an interpretative rule, general statement of policy, or procedural rule exempt from notice-and-comment procedures. *See* 5 U.S.C. § 553(b). It does not purport to interpret anything but to change the law. Nor could it possibly qualify as a mere policy statement, given that it both affects rights and obligations and does not "leave[] the agency and its decision-makers free to exercise discretion" in any respect. *Texas*, 809 F.3d at 171 (quotation marks omitted). Finally, the Delisting Action does not purport to regulate agency organization, procedure, or practice in any manner, but instead "modifies substantive rights and interests." *Id*. at 176 (quotation marks omitted). No exemption applies.

3.      Nothing in the FDCA displaces the APA's notice-and-comment procedures for FDA actions involving the drug shortage list. "Before an agency may regulate without the protections of the notice-and-comment process, it must show that Congress 'expressly' carved out the exception." *Mann Constr.*, 27 F.4th at 1144 (quoting 5 U.S.C. § 559). Such exemptions "are not lightly to be presumed," *Marcello v. Bonds*, 349 U.S. 302, 310 (1955); instead, "Congress's *intent to make a substantive change* [must] be clear," *Ass'n of Data Processing Serv. Orgs. v. Bd. of Governors of Fed. Rsrv. Sys*., 745 F.2d 677, 686 (D.C. Cir. 1984). Importantly, it is *not* enough that a statute prescribes procedures that cover some of the same ground as the APA procedures (such as publication) but are not incompatible with them. *See, e.g.*, *Lake Carriers' Ass'n v. EPA*, 652 F.3d 1, 6 (D.C. Cir. 2011) (Clean Water Act's express notice-and-comment process did not excuse EPA "from providing an additional round of notice and comment" before promulgating final permits);

*Mann Constr.*, 27 F.4th at 1145–46 (reporting and disclosure regime did not displace APA's notice-and-comment requirements); *Citizens for Resp. & Ethics in Washington v. FEC*, 993 F.3d 880, 890 (D.C. Cir. 2021) (enforcement provisions of Federal Election Campaign Act did not displace APA's default judicial-review provisions). Section 506E contains no provision that conflicts with the APA's default rulemaking procedures, much less any provision bespeaking a clear intent to displace those procedures entirely. Any contention of displacement would be untenable.

### B.   Plaintiffs Are Likely To Prevail on Their Claims That the Delisting Action Is Arbitrary and Capricious Decisionmaking Without a Reasoned Basis

Plaintiffs are independently likely to succeed in showing that the Delisting Action is arbitrary and capricious because it was not the product of "reasoned analysis." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983). The Delisting Action fails by omission—in declining to address all factors relevant to a drug shortage—and by commission—in reaching a ruling facially inconsistent with its stated findings.

"[I]n order to permit meaningful judicial review, an agency must 'disclose the basis' of its action.'" *Dep't of Commerce v. New York*, 588 U.S. 752, 780 (2019) (citation omitted). Courts, in turn, "must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *State Farm*, 463 U.S. at 43. The APA obligates an agency to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* at 43 (citation omitted). FDA's failure to satisfy this standard justifies not only vacatur of the Delisting Action after final judgment, but immediate, temporary relief. Last Term, the Supreme Court granted the equivalent of a preliminary injunction against an Environmental Protection Agency rule on the ground that "EPA offered no reasoned response" to meaningful objections to its rule. *Ohio v. EPA*, 144 S. Ct. 2040, 2054 (2024). Because "the agency failed to supply 'a satisfactory explanation for its action,'" the challengers were "likely to prevail" and were entitled to provisional relief pending judgment. *Id.* (citation omitted). The same is true in this case.

