**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**Fort Worth Division**

| | |
|---|---|
| OUTSOURCING FACILITIES ASSOCIATION, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES FOOD AND DRUG ADMINISTRATION, et al.,<br><br>Defendants. | Civil Action No. 4:24-cv-00953-P |

**Plaintiffs' Memorandum of Law in Support of a**
**<u>Motion for Summary Judgment</u>**

## Table of Contents


Introduction ..... 1

Background ..... 2

A. Congress Authorizes Compounding To Ensure Patient Needs Are Met During Drug Shortages ..... 2

B. FDA Removes Tirzepatide from the Shortage List and Then Refused To Defend Its Decision ..... 4

C. FDA Again Declares the Shortage Over, Relying on Lilly's Representations While Waving Away All Other Evidence ..... 6

D. FDA's Delisting Action Prohibits Plaintiffs and Their Members from Compounding Tirzepatide, Putting Patient Access at Risk ..... 7

The Legal Standard ..... 8

Argument ..... 8

I. Summary Judgment Should Be Granted to Plaintiffs on the Second Claim ..... 8

A. The Agency Improperly Outsourced Its Decision-Making Responsibility ..... 9

B. The Agency Did Not Explain a Choice of Time Period ..... 10

C. The Agency Did Not Address Obvious Alternatives ..... 11

D. The Agency Did Not Explain Any Findings of Supply or Demand ..... 13

II. Summary Judgment Should Be Granted to Plaintiffs on the Fifth Claim ..... 15

III. Summary Judgment Should Be Granted to Plaintiffs on the Third Claim ..... 17

IV. Summary Judgment Should Be Granted to Plaintiffs on the Fourth Claim ..... 23

V. Summary Judgment Should Be Granted to Plaintiffs on the First Claim ..... 27

VI. Summary Judgment Should Be Granted to Plaintiffs on the Sixth Claim ..... 33

Conclusion ..... 34

# Table of Authorities

**Cases**

*Am. Fed'n of Gov't Emps., Loc. 2924 v. Fed. Lab. Rels. Auth.*,
470 F.3d 375 (D.C. Cir. 2006) .......... 18

*Amin v. Mayorkas*,
24 F.4th 383 (5th Cir. 2022) .......... 17

*Anne Arundel Cnty., Md. v. U.S. EPA*,
963 F.2d 412 (D.C. Cir. 1992) .......... 28

*Ass'n of Data Processing Serv. Orgs. v. Bd. of Governors of Fed. Rsrv. Sys.*,
745 F.2d 677 (D.C. Cir. 1984) .......... 31

*Athenex Inc. v. Azar*,
397 F. Supp. 3d 56 (D.D.C. 2019) .......... 3

*Bennett v. Spear*,
520 U.S. 154 (1997) .......... 8

*Bowen v. Georgetown Univ. Hosp.*,
488 U.S. 204 (1988) .......... 30

*Center for Biological Diversity v. U.S. Fish and Wildlife Service*,
698 F.Supp.3d 39 (D.D.C. 2023) .......... 28

*Center for Biological Diversity v. Everson*,
435 F.Supp.3d 69 (D.D.C. 2020) .......... 28

*Chamber of Com. of United States of Am. v. United States Dep't of Lab.*,
885 F.3d 360 (5th Cir. 2018) .......... 17

*City of Arlington, Tex. v. F.C.C.*,
668 F.3d 229 (5th Cir. 2012) .......... 28-30, 33

*Clarke v. CFTC*,
74 F.4th 627 (5th Cir. 2023) .......... 11

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
591 U.S. 1 (2020) .......... 8, 12

*Green Rock LLC v. IRS*,
104 F.4th 220 (11th Cir. 2024) .......... 28

*Home Box Office, Inc. v. FCC*,
567 F.2d 9 (D.C. Cir. 1977) .......... 33

*Idaho Farm Bureau Federation v. Babbitt*,
58 F.3d 1392 (9th Cir. 1995) .......................................................... 28

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024) .......................................................... 15

*Mann Constr., Inc. v. United States*,
27 F.4th 1138 (6th Cir. 2022) .......................................................... 27, 28, 31

*Marcello v. Bonds*,
349 U.S. 302 (1955) .......................................................... 31

*Michigan v. E.P.A.*,
576 U.S. 743 (2015) .......................................................... 14

*Morton v. Ruiz*,
415 U.S. 199 (1974) .......................................................... 33

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .......................................................... 8-11, 13

*Nat'l Ass'n for Gun Rts., Inc. v. Garland*,
741 F.Supp.3d 568 (N.D. Tex. 2024) .......................................................... 8

*Nat'l Treasury Emps. Union v. Fed. Lab. Rels. Auth.*,
942 F.3d 1154 (D.C. Cir. 2019) .......................................................... 21

*NLRB v. Wyman-Gordon Co.*,
394 U.S. 759 (1969) (plurality op.) .......................................................... 29

*Off. of Commc'n of United Church of Christ v. F.C.C.*,
707 F.2d 1413 (D.C. Cir. 1983) .......................................................... 11

*Ohio v. EPA*,
603 U.S. 279 (2024) .......................................................... 9

*Perez v. Mortgage Bankers Ass'n*,
575 U.S. 92 (2015) .......................................................... 27

*Safari Club Int'l v. Zinke*,
878 F.3d 316 (D.C. Cir. 2017) .......................................................... 29, 30

*SEC v. Chenery Corp.*,
318 U.S. 80 (1943) .......................................................... 31

*Shell Offshore Inc. v. Babbitt*,
238 F.3d 622 (5th Cir. 2001) .......................................................... 27

*Sutter E. Bay Hosps. v. N.L.R.B.*,
687 F.3d 424 (D.C. Cir. 2012)....................23

*Sw. Elec. Power Co. v. EPA*,
920 F.3d 999 (5th Cir. 2019)....................17

*Thompson v. W. States Med. Ctr.*,
535 U.S. 357 (2002)....................2

*Univ. of Texas M.D. Anderson Cancer Ctr. v. United States Dep't of Health & Hum. Servs.*,
985 F.3d 472 (5th Cir. 2021)....................9

*U.S. Dep't of Labor v. Kast Metals Corp.*,
744 F.2d 1145 (5th Cir. 1984)....................27

*W & T Offshore, Inc. v. Bernhardt*,
946 F.3d 227 (5th Cir. 2019)....................28, 29, 32

*10 Ring Precision, Inc. v. Jones*,
722 F.3d 711 (5th Cir. 2013)....................11

**Statutes**

5 U.S.C. § 551....................27

5 U.S.C. § 552....................32, 33

5 U.S.C. § 553....................29, 31, 32

5 U.S.C. § 559....................6, 27, 31

5 U.S.C. § 704....................8

5 U.S.C. § 706....................8, 17

21 U.S.C. § 351....................3

21 U.S.C. § 353a....................2-4, 17

21 U.S.C. § 353b....................3, 4, 17

21 U.S.C. § 356c....................3, 9, 15, 16

21 U.S.C. § 356e....................3, 9, 12, 15, 16, 31, 32

85 Fed. Reg. 19230 (Apr. 6, 2020)....................31

**Other Authorities**

Ania M. Jastreboff, et al., Tirzepatide Once Weekly for the Treatment of Obesity, New England Journal of Medicine (June 4, 2022) ....................4

APHA, Frequently Asked Questions About Pharmaceutical Compounding ....................29

FDA, Compounding Outsourcing Facilities Annual Study (Aug. 18, 2020) ....................29

FDA, Compounding when Drugs are on FDA's Drug Shortages List (Dec. 18, 2024) ....................4

FDA, FDA clarifies policies for compounders as national GLP-1 supply begins to stabilize (Dec. 19, 2024) ....................32

FDA, Registered Outsourcing Facilities (Jan. 16, 2025) ....................29

Heather Kilgore, Signed, Sealed, Protected: Solutions to Agency Handling of Confidential Business Information in Informal Rulemaking, 56 Admin. L. Rev. 519 (2004) ....................32

Penn State University, Financial and Managerial Accounting, 2.6 Accounting for Inventory ....................22

Russ Britt, MarketWatch, 'Big Three' pharma distributors post sharp gain (9/15/2010) ....................24

Webster's New World College Dictionary (4th ed. 2007) ....................15, 16

## Introduction

Patients throughout the Nation rely on compounded versions of GLP-1 drugs, including tirzepatide, to treat serious medical conditions like diabetes and obesity. Since those drugs came on the market, surging demand has far outpaced their manufacturers' supply, prompting the Food and Drug Administration to list them as in shortage. Authorized compounded versions of those drugs ensure patient access and satisfy unmet demand. By all indications, the tirzepatide shortage persists: wholesalers continue to list it as unavailable or restricted, patients continue to report inability to fill prescriptions, media continues to report its unavailability, and the demand satisfied by compounders rather than the manufacturer, Eli Lilly & Co. (Lilly), has only grown.

