**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**Fort Worth Division**

| | |
|---|---|
| OUTSOURCING FACILITIES ASSOCIATION, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES FOOD AND DRUG ADMINISTRATION, et al.,<br><br>Defendants. | Civil Action No. 4:24-cv-00953-P |

**Plaintiffs' Memorandum of Law in Opposition to Defendants' and Defendant-Intervenor's Motions for Summary Judgment**

**Table of Contents**

Introduction ........................................ 1

Background ........................................ 1

Argument ........................................ 6

I. Defendants Are Not Entitled to Summary Judgment on the Second Claim ............ 6

II. Defendants Are Not Entitled to Summary Judgment on the Fifth Claim ............ 10

III. Defendants Are Not Entitled to Summary Judgment on the Third Claim ............ 13

IV. Defendants Are Not Entitled to Summary Judgment on the Fourth Claim ............ 17

V. Defendants Are Not Entitled to Summary Judgment on the First Claim ............ 19

VI. Defendants Are Not Entitled to Summary Judgment on the Sixth Claim ............ 23

Conclusion ........................................ 24

# Table of Authorities

**Cases**

*Anne Arundel Cnty., Md. v. U.S. EPA*,
963 F.2d 412 (D.C. Cir. 1992)....................21

*Arc Bridges, Inc. v. NLRB*,
662 F.3d 1235 (D.C. Cir. 2011)....................17

*Ariz. Pub. Serv. Co. v. United States*,
742 F.2d 644 (D.C. Cir. 1984)....................14

*City of Charlottesville v. FERC*,
661 F.2d 945 (D.C. Cir. 1981)....................14

*Corrosion Proof Fittings v. EPA*,
947 F.2d 1201 (5th Cir. 1991)....................8

*Council for Urological Ints. v. Burwell*,
790 F.3d 212 (D.C. Cir. 2015)....................8

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
591 U.S. 1 (2020)....................8, 20

*Elec. Consumers Res. Council v. FERC*,
747 F.2d 1511 (D.C. Cir. 1984)....................16

*Genuine Parts Co. v. EPA*,
890 F.3d 304 (D.C. Cir. 2018)....................13

*Home Box Office, Inc. v. FCC*,
567 F.2d 9 (D.C. Cir. 1977)....................23

*Louisiana v. Dep't of Energy*,
90 F.4th 461 (5th Cir. 2024)....................7, 9–10, 15–16, 19–20

*Mann Constr., Inc. v. United States*,
27 F.4th 1138 (6th Cir. 2022)....................22

*Massachusetts v. E.P.A.*,
549 U.S. 497 (2007)....................21

*Matter of Hammers*,
988 F.2d 32 (5th Cir. 1993)....................12

*Med. Ctr. Pharmacy v. Mukasey*,
536 F.3d 383 (5th Cir. 2008)....................2

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ... 6, 8–9, 11–13

*Nat'l Parks Conservation Ass'n v. E.P.A.*,
788 F.3d 1134 (9th Cir. 2015) ... 9–10

*NRDC, Inc. v. Herrington*,
768 F.2d 1355 (D.C. Cir. 1985) ... 14

*Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*,
494 F.3d 188 (D.C. Cir. 2007) ... 9–10

*Perez v. Mortgage Bankers Ass'n*,
575 U.S. 92 (2015) ... 19

*Public Citizen v. Nuclear Regulatory Commission*,
573 F.3d 916 (9th Cir. 2009) ... 22

*Qwest Corp. v. FCC*,
258 F.3d 1191 (10th Cir. 2001) ... 9

*Safari Club Int'l v. Zinke*,
878 F.3d 316 (D.C. Cir. 2017) ... 20–21

*Sandoz Inc. v. Becerra*,
57 F.4th 272 (D.C. Cir. 2023) ... 3

*SEC v. Chenery Corp.*,
332 U.S. 194 (1947) ... 7

*Sinclair Broad. Grp., Inc. v. FCC*,
284 F.3d 148 (D.C. Cir. 2002) ... 16

*Texas Brine Co., L.L.C. v. Am. Arb. Ass'n, Inc.*,
955 F.3d 482 (5th Cir. 2020) ... 12

*Thompson v. W. States Med. Ctr.*,
535 U.S. 357 (2002) ... 1, 2

*Tripoli Rocketry Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*,
437 F.3d 75 (D.C. Cir. 2006) ... 10

*Univ. of Texas M.D. Anderson Cancer Ctr. v. United States Dep't of Health & Hum. Servs.*,
985 F.3d 472 (5th Cir. 2021) ... 18

*United States v. Florida East Coast Ry. Co.*,
410 U.S. 224 (1973) ... 21

*U.S. Air Tour Ass'n v. FAA*,
298 F.3d 997 (D.C. Cir. 2002)....................9–10

*W & T Offshore, Inc. v. Bernhardt*,
946 F.3d 227 (5th Cir. 2019)....................23

*W. States Med. Ctr. v. Shalala*,
238 F.3d 1090 (9th Cir. 2001)....................2

**Statutes and Regulations**

5 U.S.C. § 552....................22

5 U.S.C. § 553....................20

5 U.S.C. § 559....................22

21 U.S.C. § 353a....................2, 10

21 U.S.C. § 353b....................2–3, 10

21 U.S.C. § 356c....................10–11

21 U.S.C. § 356e....................10, 11

22 Tex. Admin. Code § 291.36....................1

42 U.S.C. § 7412....................21

60 Fed. Reg. 66981 (Dec. 27, 1995)....................22

80 Fed. Reg. 56469 (Sept. 18, 2015)....................22

Drug Quality and Security Act (DQSA),
PL 113-54, Nov. 27, 2013, 127 Stat. 587....................2

Food and Drug Administration Modernization Act (FDAMA) of 1997,
PL 105–115, Nov. 21, 1997, 111 Stat. 2296....................1–2

**Other Authorities**

159 Cong. Rec. 14-647 (2013)....................3

159 Cong. Rec. S8072 (daily ed. Nov. 18, 2013)....................3

Bridget C.E. Dooling, Legal Issues in E-Rulemaking,
63 Admin. L. Rev. 893 (2011)....................22

Christopher S. Yoo & Kellen McCoy, Privacy vs. Transparency: Handling Protected

Materials in Agency Rulemaking, 96 Ind. L. J. 1259 (2021).....22

Claire Rafford, Judge orders Lilly to pay $183.7M in damages in Medicaid lawsuit, Indy Star (March 24, 2023) .....6

Gillian McGovern, FDA Recalls Over 7000 Bottles of Duloxetine Because of Chemical Presence, Pharmacy Times (Oct. 24, 2024) .....5