1.      **The Delisting Action Is Unreasoned**

The Delisting Action is arbitrary and capricious because, in promulgating it, FDA did not "give adequate reasons" for the decision. *State Farm*, 463 U.S. at 48. Under "'foundational principal of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action,'" *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 20 (2020) (citation omitted), the only grounds by which the Delisting Action might be upheld appear in the two-page press release and the four-page website update concerning the Tirzepatide shortage. *See* ECF 1-2 (Ex. A) and ECF 1-3 (Ex. B). The only statement applicable to Tirzepatide that might plausibly hint support for the Delisting Action is in the press release and reads, in full: "FDA confirmed with the drug's manufacturer that their stated product availability and manufacturing capacity can meet the present and projected national demand." ECF 1-2 (Ex. A). This is wholly inadequate. *See BNSF Ry. Co. v. Fed. R.R. Admin.*, 62 F.4th 905, 911 (5th Cir. 2023) (rejecting action because "the agency has barely articulated any basis at all"). That failing is "enough" to set aside the Delisting Action. *Michigan v. E.P.A.*, 576 U.S. 743, 758 (2015).

a.      *Arbitrary Reliance on Manufacturer's Statement.*   On its face, FDA's assertion rests entirely on circumstances "stated" by the manufacturer. ECF 1-2 (Ex. A). The Delisting Action does not say that FDA independently verified any information it received from the manufacturer or explain why FDA considered the manufacturer's statements to be, not only credible, but *so* credible as to be dispositive. *See Am. Rivers v. FERC*, 895 F.3d 32, 50 (D.C. Cir. 2018) (finding agency decision arbitrary in part because no "independent verification" of market participant's assertions was "undertaken").

There are sound reasons to doubt FDA's blind-faith approach, and the Delisting Action does not address them. A single market participant cannot be expected to have a full and reliable understanding of "present and projected national demand," ECF 1-2 (Ex. A), especially here, where demand has been satisfied for nearly two years by the compounding of numerous third parties: outsourcing facilities and pharmacies. The manufacturer could not fully or reliably understand market demand without knowing the business flow at these many entities, which

satisfied part of the market demand. Nor could it project demand reliably without that information. Nor will a manufacturer necessarily have an infallible understanding of its own "manufacturing capacity" or "product availability," ECF 1-2 (Ex. A), which are complex determinations. Moreover, the manufacture's inherent self-interest in shutting down competition—and artificially increasing patient costs to inflate profits—creates an obvious reason not to rest such an important decision solely on the manufacture's "stated" understandings.

Simply put, the manufacturer's statements do not likely bear the weight FDA gave them. "Not having discussed the possibility" that the manufacturer's assertions might be inadequate on many grounds, "the agency submitted no reasons at all" for giving them dispositive force. *State Farm*, 463 U.S. at 50.

b.      *Failure to Address Relevant Factors*.  The Delisting Action does not identify what information FDA received from the manufacturer, what it showed, or how it was interpreted, considered, and weighed. This leaves several "important aspect[s] of the problem" that FDA "entirely failed to consider." *State Farm*, 463 U.S. at 43. The question posed to FDA was whether Tirzepatide is "in shortage in the United States," 21 U.S.C. § 356e(a), which requires a determination whether "the demand or projected demand for the drug within the United States exceeds the supply of the drug," *id.* § 356c(h)(2). But the Delisting Action does not state what FDA believes the demand and projected demand of the drug to be what it believes the existing supply to be, or its bases for either determination. Put differently, it makes no attempt whatsoever to answer the statutory question with anything but *ipse dixit* (coupled with affirmative findings showing that a shortage persists, *see infra* § I.B.2).