Yet in October 2024, FDA abruptly declared the tirzepatide shortage over. FDA's stated basis was Lilly's representation that it could "meet the present and projected national demand." When Plaintiffs here challenged that claim, FDA abandoned any defense of this action, obtained a remand to reconsider, and declared that tirzepatide compounding could continue in the meantime. Two months later, FDA re-took the same action on the same basis. Its decision relies solely on "information and data Lilly has provided to FDA" that FDA says "demonstrate that Lilly's supply is currently meeting or exceeding demand."

This case challenges FDA's final action resolving the shortage (the Delisting Action). As explained below, FDA's shortage resolution erred by both commission and omission. The agency failed to identify key parameters of the analysis and examined supply and demand in a manner that was not "up-to-date" as the statute requires. These failings caused FDA to err in reviewing the factual record, [redacted] That error aside, the record evidence does not support, and actually conflicts with, the agency's determination that the shortage was resolved and presents blazing red flags that should have prompted the agency to scrutinize Lilly's data, seek clarification from Lilly, and seriously consider the wealth of other evidence demonstrating that the shortage persists.

For these reasons, and those discussed below, the Court should enter summary judgment in favor of Plaintiffs, set aside the Delisting Action, and permanently enjoin FDA from taking action based on the Delisting Action.

## Background

### A. Congress Authorizes Compounding To Ensure Patient Needs Are Met During Drug Shortages

**1.** Drug compounding, "a process by which a pharmacist or doctor combines, mixes, or alters ingredients to create a medication," is "a traditional component of the practice of pharmacy, and is taught as part of the standard curriculum at most pharmacy schools." *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 360–61 (2002) (citation omitted). "Many States specifically regulate compounding practices as part of their regulation of pharmacies," and "[s]ome require all licensed pharmacies to offer compounding services." *Id.* The Federal Food, Drug, and Cosmetic Act (FDCA) regulates drug compounding in two provisions, Section 503A and Section 503B.

Titled "Pharmacy compounding," Section 503A exempts compounding at licensed pharmacies from certain FDCA requirements, including the new-drug-approval prerequisites for selling drugs in interstate commerce, if multiple standards are met. 21 U.S.C. § 353a(a). Among other things, a drug must be compounded at a licensed pharmacy "on the prescription order for [an] individual patient made by a licensed physician or other licensed practitioner authorized by State law to prescribe drugs" or, if it occurs "before the receipt of a valid prescription order for such individual patient," it must be "based on a history of the licensed pharmacist or licensed physician receiving valid prescription orders for the compounding of the drug product." *Id.* § 353a(a)(2)(A) and (B). Section 503A authorizes compounding from "bulk drug substances," which are active ingredients typically of FDA-approved drugs, so long as the pharmacy "does not compound regularly or in inordinate amounts (as defined by the Secretary) any drug products that are essentially copies of a commercially available drug product." *Id.* § 353a(b)(1)(D).

Section 503B separately governs "outsourcing facilities" and exempts their compounding from the FDCA's new-drug-approval process and other restrictions if those facilities fulfil

registration, inspection, and reporting requirements and satisfy 11 conditions. *Id.* § 353b(a)(1) and (b). Compliant facilities need not compound in response to patient prescriptions or a historical pattern of prescriptions and need not be licensed pharmacies. *Id.* § 353b(d)(4)(B) and (C). Outsourcing facilities, however, must conform with good manufacturing practices that do not apply to Section 503A pharmacies. *Compare id.* § 353a(a) *with id.* § 353b(a); *id.* § 351(a)(2)(B).

**2.** Compounding under Sections 503A and 503B serves vital national interests, especially in the case of drug shortages. To ensure that patient needs are met, Congress established a system to permit compounding to help meet demand not met by drug manufacturers during shortages.

Another FDCA provision, Section 506E, requires FDA to "maintain an up-to-date list of drugs that are determined by the Secretary [of Health and Human Services] to be in shortage in the United States." 21 U.S.C. § 356e(a). The provision requires that FDA identify for "each drug on such list" "[t]he name of the drug in shortage," "[t]he name of each manufacturer of such drug," "[t]he reason for the shortage" from an enumerated list of seven categories, and "[t]he estimated duration of the shortage as determined by the Secretary." *Id.* § 356e(b)(1)–(4). The FDCA defines "drug shortage" to mean "a period of time when the demand or projected demand for the drug within the United States exceeds the supply of the drug." *Id.* § 356c(h)(2).

Compounding a drug on the shortage list is lawful in circumstances where the same compounding would be unlawful if the drug were not on the shortage list. For outsourcing facilities, compounding from bulk drug substances (i.e., active ingredients) is impermissible under Section 503B unless the "drug substance appears on the drug shortage list … at the time of compounding, distribution, and dispensing" or, alternatively, the bulk drug substance appears on a separate list of ingredients for which there is a "clinical need." *Id.* § 353b(a)(2)(A)(ii). FDA has construed the "clinical need" requirement narrowly. *See Athenex Inc. v. Azar*, 397 F. Supp. 3d 56 (D.D.C. 2019). As a result, a shortage listing is typically a prerequisite to compounding from many active ingredients in FDA-approved drugs by outsourcing facilities.

Shortage listing has an additional consequence under Section 503B, which otherwise prohibits compounding of a drug that is "essentially a copy of one or more approved drugs." 21 U.S.C. § 353b(a)(5). The statute defines "essentially a copy of an approved drug" *not* to include any drug that "appears on the drug shortage list … at the time of compounding, distribution, and dispensing." *Id.* § 353b(d)(2)(A). Consequently, if an FDA-approved drug appears on the shortage list, an outsourcing facility may compound drugs that are essentially copies of that drug. Otherwise, essential-copy compounding is unlawful, even if the active ingredient appears on the clinical-need list or if compounding begins with the FDA-approved drug itself (rather than its active ingredients).

The effect of a drug-shortage listing is similar under Section 503A. As noted, compounding "in inordinate amounts" of "any drug products that are essentially copies of a commercially available drug product" does not qualify for protection under Section 503A. *Id.* § 353a(b)(1)(D). But FDA reads the term "commercially available drug product" not to include drugs listed on the shortage list, since such drugs are by definition not commercially available. *See* Food and Drug Administration, Compounding when Drugs are on FDA's Drug Shortages List (Dec. 18, 2024).[1]

### B. FDA Removes Tirzepatide from the Shortage List and Then Refuses To Defend Its Decision

Tirzepatide is the active ingredient of FDA-approved prescription drugs that treat type-2 diabetes and obesity. "Obesity is the most prevalent chronic disease worldwide, affecting approximately 650 million adults," which "impose[s] a considerable economic burden and constitute[s] [a] major contributor[] to global morbidity and mortality."[2] Tirzepatide is manufactured by Eli Lilly & Co. and sold under the brand names Mounjaro for diabetes treatment and Zepbound for weight loss. Decision 4. Demand for tirzepatide is exceptionally high and continues to grow rapidly. Decision 4, 15.