Grace P. Chandler, Tirzepatide Lawsuits, Motley Rice LLC.....4

Kevin Dunleavy, Eli Lilly whistleblower says she was fired after reporting manufacturing problems at massive NJ plant, Fierce Pharma (June 7, 2022) .....5

Kristin Hickman, It's Time To Let Go: Treasury Regulations Are Not Interpretative Rules, *Tax Notes*, (June 16, 2022).....19

Marisa Taylor et al., Reuters, Exclusive-U.S. opens criminal probe into alleged lapses at Eli Lilly plant.....5

Marlene Cimons, Eli Lilly Pleads Guilty of Failure to Disclose Oraflex-Linked Deaths, Los Angeles Times (Aug. 22, 1985) .....5

Napoli Shkolnik PLLC, Eli Lilly Once Again Under Scrutiny (Feb. 8, 2024).....5

Nicholas Parillo, Should the Public Get to Participate Before Federal Agencies Issue Guidance?, 71 Admin. L. Rev. 57 (2019) .....19

Patrick Wingrove, US finds control lapses at Catalent plant being sold to Novo, Reuters (Feb. 7, 2024).....4

U.S Department of Justice, US v. Eli Lilly and Company (March 26, 2009).....4

U.S. Food and Drug Admin., Eli Lilly and Company Issues Voluntary Nationwide Recall of One Lot of GLUCAGON® Emergency Kit Due to Loss of Potency (Sept. 26, 2021).....5

U.S. Food & Drug Admin., FDA Adverse Events Reporting Systems (FAERS) Public Dashboard.....4

U.S. Food & Drug Admin., FDA Drug Safety Communication: Voluntary market withdrawal of Xigris [drotrecogin alfa (activated)] due to failure to show a survival benefit (Oct. 25, 2011) .....6

U.S. Food & Drug Admin. & U.S. Dep't of Justice, Texas Pharmacist Pleads Guilty to Adulterating Drug Used in Cataract Surgeries (Oct. 13, 2021).....3

Webster's New World College Dictionary (4th ed. 2007) .....11

## Introduction

The Court should deny the summary judgment motions filed by the Food and Drug Administration (FDA) and Eli Lilly & Co. (Lilly) (collectively, Defendants). The motions fail to address critical deficiencies in FDA's action resolving the tirzepatide shortage, they are largely non-responsive to Plaintiffs' arguments, and they do not justify judgment as a matter of law in favor of Defendants.

## Background

**1.** Drug compounding "is a traditional component of the practice of pharmacy," that "is taught as part of the standard curriculum at most pharmacy schools," and some states "require all licensed pharmacies to offer compounding services." *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 360–61 (2002). Contrary to Lilly's claim that compounding "faded" out after "the colonial era," Lilly Mem. 7[1], this remains true today. *See* 22 Tex. Admin. Code § 291.36.

For more than 50 years after the Federal Food, Drug, and Cosmetic Act of 1938 (FDCA) was enacted, "the FDA generally left regulation of compounding to the States," *Thompson*, 535 U.S. at 360–61, which is further confirmation of its ongoing existence as a recognized practice. Pharmacists "provide[d] patients with compounded drugs without applying for FDA approval of those drugs." *Id.* However, in 1992, FDA announced that it would deem compounded drugs produced and sold in large quantities as within the FDCA's ambit and that, to be permitted, compounding must occur "after receipt of a valid prescription for an individual patient" and "in 'very limited quantities,'" among other dictates. *Id.* at 363 (quoting FDA guidance). FDA's goal was to confine compounding to "the bounds of traditional pharmacy practice" and thereby channel more drug products into its preferred "new drug" approval regime. *Id.* (citation omitted).

Congress enacted portions of this policy in the Food and Drug Administration Modernization Act (FDAMA) of 1997, Pub. L. No. 105–115, November 21, 1997, 111 Stat. 2296,

---

[1] Citations to "Lilly Mem." and "FDA Mem." refer to Lilly's and FDA's summary judgment supporting memoranda, respectively. This memorandum follows terms defined in Plaintiffs' opening summary judgment memorandum.

which added Section 503A to the FDCA, codified at 21 U.S.C. § 353a. The law exempted compounded drugs from the FDCA's new drug approval dictates only if they satisfied multiple restrictions, including that compounding occur in response to prescriptions and in limited quantities. *Thompson*, 535 U.S. at 364. Section 503A also contained speech restrictions, which the Ninth Circuit deemed unenforceable under the First Amendment and non-severable from the non-speech restrictions—resulting in the complete invalidation of Section 503A. *W. States Med. Ctr. v. Shalala*, 238 F.3d 1090, 1098 (9th Cir. 2001). The Supreme Court in *Thompson* affirmed the First Amendment holding but did not reach the severability holding, which the government did not challenge. *See* 535 U.S. at 366, 376–77. Circuits split on the severability question, *see Med. Ctr. Pharmacy v. Mukasey*, 536 F.3d 383, 401–02 (5th Cir. 2008), and uncertainty persisted as to FDA's authority to regulate drug compounding.

**2.** Congress responded in 2013 with the Drug Quality and Security Act (DQSA), Pub. L. No. 113-54, 127 Stat. 587; 159 Cong. Rec. 14-647 (2013). Congress began by amending the infirm speech restrictions out of Section 503A and providing for severability. Pub. L. No. 113–54, title I, § 106(a), Nov. 27, 2013, 127 Stat. 598.

Congress also added a new FDCA provision, Section 503B. 21 U.S.C. § 353b(a). Lilly erroneously characterizes Congress's action as effectively an effort to eliminate compounding. Lilly Mem. 8–9. The truth is that Congress intended to regulate, rather than prohibit, compounding. Had Congress intended to ban compounding outside of pharmacies, its revisions to Section 503A would have sufficed: the express permission for pharmacy compounding would likely have foreclosed other compounding by implication.

But, in Section 503B, Congress authorized and comprehensively regulated compounding by "outsourcing facilities" and exempted such compounding from the new-drug approval process. Outsourcing facilities are facilities having "one geographic location and address" that engage "in the compounding of sterile drugs," have "elected to register" with FDA, and comply with the numerous provisions of Section 503B. 21 U.S.C. § 353b(d)(4)(A). An outsourcing facility need not be a be a licensed pharmacy or compound drugs in small quantities in response to prescriptions

for identified patients. *Id.* § 353b(4)(B). Outsourcing facilities are regulated like drug manufacturers. They are subject to the same stringent manufacturing standards—known as "current Good Manufacturing Practices," or "cGMP"—that apply to drug manufacturers, as well as reporting and inspection requirements. *See id.* § 353b(a) and (b). Simply put, Congress rejected FDA's longstanding goal of confining compounding to traditional pharmacy practice. It "create[d] a whole new alternative for safe sources of sterile compounded drugs that are held to a nationwide quality standard." 159 Cong. Rec. S8072 (daily ed. Nov. 18, 2013) (statement of co-sponsor Sen. Alexander); *see also id.* at S8074 (statement of co-sponsor Sen. Warner) (The Act "ensures that patients and providers have access to safe compounded drugs.").