While the press release contains a boilerplate note that "FDA considers a variety of factors" in the shortage determination, ECF 1-2 (Ex. A), "[n]ot one sentence of its rulemaking statement discusses" any of them with respect to Tirzepatide, *State Farm*, 463 U.S. at 48; *see Puerto Rico Higher Educ. Assistance Corp. v. Riley*, 10 F.3d 847, 851–53 (D.C. Cir. 1993) (rejecting action in the absence of case-specific findings on relevant factors). The press release says nothing about the "affected market share" of Tirzepatide, "the amount in a manufacturer's stock," "the company's

15

ability to meet current and historical demand," the "ability of alternative manufacturers to cover the demand," or "confirmed market stabilization." ECF 1-2 (Ex. A); *see NRDC v. EPA*, 658 F.3d 200, 217 (2d Cir. 2011) (rejecting action where agency did not "identify 'reliable data' and explain how that data showed" anything on the relevant question). In fact, the press release does not even say what FDA considers these factors to mean or how FDA construes the concept of a shortage. *See Puerto Rico Higher Educ.*, 10 F.3d at 852 (finding action arbitrary in part because agency did not "articulate the statutory interpretation upon which its waiver determination was based"). But the Supreme Court has "frequently reiterated that an agency must cogently explain why it has exercised its discretion in a given manner." *State Farm*, 463 U.S. at 48. FDA did not even pretend to do that here.

One obvious issue to be addressed was how the manufacturer could suddenly keep pace with demand that for nearly two years was largely satisfied by compounding. For supply to meet demand, it would be insufficient that the manufacturer might have sufficient supply to satisfy the orders it receives (and the Delisting Action does not even find *that* much). Instead, the manufacturer's supply would need to satisfy all the orders it receives, plus all the orders being filled by outsourcing facilities and pharmacies. The Delisting Action does not address this problem, let alone provide a reasoned basis for a conclusion (assuming there was any) that the manufacturer's supply could satisfy *all* market demand, including the demand currently satisfied by compounding. *See Pub. Citizen, Inc. v. Mineta*, 340 F.3d 39, 57 (2d Cir. 2003) (rejecting decision made "without factoring in" recent developments).

c.    *Failure to Address Probative Evidence*. The Delisting Action fails the reasoned-decisionmaking standard for the additional reason that FDA received evidence of ongoing Tirzepatide shortages and "offered no reasoned response" when it issued the Delisting Action. *Ohio v. EPA*, 144 S. Ct. at 2054. Final agency action is unsupportable where the agency does "not adequately address … evidence" that may undercut the decision. *R.J. Reynolds Vapor Co. v. FDA*, 65 F.4th 182, 191 (5th Cir. 2023). The Delisting Action fails this standard as well.

16

Leading up to the Delisting Action, market participants met with FDA officials and otherwise presented evidence of an ongoing Tirzepatide shortage. Rosebush Decl. ¶ 31, App. 12. Although the full record has yet to be disclosed, it will show a multitude of submissions proving an ongoing shortage.[5] Plaintiff OFA is aware that FDA received information from at least two major national telehealth companies, which collect information from customers about ability to obtain drugs. Rosebush Decl. ¶ 30, App. 11. One reported to FDA on September 10, 2024, that it received 500 to 700 *daily* reports of patients reporting to *just that company* an inability to obtain a branded version of Tirzepatide. *Id.* Another sent FDA periodic updates to FDA, including thousands of shortage reports indicating inability of patients to obtain Mounjaro and Zepbound. *Id.* FDA also received reports from outsourcing pharmacies (including OFA members) of voluminous Tirzepatide compounding meeting high demand. Rosebush Decl. ¶ 31, App. 12. Additionally, press reporting, Ex. 12 (App. 87), and industry blogs, Ex. 14 (App. 111), presented readily available information of an ongoing shortage that any remotely reasonable investigation by FDA would have uncovered.