---

[1] *Available at* https://www.fda.gov/drugs/human-drug-compounding/compounding-when-drugs-are-fdas-drug-shortages-list.

[2] *See* Ania M. Jastreboff, et al., Tirzepatide Once Weekly for the Treatment of Obesity, New England Journal of Medicine, *available at* https://www.nejm.org/doi/full/10.1056/NEJMoa2206038 (June 4, 2022).

On December 15, 2022, FDA added tirzepatide injection products to the shortage list. Decision 1. The listing enabled pharmacies and outsourcing facilities to satisfy patient needs through compounding. Since then, market demand has been met in meaningful part by compounded products. Decision 23 ("We acknowledge reports of significant compounding."); *id.* at 26 ("a substantial volume"). In fact, notwithstanding the additional supply provided by compounders, patient needs still went unfulfilled or met delays.

On October 2, 2024, FDA abruptly declared the shortage over by posting a declaration to that effect on its website. The agency's scant explanation indicated that the decision was premised entirely on Lilly's representation that its "stated product availability and manufacturing capacity can meet the present and projected national demand." ECF No. 1-2 (Exhibit A). Nonetheless, FDA's notice warned of continuing "intermittent localized supply disruptions," *id.*, and stated in tirzepatide entries in its database: "Even When A Medication Is Available, Patients May Not Always Be Able To Immediately Fill Their Prescription At A Particular Pharmacy." ECF No. 1-3 (Exhibit B).

The record proves FDA knew nothing about Lilly's ability to meet demand: it did not know what the supply or demand was for any time period. [redacted]

Plaintiffs brought suit and moved for a temporary restraining order and preliminary injunction. ECF Nos. 1, 7, 8. Rather than defend its action, FDA sought a voluntary remand to "reevaluate the challenged decision." ECF No. 27 at 1–2. The agency represented that it would

exercise "enforcement discretion" to allow Plaintiffs and their members to continue compounding dependent on tirzepatide's shortage status through the remand and adjudication of a preliminary injunction motion challenging a new decision delisting the drug. *Id*. at 3. The Court granted FDA's request. ECF No. 28.

Meanwhile, the shortage did not abate. In late 2024, industry participants presented FDA information showing surging demand for tirzepatide, inability of its manufacturer to keep up, scarcity in various regions and at the national level, and delays in filling prescriptions. FDA607–1018, App. 148–559; FDA1422–1606, App. 560–744.

### C. FDA Again Declares the Shortage Over, Relying on Lilly's Representations While Waving Away All Other Evidence

On December 19, 2024, FDA again declared the tirzepatide shortage over. This "**Delisting Action**" is memorialized in two documents. The "**Decision**" presents the agency's evidence and reasoning for the Act. FDA13, App. 17 (unredacted); ECF No. 67 at 21 (redacted). And the "**Order**" summarizes the agency's rationale, argues that the agency properly acted through "informal adjudication" instead of notice-and-comment rulemaking, and provides enforcement discretion for compounding of tirzepatide products by pharmacies and outsourcing facilities of, respectively, 60 and 90 days. FDA1, App. 5.

Like its predecessor, the Delisting Action rests on Lilly's representations. FDA "conclude[d] that the information and data Lilly has provided to FDA demonstrate that Lilly's supply is currently meeting or exceeding demand for these drug products." Decision 1. [redacted]

[redacted]

FDA gave no weight to all evidence that it received from parties other than Lilly. It concluded that each separate category of this evidence "does not undermine or outweigh the information submitted by Lilly." Decision 16–17; *see also id*. at 18–23 (substantially similar). It rejected all survey data submitted to the agency as insufficiently detailed. Decision 17–18. It rejected all evidence of pharmacy-wholesaler ordering portals showing tirzepatide products as unavailable or in restricted supply, dismissing some based on where submitters identified the date and ultimately accepting Lilly's explanation that pharmacies' inability to order products is not reflective of a shortage. Decision 19–21. It rejected all media reports of tirzepatide unavailability in one fell swoop, stating that "FDA did not find them to contain probative evidence." Decision 21. It rejected "[t]housands of individual comments" by patients, stating that they "do not provide reliable evidence that could be probative." Decision at 22. And it rejected all evidence that compounded products are satisfying demand that will fall on Lilly when the shortage is declared over, deeming it nearly irrelevant. Decision 22–23.

### D. FDA's Delisting Action Prohibits Plaintiffs and Their Members from Compounding Tirzepatide, Putting Patient Access at Risk

Plaintiff North American Custom Laboratories, LLC, doing business as FarmaKeio Custom Compounding ("FarmaKeio"), is a Section 503A compounding pharmacy located in Richardson, Texas. Declaration of Dan DeNeui ("DeNeui Decl.") ¶ 3, App. 1. When doing so was permissible, FarmaKeio compounded tirzepatide in reliance on tirzepatide's drug-shortage status. DeNeui Decl. ¶¶ 10–11, App. 2. Plaintiff Outsourcing Facilities Association (OFA) is a trade association representing outsourcing facilities registered under Section 503B. Supplemental Declaration of Lee Rosebush ("Rosebush Supp. Decl.") ¶ 2, App. 4. OFA members, including Olympia Pharmacy and PQ Pharmacy LLC, compounded tirzepatide in reliance on tirzepatide's drug-shortage status. Rosebush Supp. Decl. ¶ 3, App. 4. FDA's Delisting Action will prevent FarmaKeio from compounding drugs that are essentially copies of branded tirzepatide products

and OFA's members from compounding any drugs containing tirzepatide. DeNeui Decl. ¶ 17–18, App. 3.

**The Legal Standard**

The Administrative Procedure Act (APA) establishes "judicial review" over "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. This case qualifies for review. The Delisting Action is "one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citation omitted). The APA requires a court to "hold unlawful and set aside agency action" on certain grounds, including that it is "arbitrary, capricious, … or not in accordance with law." 5 U.S.C. § 706(2)(A). Summary judgment is the proper procedure for the Court to decide APA claims on the administrative record. *Nat'l Ass'n for Gun Rts., Inc. v. Garland*, 741 F.Supp.3d 568, 596 (N.D. Tex. 2024).

**Argument**

The Delisting Action violates the APA in several respects, which the Amended Complaint challenges in six causes of action. As the Court's preliminary-injunction order observed, ECF No. 101 at 6, claims one and six are closely related, as are claims two through four. However, to aid clarity, this memorandum breaks out each claim and provides further development.

**I. Summary Judgment Should Be Granted to Plaintiffs on the Second Claim**

The Court should grant summary judgment to Plaintiffs on the second cause of action, which challenges FDA's failure to provide a satisfactory explanation of the grounds of its decision. Am. Compl. ¶¶ 79–84. The Supreme Court "has frequently reiterated that an agency must cogently explain why it has exercised its discretion in a given manner." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983). In turn, "judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 20 (2020) (citation omitted). A court "must set aside any action premised on reasoning that fails to account for 'relevant factors'

or evinces 'a clear error of judgment.'" *Univ. of Texas M.D. Anderson Cancer Ctr. v. United States Dep't of Health & Hum. Servs.*, 985 F.3d 472, 475 (5th Cir. 2021) (citation omitted).

The Delisting Action makes no findings on the critical statutory elements FDA claimed to analyze. FDA stated that it was analyzing whether there exists "a period of time when the demand or projected demand for" injection tirzepatide "within the United States exceeds the supply of the drug." Decision 3 (quoting 21 U.S.C. § 356c(h)(2)). But FDA did not select a period of time for analysis, explain why it selected that period of time, of make findings of supply and demand levels for that period of time. While the Decision covers many pages, none of them identify or explain these relevant factors. Even if "there is an explanation" offered at this stage, "it does not appear in the" Decision and thus cannot save it. *Ohio v. EPA*, 603 U.S. 279, 293–94 (2024). Several interrelated problems plague the Decision.