Thus, while Congress subjected compounding to exacting standards, that confirms it intended compounded drugs to serve a broad market purpose (here, to alleviate shortages). Outsourcing facilities must comply with the same "strict controls for manufacturing" that apply to Lilly. Lilly Mem. 5. And it is misleading for Lilly to state that compounded products have not been reviewed by FDA. The "assessment and study of the active ingredient is central to the new drug approval process," *Sandoz Inc. v. Becerra*, 57 F.4th 272, 280 (D.C. Cir. 2023), so the finding that an active ingredient is safe and effective applies equally to drugs compounded using that ingredient. When a compounded drug is "essentially a copy of one or more approved drugs," 21 U.S.C. § 353b(a)(5), its active ingredients have already undergone FDA pre-market review.

**3.** Lilly's smear campaign against compounded drugs fails to identify a single safety incident involving an outsourcing facility acting in compliance with Section 503B. All but one incident Lilly cites, Lilly Mem. 9–10, involve pharmacies, not outsourcing facilities. The one case of an outsourcing facility involved overt violations of law.[2] Violations of Section 503B do not impugn compounding any more than violations of law by pharmaceutical giants selling FDA-approved products condemns drug manufacturing.

[2] U.S. Food & Drug Admin. & U.S. Dep't of Justice, Texas Pharmacist Pleads Guilty to Adulterating Drug Used in Cataract Surgeries (Oct. 13, 2021), https://tinyurl.com/3r2xfkxc.

Lilly's attacks on compounding ignore that FDA-approved products regularly harm, even kill, patients, and manufacturers are frequently cited for violations of law.[3] Lilly itself is among the offenders. FDA's adverse-incident reporting system identifies over 56,000 adverse events involving Mounjaro and Zepbound, including 220 deaths.[4] These products were involved in over 37,000 adverse-incident reports for 2024 alone, with 4,550 serious cases including 151 deaths.[5] A mass-tort multi-district lawsuit is pending in Pennsylvania involving thousands of suits claiming injuries from, among other drugs, Mounjaro and Zepbound.[6] People who have taken Lilly's products allege they suffered kidney injury, pancreatitis, severe allergic reactions, and thyroid tumors, among other ailments.[7]

Lilly calls itself a "medicine company" that "has pioneered countless life-changing discoveries," Lilly Mem. 5, and that assertion may be fair in some respects. But Lilly is also a criminal. For example, it entered a plea agreement with the Department of Justice admitting to criminal misbranding in 2009, which—with a companion civil settlement—resulted in over $1.4 billion in damages and penalties.[8] In 1985, Lilly pleaded guilty to federal charges after one of its

[3] *See, e.g.*, Patrick Wingrove, US finds control lapses at Catalent plant being sold to Novo, Reuters (Feb. 7, 2024), https://www.reuters.com/markets/deals/us-fda-finds-control-lapses-catalent-plant-being-sold-novo-2024-02-06/ (last visited April 16, 2025).

[4] U.S. Food & Drug Admin., FDA Adverse Events Reporting Systems (FAERS) Public Dashboard, https://www.fda.gov/drugs/fdas-adverse-event-reporting-system-faers/fda-adverse-event-reporting-system-faers-public-dashboard (last visited April 16, 2025).

[5] *Id.*

[6] Grace P. Chandler, Tirzepatide Lawsuits, Motley Rice LLC, https://www.motleyrice.com/diabetes-lawsuits/tirzepatide (last visited April 16, 2025).

[7] *Id.*

[8] U.S Dep't of Justice, US v. Eli Lilly and Company (March 26, 2009), https://www.justice.gov/civil/cpb/case/us-v-eli-lilly-and-company-zyprexa#:~:text=On%20January%2030%2C%202009%2C%20Eli,additional%20%24100%20million%20in%20assets (last visited April 16, 2025).

drugs killed 49 people in the United States.[9] In that case, Lilly was informed that the drug in question harmed patients in the United Kingdom and elsewhere, but did not disclose this to FDA, resulting "in cases of liver failure, one case of acute kidney failure, one case of kidney and liver failure and three cases of jaundice."[10] Lilly has more recently been subject to criminal investigation based on "manufacturing irregularities and records tampering" at a site in New Jersey.[11] Eli Lilly is alleged to have fired the whistleblower.[12] Criminal acts aside, Lilly has been cited by FDA for poor quality control practices and malfunctioning equipment.[13] Lilly has frequently issued recalls for such blatant product defects as a drug's distribution "in liquid form instead of the powder form"—which can cause "death"[14]— and a drug's containing dangerous impurities.[15] In October 2011, Lilly announced a worldwide withdrawal of a drug FDA approved in 2001 that was later

---

[9] Marlene Cimons, Eli Lilly Pleads Guilty of Failure to Disclose Oraflex-Linked Deaths, Los Angeles Times (Aug. 22, 1985), https://www.latimes.com/archives/la-xpm-1985-08-22-fi-2455-story.html (last visited April 16, 2025).

[10] *Id.*

[11] Marisa Taylor et al., Exclusive-U.S. opens criminal probe into alleged lapses at Eli Lilly plant, Reuters (Jan. 19, 2024), https://www.reuters.com/business/healthcare-pharmaceuticals/us-fda-finds-new-manufacturing-lapses-eli-lilly-plant-2024-01-19/ (last visited April 16, 2025).

[12] Kevin Dunleavy, Eli Lilly whistleblower says she was fired after reporting manufacturing problems at massive NJ plant, Fierce Pharma (June 7, 2022), https://www.fiercepharma.com/pharma/eli-lilly-target-fired-whistleblower-who-warned-company-manufacturing-violations (last visited April 16, 2025).

[13] Napoli Shkolnik PLLC, Eli Lilly Once Again Under Scrutiny (Feb. 8, 2024), https://www.napolilaw.com/en/article/eli-lilly-once-again-under-scrutiny/ (last visited April 16, 2025).

[14] U.S. Food & Drug Admin., Eli Lilly and Company Issues Voluntary Nationwide Recall of One Lot of GLUCAGON® Emergency Kit Due to Loss of Potency (Sept. 26, 2021) https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/eli-lilly-and-company-issues-voluntary-nationwide-recall-one-lot-glucagonr-emergency-kit-due-loss (last visited April 16, 2025).