Faced with credible information that, across the United States, patients cannot access Tirzepatide (at least without compounded forms), FDA was obligated—at a minimum—to address this information at the time of the Delisting Action. *Ohio v. EPA*, 144 S. Ct. at 2054; *R.J. Reynolds*, 65 F.4th at 191. But "if there is an explanation" for the delisting despite all available evidence, "it does not appear in the final" action, *Ohio v. EPA*, 144 S. Ct. at 2054, and anything FDA might say now "can be viewed only as impermissible post hoc rationalizations and thus are not properly before" this Court. *Dep't of Homeland Sec.*, 591 U.S. at 22. The standard of review prohibits "*post hoc* justifications…raised in court by those appearing on behalf of the agency or by agency

---

[5] Even without a notice-and-comment-rulemaking requirements, FDA still must work from an administrative record which it must assemble and file with this Court. If FDA fails to include information it received in the record, that will present an independent basis for vacatur of the Delisting Action, *see Camp v. Pitts*, 411 U.S. 138, 142 (1973), or else for discovery, *see Dep't of Commerce*, 588 U.S. at 781–82; *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971).

officials themselves." *Id.* Nothing FDA may say in this litigation can justify its failings, and Plaintiffs are entitled to immediate, temporary relief as it futilely attempts to defend a rule with nothing. *Ohio v. EPA*, 144 S. Ct. at 2054.

### 2.    The Delisting Action Is Internally Inconsistent and Incoherent

The Delisting Action is deficient not only in what it omits but also in what it says. Every fact-based assertion in the press release and website update indicates an ongoing Tirzepatide shortage. The declaration that the shortage ended is incompatible with the agency's own findings. "Illogic and internal inconsistency are characteristic of arbitrary and unreasonable agency action." *Chamber of Com. of United States of Am. v. United States Dep't of Lab.*, 885 F.3d 360, 382 (5th Cir. 2018); *see also Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1016 (5th Cir. 2019) (same); *Am. Fed'n of Gov't Emps., Loc. 2924 v. Fed. Lab. Rels. Auth.*, 470 F.3d 375, 380 (D.C. Cir. 2006) ("Certainly, if the result reached is 'illogical on its own terms,' the … order is arbitrary and capricious.").

Immediately after assuring that public that FDA could blindly rely on the manufacturer's "product availability and manufacturing capacity," FDA went on to find that "[p]atients and prescribers may still see intermittent localized supply disruptions as the products move through the supply chain from the manufacturer and distributors to local pharmacies." ECF 1-2 (Ex. A). In other words, supply may still not match demand. The website update was even less optimistic. There, FDA made no representation at all that supply will meet demand and instead filled every update (for each of the 10 formerly listed Tirzepatide injections) with warnings of supply shortages: "Patients May Not Always Be Able To Immediately Fill Their Prescription At A Particular Pharmacy," "Especially … for Refrigerated Products And Products With Multiple Dose Strengths, Due To Factors Like Ordering Practices And Incentives, Cold Chain Logistical Considerations, And Retailer Capacity Constraints." ECF 1-3 (Ex. B).

FDA's ultimate determination that "the shortage of tirzepatide injection … has been resolved," ECF 1-2 (Ex. A), is illogical when compared to those findings. *See Sw. Elec. Power Co.*

*v. EPA*, 920 F.3d at 1016 (rejecting as arbitrary agency's choice of pollution control after agency found the same control "would not result in reasonable further progress toward eliminating the discharge of all pollutants"). FDA's task in identifying and declaring that shortages have begun and ended is to determine, in the real world, whether patients have access to needed medicines. When the only findings (apart from the manufacturer's say-so) are to the effect that patients will not be able to fill prescriptions, a determination that there is no shortage is "illogical on its own terms." *GameFly, Inc. v. Postal Regul. Comm'n*, 704 F.3d 145, 148 (D.C. Cir. 2013) (citation omitted).

## II.    The Equitable Factors Favor an Injunction and TRO

The equities of this case are entirely clear-cut in favor of a preliminary injunction, which would afford substantial benefit to Plaintiffs and the public and impose no cognizable harm on FDA. "Preliminary injunctions commonly favor the status quo and seek to maintain things in their initial condition so far as possible until after a full hearing permits final relief to be fashioned." *Wenner v. Tex. Lottery Comm'n*, 123 F.3d 321, 326 (5th Cir. 1997). Here, patient needs and market demand have been satisfied for nearly two years by compounding, as Congress contemplated. To permit compounding by FarmaKeio and OFA members for the comparatively short duration of this lawsuit will secure patients' access to much-needed medication and avoid irreparable harm. By comparison, an injunction would impose no countervailing harms. Rarely is a Court's task in balancing the equities so simple.