**A. The Agency Improperly Outsourced Its Decision-Making Responsibility**

As an initial matter, FDA did not decide on a time period to review. The administrative record [redacted] at no point did it inform Lilly that the *agency* was examining supply and demand during a given time period and that Lilly should make a consistent presentation for that time period. Indeed, it failed to make this request even after [redacted]

[redacted], the statute delegates the shortage determination to FDA, not to private parties. 21 U.S.C. § 356e(a) ("The Secretary shall maintain an up-to-date list of drugs that are determined *by the Secretary* to be in shortage in the United States." (emphasis added)). It was improper for the agency to outsource the determination of critical exercises of government power to Lilly. *See State Farm*, 463 U.S. at 49 ("If, under the statute, the agency should not defer to the

industry's failure to develop safer cars, which it surely should not do, a fortiori it may not revoke a safety standard which can be satisfied by current technology simply because the industry has opted for an ineffective seatbelt design.").

**B. The Agency Did Not Explain a Choice of Time Period**

[redacted] FDA did not "cogently explain" *what* time period it was analyzing and *why*. *State Farm*, 463 U.S. at 48. To begin with the obvious: the Decision does not state in plan terms what time period is at issue.

To be sure, courts may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.* at 43 (citation omitted). But the agency's path cannot be reasonably discerned because [redacted]

This problem is not a superficial failure of perfection that can be overlooked. The period of time is central to the analysis not only legally but practically. The legal point is addressed below (§II). The practical point is that the choice of time period is so significant that it can dictate the outcome of the analysis. For example, a manufacturer may be seen to meet demand over a five-year period, viewed in total, even though it could not meet demand for two years of that period. The result of the analysis will turn on the time period selected. In turn, this phenomenon creates opportunities for manipulation. It will not take much creativity to look at numbers over time and

gerrymander a time period that obtains a predetermined outcome. That is another reason [redacted] is so concerning.

A second reason the period of time matters is that the most basic way to discern whether accounting representations may be flawed—e.g., infected by anything ranging from inadvertent mistake to outright fraud, or simply not representing what the reader assumes they do—is to see if numbers across statements *match* each other. For instance, if a mortgage lender received a purported bank statement and a purported wage statement from the same mortgage applicant, and those documents showed *different* figures representing the applicant's payable wages, the mortgage lender would obviously be dissatisfied. If the applicant responded that the discrepancy arose from the fact that the two statements reflect different time periods, the lender would demand documentation aligning the figures by *the same* time period to make sure they match. If that did not happen, the lender would deny the application and may even refer the matter for investigation. The same principle applies here.

### C. The Agency Did Not Address Obvious Alternatives

Because FDA did not choose a time period or justify such a choice, it also failed to explain a choice against obvious alternatives. *See State Farm*, 463 U.S. at 50 ("Not having discussed the possibility, the agency submitted no reasons at all."). In justifying its exercise of power, an agency must address readily apparent "alternative[s]" that it has necessarily ruled out in making its choice. *Id.*; *Off. of Commc'n of United Church of Christ v. F.C.C.*, 707 F.2d 1413, 1424 (D.C. Cir. 1983) (explaining that arbitrary-and-capricious review "will demand that the [agency] consider reasonably obvious alternative[s] … and explain its reasons for rejecting alternatives in sufficient detail to permit judicial review"); *Clarke v. CFTC*, 74 F.4th 627, 641 (5th Cir. 2023) (same). This standard is not too difficult for agencies. They need not address "every alternative," only "obvious" ones. *10 Ring Precision, Inc. v. Jones*, 722 F.3d 711, 724 (5th Cir. 2013). For example, in rescinding a requirement that new automobiles include both automatic seatbelts and airbags, after concluding that the seatbelt requirement was not justified, the Secretary of Transportation acted arbitrarily in failing to consider "an airbags-only alternative." *State Farm*, 463 U.S. at 50. Similarly, in

rescinding a policy extending both enforcement discretion and benefits to unlawfully present persons after concluding the benefits piece was illegal, the Department of Homeland Security acted arbitrarily in failing to consider a policy that extended only enforcement discretion but not benefits. *Regents of the Univ. of California*, 591 U.S. at 27–30.

"While the factual setting is different here, the error is the same." *Id.* at 29. In deciding whether supply exceeds demand over "a period," obvious candidates are daily, bi-monthly, monthly, two-month, quarterly, and annual periods, as well as periods beyond a year. The Court need not take Plaintiffs' word that these are obvious candidates: [redacted] On this point, the Decision is silent.

Even if the Decision is fairly read to disclose a purposeful choice by FDA [redacted], *see* ECF No. 101 at 24, the agency's reasons for choosing that over alternatives are neither apparent nor facially logical. For one thing, [redacted] appears to be unheard of in the accounting world. Americans pay annual taxes, business owners pay quarterly estimated taxes, companies report quarterly and annual financials, and most businesses record their profits, losses, and inventory on a monthly basis. Again, the Court need not take Plaintiffs' word that other alternatives were at the agency's fingertips: [redacted] FDA did not explain why [redacted], and the time period chosen certainly is not a self-evidently logical candidate to carry out a statutory mandate to maintain an "up-to-date" shortage list. 21 U.S.C. § 356e(a). To be clear, to demand a *rationale* for not running

[3] The statute's text lends some support to quarterly assessment by requiring periodic reports from FDA every 90 days regarding drugs on the shortage list. 21 U.S.C. § 356e(d).

a month-to-month analysis is not the same as to demand an *actual* month-to-month analysis. In *State Farm*, the Supreme Court rejected the view that a judicial demand that agencies consider alternatives is not the same as "to dictate the agency the procedures it is to follow." 463 U.S. at 50. Agencies' procedural discretion is not "a talisman under which any agency decision is by definition unimpeachable." *Id.*

For similar reasons, the Decision is infirm in failing to explain [redacted] The agency, of course, enjoys discretion in this type of choice, but it nonetheless must explain the choice, and it would be too deferential to say that the mere fact that FDA *chose* the time period (for undisclosed reasons) justifies [redacted]. One obvious alternative would be to run an analysis of past supply and demand and projected future demand and to restart in between: again, the Court can tell [redacted] *Compare* Decision 7–10 (past analysis) *with id.* at 14–15 (projected analysis). Additionally, it was not obvious that FDA [redacted] FDA did not explain why that would not work.

**D. The Agency Did Not Explain Any Findings of Supply or Demand**

For many of the same reasons, the Decision is deficient in explaining its supply and demand choices. The failure to identify and apply a time period manifested itself in the failure to explain basic supply and demand choices, such as [redacted]

Likewise, FDA did not explain which of the competing showings of supply and demand it considered determinative, [redacted]

[redacted] These points are articulated in depth below (§ III), but it bears emphasis that *nothing* FDA's or Lilly's lawyers could say about these discrepancies would have effect at this time because the Decision does nothing to address these issues.

[redacted] So what good is it? What *does* it show? Why would the agency rely on it so heavily? The Decision simply does not say.

Finally, FDA failed to consider obvious questions about product storage, loss, and longevity. If a dose of tirzepatide product counted [redacted], the plain question becomes whether that is realistic: these are refrigerated products that presumably suffer some loss due to various types of error, and the record does not say how long they last under the best of circumstances. This is information that should have factored into the agency's thinking.

In a legal brief in this case, Lilly represents a 24-month longevity period, but lawyers may not add to the administrative record after the fact. *Michigan v. E.P.A.*, 576 U.S. 743, 758 (2015). And there is good reason for that rule: the administrative record contains information *contradicting* Lilly's assertion: [redacted] Regardless, whether or not FDA *could* justify its choices, it did not *actually* do so here. That is fatal.