[15] Gillian McGovern, FDA Recalls Over 7000 Bottles of Duloxetine Because of Chemical Presence, Pharmacy Times (Oct. 24, 2024) https://www.pharmacytimes.com/view/fda-recalls-over-7000-bottles-of-duloxetine-because-of-chemical-presence (last visited April 16, 2025).

revealed to be ineffective and cause serious bleeding.[16] Lilly also lost a federal jury verdict ordering it to pay treble damages of hundreds of millions to state and local governments for misreporting prices and making false claims about the Medicaid rebate program.[17]

No one contends that Lilly's legal rights and positions in this case should be construed by reference to its many past failings. Lilly's hypocritical suggestion that it should prevail in this case based on a comparatively weaker, and vaguer, criticism of all things compounding stands on no firmer ground.

## Argument

### I. Defendants Are Not Entitled to Summary Judgment on the Second Claim

Defendants should not be awarded summary judgment on the second cause of action, which challenges FDA's failure to provide a satisfactory explanation of the grounds of its decision. Am. Compl. ¶¶ 79–84. As Plaintiffs' motion for summary judgment explains, ECF No. 122 at 8–15, FDA did not identify critical parameters of its decision-making, much less justify them. Rather than "cogently explain why it has exercised its discretion" in selecting a time period for evaluation, choosing against other possible time periods, and establishing constraints for its supply-and-demand inquiry, *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983), the agency [redacted], it never set the ground rules for the decision-making and, in turn, failed to provide the requisite justification for its ground rules.

---

[16] U.S. Food & Drug Admin., FDA Drug Safety Communication: Voluntary market withdrawal of Xigris [drotrecogin alfa (activated)] due to failure to show a survival benefit (Oct. 25, 2011) https://www.fda.gov/drugs/drug-safety-and-availability/fda-drug-safety-communication-voluntary-market-withdrawal-xigris-drotrecogin-alfa-activated-due (last visited April 16, 2025).

[17] Claire Rafford, Judge orders Lilly to pay $183.7M in damages in Medicaid lawsuit, Indy Star (March 24, 2023), https://www.indystar.com/story/news/local/indianapolis/2023/05/24/judge-orders-lilly-pay-187-million-damages-medicaid-lawsuit-ronald-j-streck-whistleblower/70246794007/ (last visited April 16, 2025).

Defendants say too little about this claim to justify summary judgment in their favor. *See* Lilly Mem. 27–28; FDA Mem. 7–12. Lilly contends merely that FDA identified what time period it considered, proposing it [redacted] Lilly Mem. 27–28. But Lilly ignores that [redacted] How then could that be the time period analyzed?

Nor do Defendants identify anything in either the Decision or Order explaining why one time period was selected over others, why different time periods are proper for different evidentiary showings, [redacted]—were made, or how critical factors (like shelf life and product loss) were assessed. Indeed, Defendants' briefs consistently make clear that *Lilly* called the shots and made the decisions. *See, e.g.*, Lilly Mem. 29 (noting that "Lilly was already providing FDA with supply and demand data" and defending FDA's crediting [redacted]); *id.* at 30 ("Lilly also provided FDA with" cumulative-supply-and-demand data); *id.* at 31 ("Lilly forecasted supply and demand [redacted]); *id.* at 32 ("Lilly also provided data about inventory in the distribution channel"); FDA Mem. 8 ("FDA … examined Lilly's … reports"). While Lilly claims "FDA did not just blindly accept any of this data," Lilly Mem. 32, it paints itself as leading the agency, not the other way around. Meanwhile, the only thing FDA says about its obligation of reasoned decision-making is that it "considered a host of data provided by Lilly and other sources." FDA Mem. 8. But "conclusory statements" like this "do not constitute adequate agency consideration of an important aspect of a problem," and "[s]tating that a factor was considered … is not a substitute for considering it." *Louisiana v. Dep't of Energy*, 90 F.4th 461, 473 (5th Cir. 2024) (citation omitted). Neither brief identifies a single parameter set by FDA, much less an articulated justification.

Lilly's brief accentuates FDA's failure to provide a sufficient explanation. As noted, Lilly argues that its [redacted] provide "the most relevant assessments." Lilly Mem. 29. An agency indeed might identify certain evidence as "most relevant," and Lilly's explanation—"that [redacted] provided the most up-to-date data," *id.*—bears some logical currency.[18] But the Decision does nothing like that. This is a "basis for the agency's action that the agency itself has not given" so this Court "may not supply" it. *State Farm*, 463 U.S. at 43 (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). In fact, Lilly stated on the administrative record that it [redacted] That Lilly feels compelled to make this argument evidences that the Decision itself is deficient.

Lilly further shows this in its observation that "Lilly's medicines … can be stored for up to 24 months, so Lilly's excess supply in one month carries over to the next month." Lilly Mem. 33. The Decision says nothing about this point either. It makes no finding of storage time or lost-product rates, and does not even attempt to ascertain how these factors inform the analysis. Moreover, the administrative record—to the extent it speaks on the issue—contradicts Lilly's assertion. ECF No. 122 at 15. If government lawyers may not supply "post-hoc rationalizations" for agency action, *Council for Urological Ints. v. Burwell*, 790 F.3d 212, 222 (D.C. Cir. 2015), neither may counsel for a private company.

Equally infirm is Lilly's assertion that its "supply of … medicines does not reset to zero at the start of each month." Lilly Mem. 33. This point raises more questions than it answers. The Decision does not address how long Lilly's supply lasts or how much is available in any month

[18] As discussed below (§ III), however, [redacted]

from past months. And it certainly does not make such findings in relation to demand for any month.[19]

Lilly is wrong to accuse Plaintiffs of "nitpicking around the edges." Lilly Mem. 28. Agency failures to define and explain parameters like these have doomed agency action in precedent. *State Farm*, 463 U.S. at 50; *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 27–30 (2020); *Louisiana v. Dep't of Energy*, 90 F.4th at 473; *Corrosion Proof Fittings v. EPA*, 947 F.2d 1201, 1226–27 (5th Cir. 1991), *opinion clarified* (Nov. 15, 1991). For example, the Fifth Circuit rejected the Department of Energy's repeal of conservation standards where "several alternatives" were available "but DOE ignored all of them," failing to explain why its ultimate choice beat out other possibilities. *Louisiana v. Dep't of Energy*, 90 F.4th at 473. The D.C. Circuit vacated flight restrictions by the Federal Aviation Administration over the Grand Canyon to achieve "natural quiet" measured by "the average annual day" because the agency did not explain why it chose that measure over an "any given day" measure. *U.S. Air Tour Ass'n v. FAA*, 298 F.3d 997, 1015–18 (D.C. Cir. 2002). That court also found fault with regulations governing commercial driving hours because they were based on a model that used an aggregate measure for part (not all) of the analysis, plotted the aggregate figure in an unjustified manner, divided the crash risk estimate by an average risk estimate, and ignored the potential factor of cumulative fatigue—all without explanation. *Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 203–06 (D.C. Cir. 2007). And the Ninth Circuit condemned an EPA decision that left the "reader wondering what metric, if any, EPA used to determine" best available retrofit technology, "or if EPA employed no metric, why not." *Nat'l Parks Conservation Ass'n v. EPA*, 788 F.3d 1134, 1143 (9th Cir. 2015); *see also Qwest Corp. v. FCC*, 258 F.3d 1191, 1202 (10th Cir. 2001). Agency failures to explain basic parameters of their action present more than "a technical dispute." *U.S. Air Tour Ass'n*, 298 F.3d at 1018. "[D]ue deference to agencies does not