A.    Absent immediate relief, FarmaKeio and OFA members will be irreparably harmed. *See, e.g.*, *Wages & White Lion Invs., LLC v. United States Food & Drug Admin.*, 16 F.4th 1130, 1142 (5th Cir. 2021) (holding that plaintiff proved irreparable harm based on FDA's action forbidding its product manufacturing and marketing). FarmaKeio and OFA members have met patient needs since December 2022 and will suffer substantial financial loss without an injunction, which is "sufficient to show irreparable injury." *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016). The Delisting Action prohibits FarmaKeio's compounding of copies of FDA-approved Tirzepatide products and OFA members' bulk compounding under Section 503B. As a consequence of the

19

Delisting Action, FarmaKeio will suffer approximately $1,750,000 to $2,000,000 in lost revenue per month as a consequence of the FDA's Delisting Action. DeNeui Decl. ¶ 21, App. 4. The Delisting Action will cause FarmaKeio to lay off from 6 to 9 employees, and the patients FarmaKeio has been serving will be unable to get their Tirzepatide prescriptions filled by FarmaKeio. DeNeui Decl. ¶¶ 22–23, App. 4. OFA members will experience similar harms. Rosebush Decl. ¶¶ 39–40, App. 13.

These harms are irreparable because they "cannot be undone through monetary remedies." *Interox Am. v. PPG Indus., Inc.*, 736 F.2d 194, 202 (5th Cir. 1984). FDA's sovereign immunity will bar any recovery of lost profits or any other monetary remedies in this action. *See Wages & White Lion*, 16 F.4th at 1142 (finding financial losses irreparable "because federal agencies generally enjoy sovereign immunity for any monetary damages"); *R.J. Reynolds*, 65 F.4th at 194 (finding that the plaintiff's financial harm was irreparable in an APA challenge where "[t]here [was] no suggestion ... that [the plaintiff] could overcome the FDA's sovereign immunity to recover costs"); *Texas v. U.S. Dep't of Homeland Sec.*, 700 F. Supp. 3d 539, 546 (W.D. Tex. 2023) (noting that a plaintiff may "establish irreparable harm when its costs are unrecoverable due to the government's sovereign immunity"). Plaintiffs have satisfied their burden to prove irreparable injury.

B.      The balance of harms and public interest also favor an injunction. These factors "'merge when the Government is the opposing party,'" *Texas v. Becerra*, 577 F. Supp. 3d 527, 561 (N.D. Tex. 2021) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)), and present no contest here.

First, the public has a substantial interest in continued access to compounded Tirzepatide until the Court decides this case on the merits. As noted above, Tirzepatide treats serious conditions, and patient need has been supplied for nearly two years in meaningful part through compounding. The "access to … medical treatments is unquestionably in the public interest" and is overriding here. *Dumanian v. Schwartz*, No. 19-cv-6771, 2022 WL 2714994, at *15 (N.D. Ill. July 13, 2022); *see also Med-Cert Home Care, LLC v. Azar*, 365 F. Supp. 3d 742, 758 (N.D. Tex. 2019) (granting injunctive relief because of the public's strong interest in access to health care); *Benson v. St. Joseph Reg'l Health Ctr.*, No. 04-cv-04323, 2005 WL 6459109, at *2

(S.D. Tex. Dec. 22, 2005) (noting "the important public interest in open and fair competition for health services"); *Bos. Heart Diagnostics Corp. v. Health Diagnostics Lab'y, Inc.*, 2014 WL 2048436, at *2 (D. Mass. May 16, 2014) (recognizing the "public's interest in having access to medical treatment"); *Washington State Pharmacy Ass'n v. Gregoire*, 2009 WL 1259632, at *1 (W.D. Wash. Mar. 31, 2009) (recognizing that "it is in the public interest to ensure that the plaintiff pharmacies can continue to serve [patients] and that said [patients] have access to needed prescription drugs"). Without an injunction, FDA's unlawful action will likely deprive an untold number of patients access to Tirzepatide.