**II. Summary Judgment Should Be Granted to Plaintiffs on the Fifth Claim**

The Court should grant summary judgment to Plaintiffs on the fifth cause of action, which challenges FDA's reading of governing statutes. Am. Compl. ¶¶ 96–102. In deciding this claim, the Court should determine "the best reading of the statute" without deference to the agency. *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 400 (2024). Several modes of analysis the Decision employs are not faithful to Congress's text.

First, even if [redacted] were sufficiently justified by rationale, it would conflict with the requirement that the shortage list be "up-to-date." 21 U.S.C. § 356e(a). The agency acknowledges the weight of the directive when it finds doing so suitable: this is the agency's *principal* basis for evading notice-and-comment rulemaking. But if the agency is entitled to that exemption, then it must respect the limits Congress imposed and make shortage determinations based on *recent* information, not *old* information. The term "up-to-date" means "using or including the latest facts," "keeping up with what is more recent in … information." Webster's New World College Dictionary 1571 (4th ed. 2007). But FDA's [redacted]

Second, FDA erred in categorically treating regional shortages as not cognizable under the statute. FDA claims that the definition of a shortage is found in 21 U.S.C. § 356c, which defines

shortage as "a period of time when the demand or projected demand for the drug *within* the United States exceeds the supply of the drug." 21 U.S.C. § 356c(h)(2) (emphasis added). As used here, "within" means "inside the limits of," Webster's New World College Dictionary 1571 (4th ed. 2007), not coextensive with the limits of. FDA goes to Section 506E, which calls for an assessment of shortage "in the United States," 21 U.S.C. § 356e(a), but FDA begins with the premise that the definition applicable is that of Section 506C, 21 U.S.C. § 356c. Decision 3 and n.7. In any event, the term "in" also means "contained or enclosed by; inside," Webster's New World College Dictionary 719 (4th ed. 2007), not exhaustive of. New England, the Deep South, the Mountain West, and the Pacific Northwest are all "within the United States" and "in the United States." It was therefore incorrect for FDA to categorically exclude from consideration the possibility that shortages might exist in such regions. FDA's approach also poses practical problems by letting national companies like Lilly avoid shortages by declining to supply one or a few regions so that supply can exceed demand in many regions and thus avoid FDA's shortage definition.

Third, FDA erred in treating the shortage analysis as categorically limited to the manufacturer's capacity to meet demand at the national level. Turning to Section 506C, the statute is clear that a panoply of causes may create a cognizable shortage, including "[d]elay in shipping of the drug." 21 U.S.C. § 356e(b)(F). FDA never considered how this may bear on its analysis. It sweepingly declared that resolved shortage is "not inconsistent with some, and even many, individuals having had some trouble getting prescriptions for the affected drugs filled," because that frustration concerns "the portion of the supply chain between Lilly and the individual customers." Decision 2. In other words, disruptions down the supply chain, unrelated to Lilly's inventory and orders, do not count. The statute rejects that view. To be sure, a very small number of shipping delays may be too insubstantial to amount to a shortage, but FDA was willing to extend this to "many" (without clarification), and it did not consider how the statutory text may bear on the evidence and the degree to which more than *de minimis* shipping delays *do* matter. As discussed below, the evidence refutes the idea that inability of patients to obtain tirzepatide was restricted to just a few. The agency must revisit this question under a correct view of the standard.

Fourth, FDA erroneously determined that, in assessing past demand, "[t]he relevant demand here is the demand for the approved drug product, and *not* the demand for a different drug, i.e., demand for a compounded tirzepatide drug." Decision. 22–23. FDA later called demand for compounded drugs "of minimal relevance," Decision 23, but it did not consider the matter at all. It would read conflict into the Decision to treat FDA's "minimal relevance" as materially different from a solid "not relevant." (Inconsistently, the Decision *did* consider demand for the compounded product in assessing *future* demand, which creates a marked contrast to its treatment of past demand. *See infra* § IV.4.)

Either way, the FDA's position is the product of legal error. The compounding authorized during shortages is for drugs that are "essentially a copy" of approved drugs. 21 U.S.C. § 353b(a)(5); *see also* 21 U.S.C. § 353a(b)(1)(D). The statute does not treat a compounded form as "a different drug" but as functionally the same drug. Decision 22. The derogatory term Lilly employs is "knockoffs," and while that loaded term is objectionable in many respects, it shows Lilly knows the drugs are functionally the same. Moreover, FDA's reading is at war with the statutory scheme. Essentially-a-copy compounding is allowed during shortages to enable compounded drugs to fill the demand the manufacture is not satisfying. To redefine that same demand as not part of the demand would redefine shortages out of existence as soon as they are declared.

## III. Summary Judgment Should Be Granted to Plaintiffs on the Third Claim

The Court should grant summary judgment to Plaintiffs on the third cause of action, which challenges FDA's findings as arbitrary and capricious under the substantial evidence standard. Am. Compl. ¶¶ 85–89. Arbitrary and capricious review of "the factual basis for an agency's conclusions…is functionally the same as the 'substantial evidence' test used to evaluate formal agency action under 5 U.S.C. § 706(2)(E)." *Amin v. Mayorkas*, 24 F.4th 383, 393 (5th Cir. 2022). Agency decision-making fails this standard if it is "[i]llogic[al] and internally inconsistent." *Chamber of Com. of United States of Am. v. United States Dep't of Lab.*, 885 F.3d 360, 382 (5th Cir. 2018); *see also Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1016 (5th Cir. 2019) (same); *Am.*

*Fed'n of Gov't Emps., Loc. 2924 v. Fed. Lab. Rels. Auth.*, 470 F.3d 375, 380 (D.C. Cir. 2006) ("Certainly, if the result reached is 'illogical on its own terms,' the … order is arbitrary and capricious."). Here, the agency's failure to construct analysis according to a reasoned determination about the key factors led it into illogical findings. To the extent FDA and Lilly attempt to backfill the findings at this stage, those efforts fail for reasons stated (§ I.D).

Plaintiffs explained above why it is important to cross-check Lilly's numbers against each other rather than blindly accept what they seem to say at first glance. [redacted]

[redacted]

[redacted]

[redacted]

This memorandum refers back to these tables, and makes calculations based on them, in the following analysis. The Decision is logically inconsistent and contrary to the record in at least the following ways.

**1.** FDA acted without substantial basis in finding the shortage resolved by the most "up-to-date" figures because that determination conflicts with the figures, properly construed. [redacted]

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted] In sum, these numbers do not add up, and it is not asking for perfection to expect that an agency respect hard mathematical realities. *Nat'l Treasury Emps. Union v. Fed. Lab. Rels. Auth.*, 942 F.3d 1154, 1157 (D.C. Cir. 2019) (action is arbitrary if it "is mathematically false").

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

[redacted] An accounting of inventory for a monthly period should contain at a minimum: (1) beginning inventory, (2) purchases during the month, and (3) ending inventory. *See* Penn State University, Financial and Managerial Accounting, 2.6 Accounting for Inventory.[5] The Decision does not report that information.

[redacted]

[5] https://psu.pb.unizin.org/acctg211/chapter/periodic-v-perpetual-inventory/

[redacted]

### IV. Summary Judgment Should Be Granted to Plaintiffs on the Fourth Claim

The Court should grant summary judgment to Plaintiffs on the fourth cause of action, which challenges FDA's dismissal of evidence of an ongoing shortage as arbitrary and capricious under the substantial evidence standard. Am. Compl. ¶¶ 90–95. The legal standard stated above (§ III) applies to this cause of action as well.