[19] This reference to months does not suggest the agency must analyze months but rather is the product of Lilly's argument based on "each month." Lilly Mem. 33. Lilly intuitively understands that analysis of a set period, like a month, is essential.

make arbitrary and capricious review 'toothless'; rather, it has 'serious bite.'" *Louisiana v. Dep't of Energy*, 90 F.4th at 470.

Likewise, the choice of time period and basic parameters of supply and demand have "a significant impact" and thus require evaluation. *U.S. Air Tour Ass'n*, 298 F.3d at 1018. None appears in the Decision. Such explanation need not necessarily be "elaborate" but must be "rational, and thus adequate." *Nat'l Parks Conservation*, 788 F.3d at 1145. At best, the Decision "is founded on unsupported assertions or unstated inferences," and this Court should not "abdicate the judicial duty" to rectify this failing. *Tripoli Rocketry Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 437 F.3d 75, 83 (D.C. Cir. 2006).

## II. Defendants Are Not Entitled to Summary Judgment on the Fifth Claim

Defendants should not be awarded summary judgment on the fifth cause of action, which challenges FDA's reading of governing statutes. Am. Compl. ¶¶ 96–102. Defendants do not even attempt to explain how a [redacted] satisfies the statutory requirement that the shortage list be "up-to-date." 21 U.S.C. § 356e(a). *But see* FDA Mem. 13 (admitting the list must be based on "the latest facts" (citation omitted)). Nor do Defendants defend FDA's restricted analysis to shortages "at the national level," FDA Mem. 10, when they invoke a statutory definition calling for analysis of conditions "*within* the United States," 21 U.S.C. § 356c(h)(2) (emphasis added); Lilly Mem. 39. This includes regions of the United States.

There is no merit in FDA's defense of excluding compounded products from the demand it measured. FDA Mem. 7. FDA says nothing of statutory text, which authorizes compounded drugs that are "essentially a copy" of approved drugs. 21 U.S.C. § 353b(a)(5); *see also* 21 U.S.C. § 353a(b)(1)(D). This overcomes the Decision's rationale that compounded drugs should be considered a "different drug." Decision 22–23. FDA does not defend this rationale. FDA Mem. 7.

Instead, FDA supplies another new line of reasoning, proposing that textual fidelity would create an absurd scenario where, "the moment the supply of both the compounded and approved drug met overall demand, FDA would declare the shortage over and compounding would be

curtailed." *Id.* Setting aside that FDA is impermissibly adding *post hoc* rationales to the Decision, *State Farm*, 463 U.S. at 43, it is FDA's argument that is "absurd," FDA Mem. 7. The question is whether *the manufacturer* can satisfy demand with its supply, not whether manufacturers plus compounders can do so. Thus, it is incorrect to presume, as FDA now does, that "if a compounded product becomes part of the demand … it necessarily … becomes part of the supply of the drug." *Id.* Rather, if Lilly can satisfy *all* demand for *all* tirzepatide products, the shortage has ended. If not, then not. The fact that compounders assist in meeting demand during a shortage only confirms the statute is operating as Congress intended, not that their supply counts in the matrix.

FDA does not address the absurd result of excluding compounded drugs from the measured demand. If the portion of the market satisfied by compounded products is excluded—as FDA proposes—then the demand is redefined radically to count only the portion of demand the manufacturer can satisfy. Such an approach would set demand to equal the manufacturer's supply as a definitional matter and would end any shortage the moment it is declared. That is an absurdity, and it is at odds with Congress's evident intent that compounders step in during shortages to provide "essentially a copy" of FDA-approved drugs until the manufacturer can satisfy all demand itself.

Next, Lilly spills much ink (at 38–43) defending FDA's failure to consider "shipping" delays, 21 U.S.C. § 356e(b)(3)(F), but FDA does not join its argument, which is unpersuasive. Lilly attacks a straw man, arguing that, if shipping delays count, then a shortage exists from any delay "no matter how minor." Lilly Mem. 39. Lilly mocks the idea that a shortage must be declared "any time some patient experiences a delay in obtaining a prescribed drug." *Id.* at 41. But no one is making that argument. When the statute directs a shortage declaration due to a "[d]elay in shipping of the drug," 21 U.S.C. § 356e(b)(3)(F), it does not mean any delay no matter how minor: delays must be of sufficient scale to create a "shortage," *id.* § 356e(b)(3), which requires more than isolated instances of unavailability, *see* Webster's New World College Dictionary 1326 (4th ed. 2007) ("shortage" means "a deficiency in the quantity or amount needed"). Moreover, a shortage must be of sufficient length to be a cognizable "period of time when the projected demand

for the drug … exceeds the supply," 21 U.S.C. § 356c(h)(2). Plaintiffs have consistently acknowledged FDA's discretion to identify appropriate periods of time for analysis—which underscores why FDA should explain its choice—and the agency certainly may factor administrability into its determination. *See* ECF No. 67 at 14.

Plaintiffs' argument on shipping delays is that agency discretion must account for statutory factors. *State Farm*, 463 F.3d at 43. Under the statute, Lilly's inventory and orders do not mark the full—or even the most important—scope of the inquiry. Thus, while minor shipping delays do not create legally cognizable shortages, supply chain disruptions downstream from the manufacturer can meet the statutory standard. The agency must account for, and analyze, that possibility. Lilly never explains how, in its view, the explicit statutory reference to shipping delays means anything. "The absurdity bar is high, as it should be." *Texas Brine Co., L.L.C. v. Am. Arb. Ass'n, Inc.*, 955 F.3d 482, 486 (5th Cir. 2020). The canon applies only in "that rare instance," *Matter of Hammers*, 988 F.2d 32, 34 (5th Cir. 1993), where the result is so "preposterous" that "no reasonable person could intend" it, *Texas Brine*, 955 F.3d at 486 (citation omitted). That is not the case here, where FDA can implement the statute as written without absurdity.