Second, the public also has a "substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Texas v. United States*, 40 F.4th 205, 229 (5th Cir. 2022). It is "not in the public interest to suspend notice and comment. Notice and comment are not mere formalities. They are basic to our system of administrative law." *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 115 (2d Cir. 2018). "Notice requirements are designed (1) to ensure that agency regulations are tested via exposure to diverse public comment, (2) to ensure fairness to affected parties, and (3) to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review." *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259 (D.C. Cir. 2005). FDA's removal of compounded Tirzepatide from the market without notice-and-comment rulemaking disserves the public's interest not only in safe and effective medicine, but also in transparent government and informed decisionmaking.

No cognizable harms weigh on the other side of the scale. FDA cannot plausibly claim injury from following congressional dictates and making a reasonably informed—rather than arbitrary—decision. Nor can FDA claim cognizable harm from a continuation of the state of affairs that begun in December 2022, where patients have access to effective and inexpensive forms of Tirzepatide. FDA cannot credibly allege a public-safety risk from the same activities it approved and even encouraged just a few days ago. The FDCA contains numerous safeguards that ensure compounding will be safe, effective, and beneficial to the public. *See, e.g.*, 21 U.S.C. § 353b(b)(1)

and (2) (registration, inspection, and reporting requirements); *id.* § 353b(a)(4) (FDA prerogative to forbid outsourcing-facility compounding where "drugs or components of such drugs have been found to be unsafe or not effective"); *id.* § 353a(b)(1) (quality standards); *id.* § 353a(b)(3) (FDA prerogative to forbid pharmacy compounding of drug "that reasonably demonstrate an adverse effect on the safety or effectiveness of that drug product"). The drug-shortage element of Section 503A and 503B relates to public need for a drug and is not a mechanism of regulating its safety. Where FDA has acted arbitrarily in deeming a shortage over, an injunction to ensure public access to necessary medicine while its action is adjudicated causes no cognizable harm and is plainly in the public interest.

## <u>Conclusion</u>

The Court should grant Plaintiffs motion for a temporary restraining order and preliminary injunction.

Dated: October 8, 2024

/s/ Ty Doyle

TY DOYLE (Texas Bar No. 24072075)
BAKER & HOSTETLER LLP
811 Main Street, Suite 1100
Houston, TX 77002
(713) 646-1374
tgdoyle@bakerlaw.com

ANDREW M. GROSSMAN*
RICHARD B. RAILE*
RENEE M. KNUDSEN*
MARC N. WAGNER*
BAKER & HOSTETLER LLP
1050 Connecticut Ave., N.W., Suite 1100
Washington, D.C. 20036
(202) 861-1567
lrosebush@bakerlaw.com

* motion for pro vac vice admission
forthcoming

*Attorneys for Plaintiffs*

**<u>Certificate of Service</u>**

I hereby certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on October 8, 2024, and that I caused a copy of the foregoing, and all accompanying papers, to be served via process server and via U.S. mail on the following:

> United States Food and Drug Administration
> 10903 New Hampshire Ave.
> Silver Spring, Maryland 20903
>
> Dr. Robert M. Califf
> 10903 New Hampshire Ave.
> Silver Spring, Maryland 20903

Dated: October 8, 2024

*/s/ Ty Doyle*

TY DOYLE (Texas Bar No. 24072075)
BAKER & HOSTETLER LLP
811 Main Street, Suite 1100
Houston, TX 77002
(713) 646-1374
tgdoyle@bakerlaw.com

*Attorney for Plaintiffs*