FDA received weighty evidence that pharmacies and patients across the nation lack access to tirzepatide products. In fact, *all* evidence FDA received from *anyone* except Lilly indicated an ongoing shortage. Notably, no evidence on the record directly from a national wholesaler suggests the shortage ended. Rather than take the record as a whole seriously, FDA "treated conflicting evidence here with an almost breathtaking lack of evenhandedness." *Sutter E. Bay Hosps. v. N.L.R.B.*, 687 F.3d 424, 437 (D.C. Cir. 2012). FDA's indulgence of Lilly is matched by its hyper-skepticism of all contrary evidence, to the point one doubts that any showing could satisfy the agency.

**1.** On a weekly basis, FDA received screenshots of wholesalers' webpages showing no supply or restricted supply of brand-name tirzepatide products. FDA1430–1493, App. 568–632; FDA982–1017, App. 523–58. The Decision acknowledges that this evidence "show[s] a wholesaler's website listing" tirzepatide products "as unavailable." Decision 19. It is hard to

[redacted]

imagine more probative evidence than a drug's regular unavailability from the "Big Three" wholesalers that control 90% of the national market.[7]

FDA rejected this evidence based on "the information provided by Lilly" on "availability of product." Decision 20. But FDA failed in its assessment of Lilly's data, as shown above.

The Decision also cites "limitations of the screenshot evidence," i.e., that screenshots were "undated and do[] not include information about the length of time that the product is or was out of stock." Decision 19–20. But the record contains cover notes identifying the screen shots and providing information like dates. *See, e.g.*, FDA677–93, App. 218–34; FDA846–47, App. 387–88; FDA854–56, App. 395–97; FDA861–62, App. 402–03. Moreover, many of the screenshots *do* provide information about the length of time that the product is out of stock. [redacted] FDA1450, App. 588 (emphasis added); *see also* FDA1438–40, App. 576–78; FDA1451, App. 589; FDA1485, App. 623; FDA1529–1531, App. 667–69; FDA1541–1542, App. 679–80; FDA1544, App. 682; FDA1576, App. 714. [redacted] FDA1451, App. 589 (emphasis added). This refutes the notion that pharmacies could receive brand-name tirzepatide products within a few days: the notices expressly [redacted] as the earliest anticipated date of product availability or state that there is no anticipated date of product availability. And, because [redacted] is a national wholesaler, this evidence refutes the notion that supply disruptions were "localized" rather than national. *See* ECF No. 100 at 66. This evidence also contradicts Lilly's representations of wholesalers' stock: if those representations were true, wholesalers would have had the stock.

**2.** FDA acknowledged reports that patients cannot obtain tirzepatide products, "reported weekly and cumulatively." Decision 17. This survey data presents tens of thousands of

[7] *See* Russ Britt, MarketWatch, 'Big Three' pharma distributors post sharp gain (9/15/2010), https://www.marketwatch.com/story/big-3-pharma-distributors-post-sharp-gains-2010-09-15

reports of individuals across the nation. *See, e.g.*, FDA655–71, App. 196–212; FDA694–97, App. 235–38; FDA724–28, App. 265–69; FDA821–24, App. 362–65. FDA's principal basis for rejecting this showing yet again was the "information submitted by Lilly." Decision 16. This basis fails for reasons stated above (§ I.A).

FDA also complained of "limitations" in this data. Decision 18. But FDA met with individuals involved with the submissions, was fully informed about them, was asked for input, and declined to provide feedback or ask questions. ECF No. 67 at 5. This approach stands in stark contrast to FDA's collaborative arrangement with Lilly, where the agency provided information to Lilly and accepted Lilly's explanations. *See, e.g.*, Decision 21 & nn.95–98. FDA's treatment of other parties reflects an active disinterest in their information.

Besides, the limitations FDA complained of are overblown. FDA did not meaningfully address OFA's time-stamped reports of unavailability, which include zip codes and report only incidents where a patient "attempted to have a [tirzepatide] prescription filled at more than one pharmacy." FDA708–09, App. 249–50. FDA complains that this "does not include details of the reported individual experiences," Decision 18, but inability to get a prescription filled at *two* pharmacies is as detailed as descriptions get on this scale. The suggestion that the information may not reflect a "national" problem, Decision 18, is belied by the vast diversity of zip codes, covering dozens of states, if not all of them. FDA708–09, App. 249–50; *see also, e.g.*, FDA728, App. 269. Likewise, FDA's rejection of data from a national telehealth company ignores the national market it serves and valuable information it can provide.

**3.** The Decision acknowledges "news coverage" on "the shortage situation." Decision 21. FDA addressed none of it on the merits. It ignored the December 10, 2024 announcement that a national retail pharmacy "is no longer taking new GLP-1 patients" because of "market demand." FDA926, App. 467. It ignored a November 1, 2024 earnings call where the CEO of Cardinal Health—a "Big Three" wholesaler—discussed "strong demand, supply that does not meet demand" and explained that "we have seen very static levels of inventory, relatively low levels of inventory that have not fluctuated much at all of the last several quarters." ECF No. 67 at

78. And FDA ignored other reporting unfavorable to its conclusions. *See, e.g.* FDA738–48, App. 279–89; FDA756–59, App. 297–300; FDA802–05, App. 343–46; FDA838, App. 379; FDA883–900, App. 424–441; FDA945–64, App. 486–505; FDA965–68, App. 506–09; FDA1517, App. 655. FDA simply stated this evidence does "not undermine or outweigh" Lilly's data. Decision 22. This finding is arbitrary where FDA misconstrued Lilly's data. The same is true of FDA's disregard of "[t]housands of individual comments" it received from individuals indicating they cannot obtain GLP-1 products. Decision 22.

**4.** FDA erred in disregarding the "the sales volume of compounded tirzepatide" as evidence of demand. Decision 22. FDA acknowledged "significant compounding" with "some effect," but dismissed this because there is no "reliable basis to project the scope of this effect." Decision 23. But the difficulty in knowing the precise degree of a "significant" factor does not justify zeroing it out. FDA had evidence as of December 16 that 33 specifically identified pharmacies were providing at least 503,260 doses per month. *See* FDA1429, App. 567.[8] That is a *low* number, given that other pharmacy compounding is not necessarily disclosed. FDA's own numbers indicate that just *one* pharmacy can provide 36,820 doses per month, Decision 24, and given the thousands of pharmacies authorized to compound during a shortage, the supply from pharmacies makes a material difference, especially when combined with supply from outsourcing facilities.

FDA erred further in disregarding demand for compounded products because they beat Lilly's on price. Decision 26. FDA reasoned that customers who cannot afford Lilly's products will drop out of the market once compounding is banned, which reduces future demand from current demand. Decision 26. This announces in startling terms that, insofar as FDA is concerned, the way to end a shortage is to declare that only rich Americans may access GLP-1 products. That rule of law would enable Lilly to end shortages simply by raising prices or limiting supply (or

[8] The exhibit shows 125,815 patients being served per month, and each patient receives four doses per month (125,815 patients x 4 doses per patient = 503,260 doses).

both). Because supply and demand always meet at price, this approach redefines demand as coterminous with Lilly's supply. This would defeat the purpose of a supply-demand inquiry.

## V. Summary Judgment Should Be Granted to Plaintiffs on the First Claim

The Court should grant summary judgment to Plaintiffs on the first cause of action, which challenges FDA's promulgation of the Delisting Action without notice-and-comment rulemaking. Am. Compl. ¶¶ 69–78.

FDA's failure to follow the APA's notice-and-comment procedures is unlawful. Congress imposed the APA's notice-and-comment procedures "to give the public an opportunity to participate in the rule-making process" and "enable[] the agency promulgating the rule to educate itself" before taking actions that "have a substantial impact on those who are regulated." *U.S. Dep't of Labor v. Kast Metals Corp.*, 744 F.2d 1145, 1153 n.17 (5th Cir. 1984) (quotation marks omitted). Notice-and-comment procedures are generally applicable and are required for what are known as "substantive" or "legislative" rules—that is, "those which create law." *Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 628 (5th Cir. 2001). The APA provides that this default procedure may not be superseded by another law unless "it does so expressly." 5 U.S.C. § 559.