Lilly offers a second straw-man argument in its vigorous defense of FDA's reliance on the shortage definition of a neighboring FDCA provision (Section 506C). 21 U.S.C. § 356c(h)(2); Lilly Mem. 39. But Plaintiffs do not challenge FDA's reliance on that definition; they challenge its reliance on that definition to the *exclusion* of text in Section 506E. *See* Am. Compl. ¶ 99 (asserting that the definition of Section 506C "does not purport to define the full scope of shortage"). Lilly does not justify FDA's sole reliance on the definition of a neighboring provision where Section 506E itself provides that shipping delays may compel shortage listings.

FDA does not endorse Lilly's arguments on this point, but instead claims it *did* consider "supply chain disruptions." FDA Mem. 8. The problem for FDA is that the Decision gave short shrift to this factor, asserting that a shortage resolution is "not inconsistent with some, and even many, individuals having had some trouble getting prescriptions for the affected drugs filled," because that concerns "the portion of the supply chain between Lilly and the individual

customers." Decision 2. FDA's brief now sweeps away a mountain of evidence of shortage on the ground that it was "caused by the 'practical dynamics' of the supply chain between Lilly's production and the end user." FDA Mem. 10; FDA App. 30, 117. Simply put, FDA effectively deemed *all* supply chain disruptions to be legally irrelevant—[redacted] At a minimum, FDA was obligated to clarify what degree of supply chain disruption it would regard as non-cognizable. *State Farm*, 463 U.S. at 50.

**III. Defendants Are Not Entitled to Summary Judgment on the Third Claim**

Defendants should not be awarded summary judgment on the third cause of action, which challenges FDA's findings as arbitrary and capricious under the substantial evidence standard. Am. Compl. ¶¶ 85–89. Defendants' assertions do not address the many failings Plaintiffs have identified in the evidentiary showing recounted in the Decision. That omission is notable, given that this Court directed summary-judgment briefing "to give Defendants a chance to answer" the "questions raised by the evidence supplied by Plaintiffs" in their response to order, ECF No. 110, "prior to entering a judgment on the merits," ECF No. 120 at 3. The Court will not find answers to Plaintiffs' questions in Defendants' opening briefs. And all Defendants' assertions are countered in Plaintiffs' summary judgment opening brief (at 17–23). Plaintiffs summarize these points here.

**1.** Defendants do not address [redacted]; *see Genuine Parts Co. v. EPA*, 890 F.3d 304, 313 (D.C. Cir. 2018) ("It was arbitrary and capricious for EPA to

rely on portions of studies in the record that support its position, while ignoring cross sections in those studies that do not.”).

**2.** FDA and Lilly both emphasize [redacted] Decision 7 (Table 1). The stock reports therefore cannot reveal whether supply exceeds demand. The substantial evidence standard is unsatisfied by evidence that “is incomplete on the relationship between” different portions of the “formula” the agency implements. *City of Charlottesville v. FERC*, 661 F.2d 945, 952 (D.C. Cir. 1981). In *City of Charlottesville*, the D.C. Circuit found the substantial standard unmet for a ratemaking decision predicated on assumed consolidated tax benefits because the record shed no light on “the interaction between the tax calculation and other portions of the ratemaking formula.” *Id.* Similarly, [redacted] *See NRDC, Inc. v. Herrington*, 768 F.2d 1355, 1385 (D.C. Cir. 1985) (explaining requirement that agency “explain[] the assumptions and methodology it used in preparing [a] model” in its decision-making).

[redacted] FDA again ignored this key record item. *See Ariz. Pub. Serv. Co. v. United States*, 742 F.2d 644, 650 (D.C. Cir. 1984) (vacating agency decision that “inexplicably ignores considerable—and highly significant—evidence”).

[redacted] But neither the record nor the Decision justify that leap of faith. *Louisiana v. Dep't of Energy*, 90 F.4th at 477 (reiterating condemnation of "*post hoc* rationalizations" (citation omitted)). [redacted]

**3.** Defendants then turn to cumulative supply-and-demand tables, FDA Mem. 9; Lilly Mem. 30–31, but [redacted]

---

[redacted]

[redacted] *see Elec. Consumers Res. Council v. FERC*, 747 F.2d 1511, 1518 (D.C. Cir. 1984) (rejecting agency action based on evidence that "bear[s] no relation to present realities").

[redacted]

[redacted] To credit an assertion "without explaining why" is "the touchstone of arbitrary and capricious agency action." *Louisiana v. Dep't of Energy*, 90 F.4th at 473; *see Sinclair Broad. Grp., Inc. v. FCC*, 284 F.3d 148, 162–63 (D.C. Cir. 2002) (rejection action based on determination for which agency "has not provided any

[redacted]

justification" due to an "evidentiary gap" in the record); *Arc Bridges, Inc. v. NLRB*, 662 F.3d 1235, 1239 (D.C. Cir. 2011) (rejecting agency finding that "comes out of thin air" due to "a rather large evidentiary hole"). [redacted]

[redacted]

## IV. Defendants Are Not Entitled to Summary Judgment on the Fourth Claim

Defendants should not be awarded summary judgment on the fourth cause of action, which challenges FDA's dismissal of evidence of an ongoing shortage as arbitrary and capricious under the substantial evidence standard. Am. Compl. ¶¶ 90–95. As an initial matter, Defendants' criticism of "Plaintiffs and their supporters" for "a jumbled collection" of information, Lilly Mem. 34, conflicts with their assertion that no prejudice followed from FDA's failure to engage in notice-and-comment rulemaking. FDA actively worked behind the scenes with Lilly to help Lilly make its case, but provided no notice to anyone else of the parameters of its decision-making, the types of information it would consider informative, or its view of shortcomings in information provided. Only after the Delisting Action did anyone beyond Lilly learn of the "important limitations" FDA claimed to find in these showings. Lilly Mem. 34 (citation omitted). FDA did not hold "all submissions to the same standard." Lilly Mem. 37.

In all events, Defendants' objections to the overriding evidence of a shortage fail to account for that evidence. Contrary to Lilly, Lilly Mem. 35–36, screen shots of unavailable tirzepatide products came with dates, FDA677–93, App. 218–34; FDA846–47, App. 387–88; FDA854–56, App. 395–97; FDA861–62, App. 402–03, and information about the length of time of

unavailability [redacted] FDA1450, App. 588; FDA1438–40, App. 576–78; FDA1451, App. 589; FDA1485, App. 623; FDA1529–1531, App. 667–69; FDA1541–1542, App. 679–80; FDA1544, App. 682; FDA1576, App. 714. The quantity of this information overcomes Lilly's objection that it shows only occasional minor disruptions. Lilly Mem. 35–36.