**1.** The Delisting Action is a substantive rule subject to the APA's notice-and-comment mandate. The APA defines "rule" to include "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4). Substantive rules (also called "legislative rules") "are those which create law" by "affect[ing] individual rights and obligations." *Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 628 (5th Cir. 2001) (quotation marks omitted); *see also Mann Constr., Inc. v. United States*, 27 F.4th 1138, 1143 (6th Cir. 2022) ("impose[s] new rights or duties and change[s] the legal status of regulated parties"). For the promulgation of substantive rules, the APA prescribes a "three-step procedure": notice, solicitation and consideration of comments, and explanation of the final rule's "basis and purpose." *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96 (2015).

The Delisting Action creates law by prohibiting all compounding of tirzepatide by Section 503B outsourcing facilities and compounding drugs that are essentially copies of branded tirzepatide products by Section 503A pharmacies. This affected the rights of compounders by making a previously lawful activity (compounding tirzepatide) unlawful, no different in its force and effect than if Congress had enacted a statute prohibiting that activity. That is a substantive rule.

Courts have consistently held that agency listing decisions that trigger legal consequences are substantive rules. For example, the Sixth and Eleventh Circuits each recently held that IRS actions adding items to a list of presumptively abusive transactions, which in turn triggered reporting requirements, were substantive rules and therefore invalid because the agency failed to undertake notice and comment. *Green Rock LLC v. IRS*, 104 F.4th 220 (11th Cir. 2024); *Mann Constr*, 27 F.4th at 1138. EPA's adding a site to the CERCLA "national priorities list," which triggers various remedial obligations, is a substantive rule. *See generally Anne Arundel Cnty. v. U.S. EPA*, 963 F.2d 412 (D.C. Cir. 1992). So too are actions adding species to lists under the Endangered Species Act. *See Idaho Farm Bureau Federation v. Babbitt*, 58 F.3d 1392, 1401–04 (9th Cir. 1995); *Center for Biological Diversity v. U.S. Fish and Wildlife Service*, 698 F.Supp.3d 39 (D.D.C. 2023); *Center for Biological Diversity v. Everson*, 435 F.Supp.3d 69 (D.D.C. 2020).

Such actions are substantive rules because there is no difference between, for example, a rule providing that "compounding of tirzepatide is prohibited" and removing tirzepatide from the shortage list. Either way, the agency has changed the law by establishing a new prohibition. To change the law, an agency must follow notice-and-comment procedures. FDA's failure to do so here is fatal. *See W & T Offshore, Inc. v. Bernhardt*, 946 F.3d 227, 237 (5th Cir. 2019) ("Substantive rules not subjected to notice and comment may not be enforced against a party.").

**2.** FDA insists that its Delisting Action is not a rule at all but "the product of an informal adjudication." Order 5. That is not so. For many of the reasons that it qualifies as a substantive rule, the Delisting Action "bear[s] all the hallmarks…of rulemaking, not adjudication." *City of Arlington, Tex. v. F.C.C.,* 668 F.3d 229, 242 (5th Cir. 2012).

"An agency may not escape the requirements of § 553 by labeling its rule an 'adjudication.'" *Safari Club Int'l v. Zinke*, 878 F.3d 316, 332 (D.C. Cir. 2017). An "agency's characterization of its own [action]" is due "minimal" deference; instead, "courts focus primarily on the actual characteristics of the agency action." *W & T Offshore*, 946 F.3d at 237 (cleaned up).

Issuance of a generally applicable legal prohibition "is classic rulemaking" and not the proper subject of an adjudication. *City of Arlington*, 668 F.3d at 243. "Adjudications typically "resolve disputes among specific individuals in specific cases, whereas rulemaking affects the rights of broad classes of unspecified individuals." *Id*. at 242 (quotation marks omitted). The Delisting Action is generally applicable and affects the rights of thousands of compounding pharmacies and outsourcing facilities. The American Pharmacists Association reports that "about 7,500 pharmacies specialize in compounding," not including compounding pharmacies in hospitals and other health care facilities.[9] FDA identifies 88 outsourcing facilities,[10] including large facilities engaged in "high-volume" production.[11] This was not an adjudication of "the rights of a small number of parties properly before [the agency]." *Id*.

In fact, *none* of the pharmacies and facilities whose rights were the object of this so-called "adjudication" were party to it. Lilly was also not a party to this "adjudication," and neither the Decision nor Order identify it as one.[12] The Decision and Order identify no parties and do not apply any legal rule or determination to any person. There was no adjudication here at all. Instead, FDA simply announced a new legal restriction applicable to an entire industry. That is a rule. *Compare NLRB v. Wyman-Gordon Co*., 394 U.S. 759, 765–66 (1969) (plurality op.) (holding agency was required to proceed through APA rulemaking when it "purported to make a rule"—that is, "exercise its quasi-legislative power"—through adjudication).[13]

[9] APHA, Frequently Asked Questions About Pharmaceutical Compounding (last visited Apr. 1, 2025), *available at* https://www.pharmacist.com/Practice/Patient-Care-Services/Compounding/Compounding-FAQs

[10] FDA, Registered Outsourcing Facilities (Jan. 16, 2025), *available at* https://www.fda.gov/drugs/human-drug-compounding/registered-outsourcing-facilities

[11] FDA, Compounding Outsourcing Facilities Annual Study (Aug. 18, 2020), *available at* https://www.fda.gov/media/163704/download

[12] As relevant to Lilly's exclusion, the legal prohibitions triggered by a delisting apply only to compounders, not a manufacturer like Lilly.

[13] *See also id*. at 777 (Douglas, dissenting) (agreeing with holding); *id*. at 780 (Harlan, J., dissenting) (same).

Confirming as much is the Delisting Action's prospective nature. "[R]ules generally have only 'future effect' while adjudications immediately bind parties by retroactively applying law to their past actions." *Safari Club*, 878 F.3d at 333; *see also City of Arlington*, 668 F.3d at 243 (emphasizing that FCC order "would apply prospectively"). As Justice Scalia put it, "Adjudication deals with what the law was; rulemaking deals with what the law will be." *Bowen v. Georgetown Univ. Hosp*., 488 U.S. 204, 221 (1988) (Scalia, J., concurring). The Delisting rule's effect is, as FDA recognizes, purely prospective. Order at 9–10 (addressing the "Status of Compounding Following this Decision").

In these respects, the Delisting Action is indistinguishable from the *faux* adjudicatory orders *Safari Club* held to be rules. At issue were two Fish and Wildlife Service "findings" determining that the agency lacked sufficient information to conclude that sport-hunting of Zimbabwean elephants enhanced the species' survival, triggering an import-ban on trophies. 878 F.3d at 323–24. These findings, the court concluded, "had all of the qualities of a legislative rule" requiring notice and comment. *Id*. at 332. First, they "applied to all potential imports of sport-hunted elephant trophies from Zimbabwe, not to any individual parties." *Id*. Indeed, they "did not adjudicate any dispute between specific parties." *Id*. Second, the resulting import-ban applied only "in future permitting adjudications and enforcement actions" regarding conduct "going forward," with no "retroactive" effect on completed conduct. *Id*. Third, the agency had not "made its findings in the course of" adjudicating a party's rights, but "simply established a standard binding on the agency—a negative enhancement finding and ban on imports—to be applied to future [proceedings], until such time as the Service decides to issue a new rule based on different information." *Id*. at 334. FDA's Delisting Action shares all of these features.