Lilly criticizes the survey information before FDA because it "had no reliable controls" and nothing to prevent "fabricated" information. Lilly Mem. 35. But this is just another respect in which FDA did not hold "all submissions to the same standard." Lilly Mem. 37; *see Univ. of Tex. M.D. Anderson Cancer Ctr. v. Dep't of Health & Hum. Servs.*, 985 F.3d 472, 479 (5th Cir. 2021) ("It is a bedrock principle of administrative law that an agency must 'treat like cases alike.'" (citation omitted)). FDA did nothing to ensure that Lilly's information came with proper controls and was not "fabricated" or misleading and, as described, made no effort even to assess if the different showings were consistent with each other (which is the most basic way to smoke out fabrication or error). Survey reports did include locality information and meaningful restrictions. FDA708–09, App. 249–50. The difference was that anything Lilly might say came to the agency with near infallibility while anything else was dead on arrival.

Notably, press releases showing shortages were not from Plaintiffs and their "supporters," nor was information [redacted]. FDA738–48, App. 279–89; FDA756–59, App. 297–300; FDA802–05, App. 343–46; FDA838, App. 379; FDA883–900, App. 424–441; FDA945–64, App. 486–505; FDA965–68, App. 506–09; FDA1517, App. 655. By comparison, no one anywhere other than Lilly asserts that the shortage is over. One would have thought FDA might desire information corroborating Lilly's claims.

Defendants do not adequately defend FDA's error in accounting for the volume of compounded tirzepatide. FDA contends that the volume of compounding would be small [redacted] Lilly's argument about "*excess inventory*," Lilly Mem. 36 [redacted]

[redacted] and that is its only response to the more than 500,000 doses per month provided by pharmacies. Lilly actually criticizes Plaintiff FarmaKeio for its substantial amount of compounding, Lilly Mem. 12–13. No substantial evidence supports the notion that Lilly could meet demand once compounded products exit the market.

**V. Defendants Are Not Entitled to Summary Judgment on the First Claim**

Defendants should not be awarded summary judgment Plaintiffs on the first cause of action, which challenges FDA's promulgation of the Delisting Action without notice-and-comment rulemaking. Am. Compl. ¶¶ 69–78.

**1.** Lilly is mistaken in maintaining that "[e]ither way, Plaintiffs lose" on their procedural claim. Lilly Mem. 21. Lilly ignores the Court's jurisdictional and statutory limitations in contending that, "if Plaintiffs were correct, then FDA's original decision to list Lilly's medicines would be *ultra vires*." *Id.* This Court has no vehicle to consider, or invalidate, the original listing decision because no plaintiff is before it having established standing to challenge the original decision or a cause of action. Article III limits federal judicial power to the justiciable case "before it," *United States v. Vega*, 960 F.3d 669, 672 (5th Cir. 2020), and does not permit couts to adjudicate questions that may (or may not) be raised in other lawsuits.

Moreover, APA review does not operate as Lilly proposes. The APA directs that the process "required" to promulgate a rule be used to rescind it, not that that whatever the agency did at the outset necessarily applies to amendments or repeal. *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 101 (2015). If that were not correct, then agencies would be free to disregard numerous rules that have been in effect for years. "But in rescinding a prior action, an agency cannot simply brand it illegal and move on." *Louisiana v. Dep't of Energy*, 90 F.4th at 475. Agency actions of questionable authority are in ample supply. For example, the Internal Revenue Service eschewed notice-and-comment rulemaking for years, accounting for a meaningful portion of tax regulations that—as Lilly would have it—can be withdrawn by the agency at will, without any APA process. Kristin Hickman, It's Time To Let Go: Treasury Regulations Are Not Interpretative Rules, *Tax Notes*, (June 16, 2022). Meanwhile, other agencies have employed notice-and-comment

rulemaking, even though it was not required. Nicholas Parillo, Should the Public Get to Participate Before Federal Agencies Issue Guidance?, 71 Admin. L. Rev. 57 (2019). Lilly suggests these actions may only be undone through notice-and-comment rulemaking, even though that was unnecessary to their promulgation.

Moreover, the Delisting Action can stand only on the basis FDA supplied in the action itself. *Regents*, 591 U.S. at 20. FDA did not state that a basis of the Delisting Action is invalidity of the original listing action. *Cf. id.* at 26 (agency action issued because government concluded it "is illegal"). If FDA had reached such a view, it would be required to evaluate obvious alternatives to simple rescission, such as justifying the listing action under the "good cause" exception to notice-and-comment rulemaking, 5 U.S.C. § 553(d)(3), or reissued under different procedures, *see Regents*, 591 U.S. at 27 (finding that agency acted arbitrarily and capriciously, even though it properly found prior policy unlawful, because it failed to consider partial rescission rather than total rescission). As the Fifth Circuit has recounted, the Supreme Court in *Regents* "held that the rescission" of programs called DACA and DAPA "was arbitrary and capricious *even if* DACA and DAPA were unlawful." *Louisiana v. Dep't of Energy*, 90 F.4th at 475. That is because "deciding how best to address a finding of illegality moving forward can involve important policy choices." *Id.* (citation omitted). So too here.

**2.** FDA and Lilly defend the Delisting Action as an informal adjudication. But there were no parties. An adjudication at a minimum requires "individual parties." *Safari Club Int'l v. Zinke*, 878 F.3d 316, 333 (D.C. Cir. 2017). Lilly and FDA identify no party-less "adjudication" in the history of agency practice. Lilly contends that an adjudicating can "affect a large group of individuals," Lilly Mem. 23 (citation omitted), but it does not follow that it can do so with *no* parties. Similarly, Lilly is incorrect to analogize the Delisting Action to FDA's approval of a new drug application (NDA). Lilly Mem. 24. FDA's consideration of an NDA is an adjudication of the rights of a party (the applicant) before the agency that, in turn, has collateral legal consequences on third parties. *See Safari Club*, 878 F.3d at 334 (discussing adjudication of applications). That is

entirely different from an agency's simply declaring generally applicable legal consequences, as FDA did here. That is a rule.

FDA and Lilly mis-identify the standard differentiating adjudication from rulemaking. The Supreme Court decision they cite, *United States v. Florida East Coast Ry. Co.*, 410 U.S. 224, 246 (1973), held that rulemaking was the correct procedure where the Interstate Commerce Commission took action "applicable across the board to all" participants in an industry, made no "effort" to "single out any particular" actor for "special consideration based on its own peculiar circumstances," and established a rule "for prospective application only, rather than in adjudicating a particular set of disputed facts." *Id.* at 245–46. Each box here equally checks in favor of rulemaking: FDA banned compounding essential copies of Mounjaro and Zepbound by all outsourcing facilities and pharmacies, did not identify any of them as parties, made no special considerations regarding facts germane to some of them, and established a rule for prospective application only, rather than adjudicating whether anyone should be penalized for past compounding. The "immediate and determinable impact" of the Delisting Action, Lilly Mem. 22 (citation omitted), was prospective, not retrospective—confirming the Delisting Action is a rule.