FDA's contrary arguments lack merit. Its suggestion that the Delisting Action "do[es] not create new law," Order 6, is belied by its express acknowledgement that the Action makes certain compounding illegal, Order 9. Its italicized claim that the Delisting Action "*serves only to clarify and state an agency's interpretation of an existing statute or regulation,*" Order 6 (quotation marks omitted), makes no sense: the shortage status of tirzepatide products and lawfulness of

compounding copies is not a matter of interpretation. If the agency believed its task here was to interpret some unidentified statute or regulation, then the Delisting Action is *per se* arbitrary and capricious and contrary to law. And no authority supports FDA's view that the possible "temporary nature" of an agency action transforms it from a rule into an adjudication. *See* Order 6. The APA permits agencies to dispense with notice and comment for "good cause," 5 U.S.C. § 553(b)(B), and agencies regularly employ that authority to address temporary or urgent needs through, for example, interim final rules, *e.g.*, 85 Fed. Reg. 19230 (Apr. 6, 2020) (interim final rule by FDA's sister agency making temporary changes to Medicare and Medicaid rules during pandemic). There is no additional "adjudication" exception. Anyway, actions regarding the shortage list need not be temporary; tirzepatide was listed for nearly two years, which is much longer than many of the Biden Administration's notice-and-comment rules from this past year will remain on the books.

FDA is also wrong to argue that Section 506E's "public health exception" to disclosure of a shortage and protection of "trade secrets and confidential information, 21 U.S.C. § 356e(c)(2), (3), weigh against following the APA's notice-and-comment provision, *see* Order 7–8. This argument errs from the beginning by failing to identify the applicable legal standard. Congress prescribed that another statute supersedes APA procedures only "to the extent that it does so expressly." 5 U.S.C. § 559. "Before an agency may regulate without the protections of the notice-and-comment process, it must show that Congress 'expressly' carved out the exception." *Mann Constr.*, 27 F.4th at 1144. Such exemptions "are not lightly to be presumed," *Marcello v. Bonds*, 349 U.S. 302, 310 (1955); instead, "Congress's intent to make a substantive change [must] be clear," *Ass'n of Data Processing Serv. Orgs. v. Bd. of Governors of Fed. Rsrv. Sys.*, 745 F.2d 677, 686 (D.C. Cir. 1984). While it would be enough here to conclude that FDA's failure to engage the proper standard dooms its argument, *see SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943), the agency also cannot satisfy that standard. Nothing in Section 506E "expressly" displaces the APA's rulemaking procedures. Moreover, the "public health exception" to disclosure of a shortage is not inconsistent with the APA, which specifically authorizes agencies to forgo notice and comment for "good cause" and to refrain from publishing rules "exempted from disclosure by statute." 5 U.S.C.

§§ 553(b)(B), 552(b)(3). So too for Section 356e's treatment of confidential business information. Agencies routinely accept, consider, and protect confidential materials in APA notice-and-comment rulemakings. *See generally* Heather Kilgore, Signed, Sealed, Protected: Solutions to Agency Handling of Confidential Business Information in Informal Rulemaking, 56 Admin. L. Rev. 519 (2004). FDA's preparation and issuance of the non-confidential Order and a redacted version of the Decision mirror the way agencies accommodate confidential information in rulemakings.

To the extent it matters, FDA's failure prejudiced Plaintiffs. (It should not matter, because FDA's failure deprives the Delisting Action of all legal force. *W & T Offshore*, 946 F.3d at 237.) First, the agency never provided notice to the public, even as it considered a matter implicating supply, demand, and availability across the entire nation. While some parties like Plaintiffs were aware of FDA's consideration, not all of the patients, providers, insurers, telehealth operators, pharmacy chains, etc., with pertinent information regularly visit "FDA's website," Order 8—or, to be precise, an obscure page buried on its website.[14] That matters because most public evidence of a shortage is additive: more reports of unavailability, across more places, showing consistency or growth over time carry greater weight. Those who were able to provide evidence are prejudiced by the agency's refusal to provide notice to and solicit information from everyone else.

Second, without notice, members of the public had no way of knowing what kinds of information the agency would consider and no ability to address the agency's restrictions on the information for consideration. The prejudice in this is plain: FDA's Decision either ignores or dismisses the probative value of every single submission the agency received from every single party (including Plaintiffs) but Lilly. *See* § I.B.2, *infra*. FDA knew that parties other than Lilly would provide evidence of actual unavailability in the form of wholesaler information, survey data, media coverage, patient reports, and so forth. But it never disclosed its intention to hold these categories of evidence to the idiosyncratic standards that it applied in the Decision, which led it to

[14] *See* FDA, FDA clarifies policies for compounders as national GLP-1 supply begins to stabilize (Dec. 19, 2024), *available at* https://www.fda.gov/drugs/drug-safety-and-availability/fda-clarifies-policies-compounders-national-glp-1-supply-begins-stabilize.

disregard all this evidence in the final calculus. Had FDA done that, parties could have attempted to satisfy its standards or explain how they arbitrarily deprive the agency of highly probative information. FDA's failure to do so violated its "obligation to make its views known to the public in a concrete and focused form so as to make criticism or formulation of alternatives possible." *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 36 (D.C. Cir. 1977).

**3.** Even if the Delisting Action was the product of an adjudication, it is still invalid. First, FDA's creation and application of a "new methodology" to assess shortage status—disregarding all demand satisfied by compounded supply, dismissing all evidence of unavailability, and accepting the manufacturer's representations without verification or cross-checking—"is not an adjudicatory application of an existing rule to the facts of a specific case." *W & T Offshore*, 946 at 239. FDA may "not cloak its development—and industry-wide application—of a new [] methodology in the guise of simple adjudicative orders." *Id*. Second, at a minimum FDA's "reliance on adjudication instead of rulemaking constitutes an abuse of discretion" because the Delisting Action "bears all the hallmarks of [a] rulemaking." *City of Arlington*, 668 F.3d at 241–42.

## VI. Summary Judgment Should Be Granted to Plaintiffs on the Sixth Claim

The Court should grant summary judgment to Plaintiffs on the sixth cause of action, which challenges FDA's failure to publish the Delisting Action in the Federal Register. Am. Comp. ¶¶ 103–107. The APA obligates agencies to "publish in the Federal Register… (D) substantive rules of general applicability adopted as authorized by law." 5 U.S.C. § 552(a)(1)(D). This "was adopted to provide, inter alia, that administrative policies affecting individual rights and obligations be promulgated pursuant to certain stated procedures so as to avoid the inherently arbitrary nature of unpublished ad hoc determinations." *Morton v. Ruiz*, 415 U.S. 199, 232 (1974). The Delisting Action is a legislative rule that was not published in the Federal Register.

## CONCLUSION

The Court should the Court should enter summary judgment in favor of Plaintiffs, set aside the Delisting Action, and permanently enjoin FDA from taking action based on the Delisting Action.

Dated: April 2, 2025

*/s/ Ty Doyle*
TY DOYLE (Texas Bar No. 24072075)
BAKER & HOSTETLER LLP
811 Main Street, Suite 1100
Houston, TX 77002
(713) 646-1374
tgdoyle@bakerlaw.com

ANDREW M. GROSSMAN*
RICHARD B. RAILE*
RENEE M. KNUDSEN*
MARC N. WAGNER*
BAKER & HOSTETLER LLP
1050 Connecticut Ave., N.W., Suite 1100
Washington, D.C. 20036
(202) 861-1697
agrossman@bakerlaw.com

* admitted *pro hac vice*

*Attorneys for Plaintiffs*

**Certificate of Service**

I hereby certify that this document, filed through the CM/ECF system on this day, will be sent via electronic mail to the registered participants as identified on the Notice of Electronic Filing

Dated: April 2, 2025

*/s/ Ty Doyle*
TY DOYLE (Texas Bar No. 24072075)
BAKER & HOSTETLER LLP
811 Main Street, Suite 1100
Houston, TX 77002
(713) 646-1374
tgdoyle@bakerlaw.com

*Attorney for Plaintiffs*