The involvement of fact questions is immaterial. Rulemaking was proper in *Florida East Coast*, even though the agency "obviously relied on factual inferences as the basis of its order." 410 U.S. at 246. Likewise, *Safari Club* involved the fact question whether "the killing of [a] trophy animal will enhance the survival of the species." 878 F.3d at 322 (quoting regulatory directive). EPA often undertakes fact-intensive listing actions by rule, determining whether forms of air pollution "may reasonably be anticipated to endanger public health or welfare," *Massachusetts v. EPA*, 549 U.S. 497, 506 (2007) (quoting statutory directive), whether substances "present, or may present, through inhalation or other routes of exposure, a threat of adverse human health effects," 42 U.S.C. § 7412(b)(2) (requiring list of such substances), and whether specific waste sites involve "risk of harm to the environment from the migration of hazardous substances from the site by way of three routes: groundwater, surface water, and/or air." *Anne Arundel Cnty., Md. v. EPA*, 963 F.2d 412, 414 (D.C. Cir. 1992). IRS similarly takes fact-intensive rulemakings when it lists transactions

that have the "potential for [illegal] tax avoidance or evasion." *Mann Constr., Inc. v. United States*, 27 F.4th 1138, 1141 (6th Cir. 2022) (quoting statute).

**3.** Defendants advance no meaningful argument that the FDCA "expressly" relieves FDA from the APA's default requirements. 5 U.S.C. § 559. Ignoring the standard, FDA points out (at 13) that the shortage list must be "up-to-date"—[redacted]—and that FDA receives "confidential business information and trade secrets" in assessing shortages. But the FDCA does "not say anything, expressly or otherwise, that modifies the baseline procedure for rulemaking established by the APA." *Mann Constr.*, 27 F.4th at 1146. Because FDA can update the shortage list frequently through notice-and-comment rulemaking—or by finding good cause when necessary to act without such rulemaking—the statutory scheme remains "compatible with the APA." *Id.* at 1145 (citation omitted).

The same is true of FDA's confidentiality point. Agencies often base rulemaking decisions on confidential information. *See generally* Christopher S. Yoo & Kellen McCoy, Privacy vs. Transparency: Handling Protected Materials in Agency Rulemaking, 96 Ind. L. J. 1259 (2021); Bridget C.E. Dooling, Legal Issues in E-Rulemaking, 63 Admin. L. Rev. 893, 911–13 (2011). *Public Citizen v. Nuclear Regulatory Commission*, 573 F.3d 916 (9th Cir. 2009), held that an agency properly relied on "classified information about nuclear facilities" in a rulemaking, explaining that "[t]he APA also exempts from the general rule information it is specifically authorized to withhold from public scrutiny." *Id.* at 928 (citing 5 U.S.C. § 552(b)). The FDA itself has published "Procedures for Handling Confidential Information in Rulemaking." 60 Fed. Reg. 66981 (Dec. 27, 1995); *see also* FDA, Consumer Comments—Public Posting and Availability of Comments Submitted to Food and Drug Administration Dockets, 80 Fed. Reg. 56469 (Sept. 18, 2015) (updating 1995 policy). Similarly, the fact that FDA may determine that the public interest favors maintaining in confidence even the existence of the shortage, FDA Mem. 14, is irrelevant here, where FDA did not find any such basis.

**4.** Defendants' harmless-error arguments conflict with Fifth Circuit precedent holding that "[s]ubstantive rules not subjected to notice and comment may not be enforced against a party."

*W & T Offshore, Inc. v. Bernhardt*, 946 F.3d 227, 237 (5th Cir. 2019). Those arguments also conflict with Defendants' criticisms of third parties for failing to satisfy standards FDA concealed until it issued the Delisting Action (*see supra* § IV). The agency never provided notice to the public, even as it considered a matter implicating supply, demand, and availability across the entire nation. Not all patients, providers, insurers, telehealth operators, pharmacy chains, etc., with pertinent information regularly visit an obscure page buried on FDA's website. That matters because evidence of a shortage is additive: more reports of unavailability, across more places, carry greater weight. Those who provided evidence were prejudiced by the agency's refusal to provide notice to and solicit information.

Moreover, without notice, members of the public had no way of knowing what kinds of information the agency would consider and no ability to address the agency's restrictions. The prejudice in this is plain: FDA dismissed all non-Lilly evidence based on "limitations," Decision 16, but it never disclosed—as it would have in notice-and-comment rulemaking—its intention to hold these categories of evidence to idiosyncratic standards it applied in the Decision. FDA's failure violated its "obligation to make its views known to the public in a concrete and focused form so as to make criticism or formulation of alternatives possible." *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 36 (D.C. Cir. 1977).

## VI. Defendants Are Not Entitled to Summary Judgment on the Sixth Claim

Defendants should not be awarded summary judgment Plaintiffs on the sixth cause of action, which challenges FDA's failure to publish the Delisting Action in the Federal Register. Am. Comp. ¶¶ 103–107. Defendants do not deny that legislative rules must be published in the Federal Register, but rather refer back to their unpersuasive positions that the Delisting Action is not a legislative rule. Lilly Mem. 24–25; FDA Mem. 12. These positions fall with Defendants' positions on the first cause of action.

**CONCLUSION**

The Court should deny Defendants' summary-judgment motions. The Court should enter summary judgment in favor of Plaintiffs, set aside the Delisting Action, and permanently enjoin FDA from taking action based on the Delisting Action.

Dated: April 16, 2025

*/s/ Ty Doyle*

TY DOYLE (Texas Bar No. 24072075)
BAKER & HOSTETLER LLP
811 Main Street, Suite 1100
Houston, TX 77002
(713) 646-1374
tgdoyle@bakerlaw.com

ANDREW M. GROSSMAN*
RICHARD B. RAILE*
RENEE M. KNUDSEN*
MARC N. WAGNER*
BAKER & HOSTETLER LLP
1050 Connecticut Ave., N.W., Suite 1100
Washington, D.C. 20036
(202) 861-1697
agrossman@bakerlaw.com

* admitted *pro hac vice*

*Attorneys for Plaintiffs*

**Certificate of Service**

I hereby certify that this document, filed through the CM/ECF system on this day, will be sent via electronic mail to the registered participants as identified on the Notice of Electronic Filing.

Dated: April 16, 2025

*/s/ Ty Doyle*

TY DOYLE (Texas Bar No. 24072075)
BAKER & HOSTETLER LLP
811 Main Street, Suite 1100
Houston, TX 77002
(713) 646-1374
tgdoyle@bakerlaw.com

*Attorney for Plaintiffs*