**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**Fort Worth Division**

| | |
|---|---|
| OUTSOURCING FACILITIES ASSOCIATION, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES FOOD AND DRUG ADMINISTRATION, et al.,<br><br>Defendants. | Civil Action No. 4:24-cv-00953-P |

**Plaintiffs' Reply in Support of**
**Motion for Summary Judgment**

**Table of Contents**

Introduction ........ 1

Argument ........ 1

I. Summary Judgment Should Be Granted to Plaintiffs on the Second Claim ........ 1

A. FDA Was Required to Explain Its Parameters, Including Its Choice Against Alternative Parameters ........ 2

B. FDA Did Not Explain Its Parameters, Including Its Choice Against Alternative Parameters ........ 5

II. Summary Judgment Should Be Granted to Plaintiffs on the Fifth Claim ........ 12

III. Summary Judgment Should Be Granted to Plaintiffs on the Third Claim ........ 15

IV. Summary Judgment Should Be Granted to Plaintiffs on the Fourth Claim ........ 19

V. Summary Judgment Should Be Granted to Plaintiffs on the First Claim ........ 21

VI. Summary Judgment Should Be Granted to Plaintiffs on the Sixth Claim ........ 24

Conclusion ........ 24

## Table of Authorities

**Cases**


*Amin v. Mayorkas*,
24 F.4th 383 (5th Cir. 2022)....................10, 15

*Ass'n of Data Processing Serv. Orgs. v. Bd. of Governors of Fed. Rsrv. Sys.*,
745 F.2d 677 (D.C. Cir. 1984)....................23

*Ass'n of Priv. Colls. & Univs. v. Duncan*,
870 F. Supp. 2d 133 (D.D.C. 2012)....................3

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
591 U.S. 610 (2020)....................13

*Bostock v. Clayton County*,
590 U.S. 644 (2020)....................14

*Bowen v. Georgetown Univ. Hosp.*,
488 U.S. 204 (1988)....................21

*City of Arlington v. FCC*,
569 U.S. 290 (2013)....................4, 22

*Clarke v. CFTC*,
74 F.4th 627 (5th Cir. 2023)....................6

*Dep't of Com. v. New York*,
588 U.S. 752 (2019)....................3, 4

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
591 U.S. 1 (2020)....................1, 2, 4

*Edison Elec. Inst. v. EPA*,
2 F.3d 438 (D.C. Cir. 1993)....................2, 5

*Louisiana v. Dep't of Energy*,
90 F.4th 461 (5th Cir. 2024)....................3, 5, 11, 16, 19

*Mann Constr., Inc. v. United States*,
27 F.4th 1138 (6th Cir. 2022)....................23

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)....................2, 4

*Nat'l Parks Conservation Ass'n v. EPA*,
788 F.3d 1134 (9th Cir. 2015) ....................4

*NRDC v. EPA*,
808 F.3d 556 (2d Cir. 2015) ....................5

*Omnipoint Corp. v. FCC*,
78 F.3d 620 (D.C. Cir. 1996)....................21–23

*Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*,
494 F.3d 188 (D.C. Cir. 2007)....................3, 5

*Process Gas Consumers Grp. v. Fed. Energy Regul. Comm'n*,
177 F.3d 995 (D.C. Cir. 1999)....................2

*Safari Club Int'l v. Zinke*,
878 F.3d 316 (D.C. Cir. 2017)....................21, 22

*SEC v. Chenery Corp.*,
318 U.S. 80 (1943)....................11, 23

*Sedima, S.P.R.L. v. Imrex Co.*,
473 U.S. 479 (1985)....................14

*Small Refiner Lead Phase-Down Task Force v. EPA*,
705 F.2d 506 (D.C. Cir. 1983)....................5

*United Distribution Cos. v. Fed. Energy Regul. Comm'n*,
88 F.3d 1105 (D.C. Cir. 1996)....................3, 5

*United States v. Florida East Coast Ry. Co.*,
410 U.S. 224 (1973)....................21

*U.S. Air Tour Ass'n v. F.A.A.*,
298 F.3d 997 (D.C. Cir. 2002)....................5

**Statutes and Constitutional Authority**

5 U.S.C. § 559....................23

21 U.S.C. § 353a....................15

21 U.S.C. § 353b....................15

21 U.S.C. § 356c....................14, 23

21 U.S.C. § 356e....................12, 22, 23

U.S. Const. Art. II, sec. 3....................22

**Other Authority**

2 Kristin E. Hickman and Richard J. Pierce, Jr.,
Administrative Law Treatise (6th ed. 2019) ....................................................................2

## Introduction

The Court directed the parties to thoroughly brief cross-motions for summary judgment because it found it inappropriate to resolve this case on the merits simply by referring back to its preliminary injunction ruling. In providing what Defendants criticize as a "rerun" of the preliminary-injunction phase, FDA Opp. 1, in "new garb," Lilly Opp. 1[1], Plaintiffs have in fact supplied a more thorough explication of six causes of action that are well grounded in law and the administrative record. The Court requested a closer look at these issues, and Plaintiffs' briefing provides it by exposing the many deficiencies of the Delisting Action. It is Defendants who offer tired positions, unduly secure in their prior, temporary successes. The fundamental problem for them, however, is that FDA was required in the Delisting Action (consisting of a "Decision" and "Order") to provide an adequate justification for its many parameters and findings, but the explanation on the page is deficient. Defendants' arguments only confirm that to be so. For these reasons, those set forth below, and those in Plaintiffs' prior summary-judgment-phase briefing, the Court should grant Plaintiffs' motion and deny Defendants' motions.

## Argument

### I. Summary Judgment Should Be Granted to Plaintiffs on the Second Claim

Plaintiffs' opening brief demonstrated the Decision's failure to explain critical assumptions, parameters, and methodologies. SJ Mem. 8–15. The Decision does not satisfy the standard of "reasoned decisionmaking" that governs all agency action. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 16 (2020) (citation omitted). Defendants' responses do not refute Plaintiffs' showing.

---

[1] Defendants' summary judgment oppositions are referred to as "Lilly Opp." and "FDA Opp.," respectively. Plaintiffs' opening memorandum is cited as "SJ Mem." Abbreviated terms have the meaning used in Plaintiffs' prior summary-judgment memoranda. Appendix citations include an "FDA" citation to refer to the administrative record page along with a parallel citation to a summary judgment appendix with sufficient information to show which appendix is meant.

### A. FDA Was Required to Explain Its Parameters, Including Its Choice Against Alternative Parameters

Defendants make various attacks against the reasoned-decisionmaking standard itself, suggesting FDA did not need to explain basic features of its action. The Court should not bless this resistance to 90-year-old principles of administrative law. *See* 2 Kristin E. Hickman and Richard J. Pierce, Jr., Administrative Law Treatise § 11.2, pp. 1167–72 (6th ed. 2019) (surveying evolution of the reasoned-decisionmaking standard).

**1.** FDA calls it "rigid" to expect the agency to identify parameters of supply, demand, and time period. FDA Opp. 3. But its insistence on "discretion," *id.*, talks past the rule that "an agency must cogently explain why it has exercised its discretion in a given manner," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983). FDA similarly argues that "nothing in the drug shortage statute requires a company to provide, or the agency to evaluate, data in any particular form." FDA Opp. 4; *see also* Lilly Op. 9 (similar). This ignores that, in order to satisfy APA review, an agency must still explain the choices it made. *See, e.g.*, *Edison Elec. Inst. v. EPA*, 2 F.3d 438, 443–47 (D.C. Cir. 1993) (finding agency choice legally permissible but inadequately explained). Here, FDA's failure to explain key parameters that drove the outcome in the Decision is an APA violation regardless of whether the statute would permit FDA's parameters had they been properly justified.

It is not unduly rigid for the judiciary to insist that "the Government should turn square corners in dealing with the people." *Regents*, 591 U.S. at 24 (citation omitted). The standard leaves ample room for FDA to "recognize the variable settings" of shortages, FDA Opp. 3, so long as it explains its premises, assumptions, and findings. Agency discretion comes with responsibility. Even if parameters governing time-period and supply-and-demand findings were mere formalisms—they are not—FDA would still need to explain them. Where an agency must select a metric that "is 'necessarily a somewhat arbitrary figure,'" it must nonetheless "'provide substantial evidence to support its choice and respond to substantial criticisms of that figure.'" *Process Gas Consumers Grp. v. Fed. Energy Regul. Comm'n*, 177 F.3d 995, 1003 (D.C. Cir. 1999) (quoting

*United Distribution Cos. v. Fed. Energy Regul. Comm'n*, 88 F.3d 1105, 1141 n.45 (D.C. Cir. 1996)) (alteration marks omitted); *see also Ass'n of Priv. Colls. & Univs. v. Duncan*, 870 F. Supp. 2d 133, 153 (D.D.C. 2012) (same). In this case, even assuming FDA could pick any time period or metric of supply, demand, monthly carryover, product life period, etc., it had to articulate its determinations, premises, and methods.

This "well-worn principle," *Louisiana v. Dep't of Energy*, 90 F.4th 461, 473 (5th Cir. 2024), answers Lilly's backwards criticism that "Plaintiffs themselves cannot seem to decide what they think the 'right' time period would be." Lilly Opp. 10 n.3. Plaintiffs are not the United States government and have no right or responsibility to decide these questions. The *agency* must exercise discretion and "explain[] why." *Louisiana v. Dep't of Energy*, 90 F.4th at 473. Plaintiffs have shown FDA's failings by illustrating numerous alternatives FDA failed to consider, assumptions lacking cogent explanation, and holes in reasoning and evidence. That Plaintiffs' arguments expose inconsistency *by FDA* does not make Plaintiffs themselves inconsistent.[2]

**2.** Defendants attempt to evade the reasoned-decisionmaking standard as to factors like time period, cumulative start and end points, and product shelf life and loss. But the agency must address factors like these because they compose "the technical basis" and the "most critical factual materials" supporting (or undermining) a shortage finding. *Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 199 (D.C. Cir. 2007) (citation omitted). Indeed, the elements "period of time," "demand," "projected demand," and "supply" are the central statutory factors. Decision 3. And Plaintiffs have demonstrated—without meaningful rebuttal—that different parameters yield different results. SJ. Mem. 19–20. If FDA need not explain its constraints, then it may act with no accountability. *See Dep't of Com. v. New York*, 588

[2] Inexplicably, the next page of Lilly's brief faults Plaintiffs for proposing a month-to-month analysis, Lilly Opp. 11, which both contradicts Lilly's prior criticism that Plaintiffs proposed no time period and misreads Plaintiffs' briefing, *see* SJ Mem. at 12–13 ("To be clear, to demand a *rationale* for not running a month-to-month analysis is not the same as to demand an *actual* month-to-month analysis.").

U.S. 752, 785 (2019) (explaining that reasoned-decisionmaking standard ensures that "judicial review is … more than an empty ritual").

Begging to differ, FDA argues that the statutory language—"a period of time when the demand or projected demand … exceeds the supply"—"merely identifies what a shortage is" but "says nothing about how FDA should *determine* whether a shortage exists or has ended." FDA Opp. 2–3. This is flat wrong. First, by defining a shortage, the statute told FDA how to decide if a shortage exists. It was lawless for FDA to decide the shortage question apart from the statute. *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013) (explaining that agencies' "power to act and how they are to act is authoritatively prescribed by Congress"). Second, the Decision itself states that the quoted statutory text governs FDA "in determining whether a drug is in shortage for purposes of the FD&C Act." Decision 3; *see also id.* at 13, 18 & n.76, 22 & n.103. For FDA to abandon that position now leaves the Decision without its logical and legal foundation, which alone compels vacatur. *See Regents*, 591 U.S. at 20–21 (explaining vacatur procedure if a decision's "grounds are inadequate"). Third, the Decision implemented the statutory wording "within the United States" in deciding what "is relevant to the questions of supply and demand that the statute tasks FDA with analyzing to determine whether a drug shortage exists." Decision 18 & n.76. It is arbitrary for FDA to adopt terms it likes—e.g., "United States"—but dismiss those it dislikes—e.g., "a period of time." Fourth, it is similarly incoherent for FDA to criticize Plaintiffs for looking to Section 506C's definition to inform Section 506E. *See* FDA Opp. 2. FDA looked to Section 506C in the Decision and now vigorously defends its choice to "borrow[] the definition from a related provision." ECF No. 125 at 7. FDA cannot credibly discard the definition to suit the needs of the moment.

**3.** Lilly errs in contending that alternative options for measuring time period, supply, and demand "are not alternatives in the relevant sense." Lilly Opp. 10. In Lilly's view, the reasoned-decisionmaking standard applies only when an agency is "enacting policy" rather than when it is "answering a factual question." *Id.* Lilly is mistaken. The standard applies in full force to "the facts" an agency "found." *State Farm*, 463 U.S. at 43. *State Farm* required assessment of

an alternative that was "*more* than a *policy* alternative …; it is a *technological* alternative within the ambit of the existing standard." *Id.* at 51 (emphases added). By consequence, agencies must give account, not only for their broad choices, but also for their "assumptions and methodology," *U.S. Air Tour Ass'n v. F.A.A.*, 298 F.3d 997, 1008 (D.C. Cir. 2002), and their bases for deciding "factual questions," *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 536 (D.C. Cir. 1983) (citation omitted).

Agencies may not leave readers wondering about their "metric[s]," *Nat'l Parks Conservation Ass'n v. EPA*, 788 F.3d 1134, 1143 (9th Cir. 2015), or "predictive models," *Small Refiner*, 705 F.2d at 535. The reasoned-decisionmaking requirement applies to things like a "time-on-task methodology" underpinning an agency decision, such that the agency must explain why it "chose to draw [a] curve" the way it did, its selection of mathematical inputs and processes, and its choice for or against cumulative counting. *Owner-Operator*, 494 F.3d at 203–04; *see also Edison Elec.*, 2 F.3d at 446–47 (faulting EPA for applying mismanagement model to mineral wastes without reasoned explanation); *NRDC v. EPA*, 808 F.3d 556, 571 (2d Cir. 2015) (faulting EPA for "failing to consider adequately a standard more stringent than" International Maritime Organization standards in permitting decisions). FDA's parameters in selecting a time period (or not) and measuring supply and demand are precisely the types of "assumptions and methodology" and agency must justify. *U.S. Air Tour*, 298 F.3d at 1008.

**B. FDA Did Not Explain Its Parameters, Including Its Choice Against Alternative Parameters**

Defendants' resistance to the reasoned-decisionmaking standard betrays their lack of confidence in their fallback position that the Decision satisfies that standard. The Decision is silent on key factors, and *post hoc* lawyers' arguments cannot fill the void. *Louisiana v. Dep't of Energy*, 90 F.4th at 469. At no point does the Decision state that [redacted] is better than some other period for any reason, that different temporal measures are more suitable for different metrics on a rational ground, that cumulative counting may logically [redacted], that product

longevity was measured or factored in any way—or a host of other things. *See Clarke v. CFTC*, 74 F.4th 627, 641 (5th Cir. 2023). Defendants talk around this core problem and do not cure it.

**1. Deference to Lilly**. Key decisions, assumptions, and parameters of the Decision were set [redacted]. SJ Mem. 9–10. Defendants deny this but without factual basis. *See* Lilly Opp. 8; FDA Opp. 3. Defendants identify no important parameter set by FDA. Lilly responds that it "did not decide that its medicines are no longer in shortage. FDA did." Lilly Opp. 8. But Lilly did [redacted]. They are "the key parameters of the decision," and FDA did "let Lilly determine" them. Lilly Opp. 8. Lilly's brief expressly states that "it determined [redacted]" and "[redacted]." *See id.* While "FDA asked Lilly to explain [redacted], *id.*, that only proves who the real decisionmaker was.

The practical concern here is that Lilly knows its internal data, and no one else does, so it can manipulate the analysis without checks or balances. The Decision bears significant indicia of selectivity. [redacted]

[redacted].

**2. Time Period**. FDA did not adequately explain what time period it analyzed, its rationale, and its bases for rejecting alternative time periods. SJ Mem. 10–13. Oddly, FDA both denies that it needed to identify a time period and claims it actually did "identify or explain the time period for analysis." FDA Opp. 3. It is hard to understand the agency's reasoning even today.

Both FDA and Lilly point to [redacted]. This fact defeats Lilly's view that the different showings "enabled FDA to both zoom in and zoom out perspectives, giving it a holistic view of the situation." Lilly Opp. 16. FDA could not "zoom in" on inventory [redacted]. Nor could it zoom out on inventory or shipments [redacted]. Nor could [redacted].

Lilly attempts to flip the script on Plaintiffs by accusing them of knowing [redacted] Lilly Opp. 9. Lilly says Plaintiffs' contrary argument "is in serious tension with the sentence" of Plaintiffs' brief [redacted]. *Id.* But Lilly rips that sentence from context. *See* SJ Mem. 10. The prior three sentences [redacted]

[redacted].[3] Moreover, the fact that anyone with an eye to see can criticize the Decision's inconsistency does not somehow make the Decision's premises ascertainable or coherently explained.

Besides, Defendants do not deny that the Decision fails to explain why one time period was chosen against readily apparent alternatives. Defendants cannot point the Court to language in the Decision explaining why or even just asserting that [redacted] for any reason. SJ Mem. 11–13. Lilly summarily announces that "Plaintiffs' 'obvious' alternatives are not 'obvious' or alternatives at all." Lilly Opp. 14. But this refuses to engage with Plaintiffs' argument. Plaintiffs grounded their alternatives in the different [redacted]—as well periods well known in accounting practice. SJ Mem. 11–13. Defendants deny no predicate of this argument. For example, they do not deny that companies like Lilly run their accounting affairs under annual, quarterly, and monthly time periods—never [redacted]. They have no basis to refute that these standard time periods were obvious alternatives.

**3. Supply and Demand.** The Decision does not disclose a supply-and-demand methodology. SJ Mem. 13–15. To begin with an undisputed irregularity, the Decision prominently features a finding of [redacted].[4] Defendants ignore this oddity. If their response is bound up in their sweeping view that no obvious alternative existed, Lilly Opp. 14, that would be hard to swallow. The Decision said the question is whether supply meets demand, Decision 1, so an obvious alternative was to find [redacted]

[3] Anyway, Plaintiffs argued in the alternative (as litigants may do), asserting no time period is fairly discernable and [redacted] is arbitrary and contrary to law.

[redacted].

[redacted]. If there was a good reason for a half-done analysis, the Decision should have explained it.

From there, more questions abound. For starters, it remains a mystery what practical significance the cumulative tables carry. Even if *post hoc* arguments could make up the Decision's failure to answer this question, Defendants do not even do that much. Lilly has finally admitted [redacted], Lilly Opp. 13, but plays ignorant about what this concession means. [redacted].

It is fair to ask what the figures say about the real world. FDA responds in circular talk stating that the tables show [redacted] This just restates question as answer. For its part, Lilly proceeds as if it never made [redacted]. Because it does not, the cumulative figures are as relevant to Lilly's actual supply (and demand) as the Rangers' win–loss record.

This answers Lilly's assertion that "FDA *had* to consider Lilly's historical cumulative data" because "whether a shortage exists at any given moment depends in part on the status of supply and demand *leading up to that moment*." Lilly Opp. 16. This point might be sound if cumulative tables [redacted]

[redacted] "After all, in the law, what is sauce for the goose is normally sauce for the gander." *Heffernan v. City of Paterson*, 578 U.S. 266, 272 (2016).

The Decision also does not explain how the agency accounted for product storage, loss, and longevity—if it did at all. SJ Mem. 14–15. According to Lilly, the agency need not have mentioned these factors because Plaintiffs' assertion that they present "obvious" questions is nothing but "rank speculation." Lilly Opp. 13. Really? Lilly felt compelled to say in its preliminary-injunction opposition that its products "can be stored for up to 24 months with proper refrigeration," ECF No. 89 at 12, even though this is not in the record and appears contradicted by the record, *see* SJ Mem. 15. The Court relied on Lilly's assertion, ECF No. 101 at 23 n.10, and Lilly repeated its assertion in its opening summary judgment memorandum, ECF No. 128 at 33. Now that Plaintiffs pointed out that the Decision is silent on product longevity, Lilly blames *Plaintiffs* for raising the issue and says the agency could fairly ignore it altogether. That is a classic heads-I-win-tails-you-lose argument.[5]

Defendants turn to other tables of the Decision but again do not attempt to answer the plainest of questions—[redacted]. The Decision does

[5] For its part, FDA bypasses Plaintiffs' point by asserting [redacted] so its longevity matters.

not explain why [redacted]

****

Lest the main point be lost, the question here is not whether answers may conceivably be provided to Plaintiffs' points. The question is whether the Decision itself provides those answers, given that "the grounds upon which an administrative order must be judged are those upon which the record discloses its action was based." *Louisiana v. Dep't of Energy*, 90 F.4th at 469 (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)). Assuming for the sake of argument that a time period consistent with the Decision could be identified and justified, alternatives could fairly be ruled out, parameters could be disclosed and made compatible with logic and math, and so on, none of that would matter because the Decision does none of that important work. The Decision

[redacted].

may not stand on "convenient litigation positions and *post hoc* rationalizations." *Id.* (cleaned up). At best, Defendants have only that to offer, which is too little, too late.

## II. Summary Judgment Should Be Granted to Plaintiffs on the Fifth Claim

Plaintiffs demonstrated multiple legal errors in the Decision. SJ Mem. 15–17. Each compels vacatur, and FDA has admitted yet another in denying it needed to adhere to the statutory shortage definition (see *supra* § I). Defendants' efforts to justify error are themselves erroneous.

**1. Up-to-Date**. Taking as given Defendants' insistence that the Decision employs [redacted], that approach contravenes the statutory command of an "up-to-date" list. 21 U.S.C. § 356e(a). FDA does not deny that [redacted]. FDA insists it "*did* consider the most recent available information" but was also permitted to "consider[] older data." FDA Opp. 5–6. But FDA did not just *consider* older data; that [redacted].

Attempting to justify that startling outcome, Lilly compares a shortage determination to assessing "a batter's seasonal batting average." Lilly Opp. 28. But the analogy supports Plaintiffs' position because a mid-season average is, like Lilly's tables, [redacted]. A batter may deliver few or no hits in September but retain a high average because of top performance earlier in the season. Likewise, if a drug manufacturer does that, it will have great cumulative numbers on paper, but patients will go without medicine in September or longer. Simply put, assessing averages and drug supply are entirely different endeavors. Worse, because FDA and Lilly maintain the right [redacted]—which a "seasonal" batting average does not do[7]—[redacted]

[7] A baseball season runs about six months. [redacted]

There is no meaning in Lilly's superficial concession that, "[s]hould there come a day when cumulative supply is outpaced by cumulative demand, a shortage would once again exist." Lilly Opp. 29. [redacted], it could stop producing (or under-produce) for years and still show a paper surplus—much as a star player at the end of his career may play several below-average seasons but retain his elite status (and statistics) because of results he delivered a decade ago.

Notably, the Court's preliminary-injunction ruling interprets the statute to require a listing update if supply falls below demand on a month-to-month, or even day-to-day basis, ECF No. 101 at 10–11, and FDA latches onto this interpretation in excusing itself from notice-and-comment rulemaking, FDA Opp. 14. But Lilly's reading contradicts both propositions by deeming the shortage determination a long-term proposition (longer than a baseball season). Once running totals have accumulated, the data are locked in and resistant to change to reflect current reality. A batter with a .300 average in July does not see it drop to .100 in September, even if he enters a six-week slump. Likewise, the evidence here is that [redacted]. Patients could lack access to a drug for many months before FDA would recognize a shortage under this construction. It is legally wrong.

**2. Shortages Within the United States**. Defendants' response to Plaintiffs' observation that the FDCA does not set a national-only shortage inquiry has more bark than bite. They announce "glaring problems" with Plaintiffs' position, FDA Opp. 6, and that it "is plainly not what Congress had in mind," Lilly Opp. 30. But the "statutory text [is] the definitive expression of Congress's will," *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 624 (2020), and Defendants' arguments are light on text.

Lilly admits "that something can be 'in' or 'within' an area without being coextensive with or exhaustive of that area," Lilly Opp. 30, which effectively concedes this point away. Lilly continues that "it is also possible that something can be 'in' or 'within' a space in an exhaustive and coextensive manner." *Id.* That is true, but Plaintiffs have not denied that national shortages

satisfy the text. Lilly incorrectly infers *exclusivity* from *breadth*—i.e., that because the text is capacious enough to cover both national and regional shortages, it actually *excludes* regional shortages. But the statute's "breadth" indicates it has both reaches. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 499 (1985) (citation omitted); *see Bostock v. Clayton County*, 590 U.S. 644, 669 (2020) (holding there is no "such thing as a 'canon of donut holes'"). FDA looks past the statutory definition to the compounding permissions of Sections 503A and 503B, FDA Opp. 6, but these provisions are entirely uninformative because they have no geographic element.

FDA and Lilly hasten too quickly to their favored absurd-results canon, Lilly Opp. 30–31; FDA Opp. 6–7, which supports Plaintiffs, who pointed out that, under a national-only shortage standard, a manufacturer that cannot meet orders could starve one region of supply, meet demand elsewhere, and avoid a shortage listing. SJ Mem. 16. That result is at once realistic and absurd. Lilly declares that this "makes no sense," Lilly Opp. 31, but says nothing more (perhaps because [redacted]). FDA ignores this point, perhaps because it elsewhere suggests that Lilly was doing [redacted]

Defendants counter with unrealistic scenarios, such as that anything short of a national standard would enable a shortage declaration "at the individual pharmacy level." FDA Opp. 6; Lilly Opp. 30. The fact that pharmaceutical drug markets extend beyond "individual states, cities, and towns," Lilly Opp. 30, refutes this assertion, as does the statutory text, which is sufficiently robust to limit shortage declarations to scenarios fairly understood as shortages—i.e., where large market segments cannot be satisfied. Fortifying the robust text of Section 506E is the reporting standard of Section 506C, which is met only by an interruption "that is likely to lead to a meaningful disruption in the supply of that drug in the United States." 21 U.S.C. § 356c(a)(2). This means disruption that is "more than negligible and affects the ability of the manufacturer to fill orders or meet expected demand for its product." 21 U.S.C § 356c(h)(3). An all-or-nothing national reading is neither necessary for practical implementation nor called for by text.

**3. Delays in Shipping**. Defendants say nothing new to justify FDA's failure to seriously consider statutory bases of shortage, such as supply disruptions downstream from Lilly. SJ Mem. 16. Lilly yet again offers straw-man arguments that Plaintiffs have rebutted. *Compare* Lilly Opp. 31 *with* ECF No. 133 at 11–13.

**4. Scope of Demand**. FDA erroneously counted demand only for Lilly's products and not for compounded forms. That is what FDA expressly said it was doing, Decision 22–23, which overcomes Lilly's contention that "FDA *did* consider demand for compounded drugs," Lilly Opp. 32. Lilly also denies that compounded drugs are functional equivalents to those produced by manufacturers, *id.* at 31–32, but it has no response to the statutory term: "essentially a copy," 21 U.S.C. § 353b(a)(5); *see also* 21 U.S.C. § 353a(b)(1)(D). Lilly presents another diatribe against compounding that just replaces its self-interested policy preferences for statutory text. Lilly Opp. 31–32. Notably, Lilly persists in treating Sections 503A and 503B as compounding bans rather than authorizations. *See* ECF No. 133 at 1–3.

## III. Summary Judgment Should Be Granted to Plaintiffs on the Third Claim

Plaintiffs' opening brief demonstrated the Decision's shortage resolution was unsupported by substantial evidence. SJ Mem. 17–23. The numbers in the Decision raise more questions than answers and do not accurately measure supply against demand. The evidence "is not substantial in the APA sense" and thus does not support the outcome. *Amin v. Mayorkas*, 24 F.4th 383, 393 (5th Cir. 2022) (citation omitted). Defendants' responses are unconvincing.[8]

---

[redacted]

**1.** Substantial evidence that is up-to-date does not support a shortage resolution. Plaintiffs have demonstrated that [redacted] Defendants do not dispute these numbers.

Defendants respond with the types of arguments that should have been in the Decision. *Louisiana v. Dep't of Energy*, 90 F.4th at 473. They are in all events without merit. [redacted]

**2.** Plaintiffs demonstrated that no evidence [redacted]

---

[redacted]

[redacted]

**3.** Plaintiffs demonstrated that no fair measure of demand is supportable in the Decision. SJ Mem. 21–23. This omission, in turn, defeats any suggestion that supply exceeds demand. Defendants do not answer Plaintiffs' point that [redacted]

Defendants do respond to Plaintiffs' demonstration [redacted]

[redacted]. FDA was obligated to make proper findings with an evidentiary basis, and the Decision cannot stand with such glaring unanswered questions and evidentiary holes.

**IV. Summary Judgment Should Be Granted to Plaintiffs on the Fourth Claim**

Plaintiffs demonstrated that the Decision improperly dismissed evidence of an ongoing shortage. SJ Mem. 23–27. FDA found that this information did "not undermine or outweigh the information submitted by Lilly." Decision 16. But, where the information supplied by Lilly did not support the shortage resolution, that position necessarily fails. In all events, Defendants are unpersuasive in defending FDA's treatment of this material.

The Decision acknowledges screenshots showing "Mounjaro and Zepbound listed as 'out of stock' and/or 'restricted' in the number a retailer may purchase from wholesalers." Decision 20. FDA now admits that screenshots "from [redacted] website reflected a lack of supply." FDA Opp. 11. That is substantial evidence that the Decision should have addressed—but did not. FDA seeks to overcome this failing by [redacted] *Id.* But FDA's record citation shows merely that [redacted]

The same deficiency applies to Lilly's assertion that its supposed [redacted] The Decision does not address this point. *Louisiana v. Dep't of Energy*, 90 F.4th at 473.

[redacted]

Defendants also blame "distribution chain dynamics unrelated to the adequacy of supply" for the screenshots showing pharmacies could not obtain Lilly's products. Lilly Opp. 19; FDA Opp. 11. But this rests of the erroneous legal view (*see supra* § II) that a shortage ends if the manufacturer's warehouses are full regardless of downstream distribution dynamics. Moreover, FDA's theory that forward distribution centers "can quickly be resupplied," FDA Opp. 11, has no evidentiary basis: even if this *can* happen at *some* level, it does not follow that it *did* happen at the level needed in this instance.

This is yet further proof that FDA rigged its analysis in Lilly's favor. The "limitations" FDA cites are equally applicable to Lilly's information. For example, [redacted] And the dating Lilly provided was no more confirmed by evidence than the dating on submission letters that

---

[9] [redacted]

Defendants discount. Lilly Opp. 19. FDA did not impose strictures to ensure Lilly's presentation was not "cherry-picked," *id.*, as it almost certainly was. A rule that screen shots needed a date on their face, *id.*, rather than in accompanying material, was not applied to Lilly and could not have been because Lilly submitted no primary-source material.[10]

## V. Summary Judgment Should Be Granted to Plaintiffs on the First Claim

Plaintiffs showed that the Delisting Action is a legislative rule subject to the APA's default notice-and-comment requirement. SJ Mem. 27–33. Defendants' responses are unconvincing.

**1.** Defendants again do not address the legal distinction between a rulemaking and adjudication. An adjudication is a backward-looking determination based on disputed facts and limited circumstances concerning the rights of specified parties. *United States v. Florida East Coast Ry. Co.*, 410 U.S. 224, 245–46 (1973). Defendants do not—because they cannot—contend that the Delisting Action imposed liability on compounders by finding their compounding from December 2022 through December 2024 contrary to law. Instead, the Delisting Action is a forward-looking prohibition on compounding by an entire industry that will only carry consequences if violated in the future. That is a rulemaking. *Safari Club Int'l v. Zinke*, 878 F.3d 316, 332 (D.C. Cir. 2017). Thus, the Delisting Action did not—contrary to Defendants' assertions—impose "immediate legal consequences." FDA Opp. 13 (citation omitted). No one was penalized, and no one will be penalized if they comport their conduct with the new standard. In sum, the Delisting action "deals with what the law will be" not with "what the law was." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 221 (1988) (Scalia, J., concurring).

Contrary to FDA, the Delisting Action does impose "a new policy-type rule or standard." FDA Opp. 13 (citation omitted). The executive branch makes a new rule and policy when it declares that certain compounding is prospectively prohibited, just as it makes rules and policies in naming a species to the Endangered Species List, a pollutant to the list of hazardous air

[10] It is strange that FDA and Lilly blame Plaintiffs for duplicate material and material concerning other drugs in the administrative record, *see, e.g.*, Lilly Opp. 20; FDA Opp. 20, when FDA compiled the administrative record.

pollutants, or a plot of land to the list of hazardous waste sites. ECF No. 133 at 21–22. Lilly's denial that a "policy judgment" is present in the Delisting Action, Lilly Opp. 4, denies the very nature of government (or at least the executive power, which is political). The Delisting Action pulls compounded drugs off the market, raises drug prices, and deprives patients of medicine, to the benefit of pharmaceutical manufacturers and their shareholders. Good or bad, that is policy. And to note that FDA acts pursuant to "an existing statute" when it declares and resolves shortages, FDA Opp. 13 (citation omitted), is merely to note what is always true of agency action, *see* U.S. Const. Art. II, sec. 3 (identifying executive duty to "take Care that the Laws be faithfully executed"); *City of Arlington*, 569 U.S. at 297 (2013) (reasoning that when agencies "act improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires").

There were also no parties to the adjudication, unlike every other adjudication in the history of the APA. FDA has never denied this point, *see* SJ Mem. 29, and does not deny it now. For the first time, Lilly announces it was "obviously … a party to the decision." Lill Opp. 5. If that were obvious, Lilly or FDA would have noticed it and mentioned it somewhere before now—such as in the Decision or the Order, neither of which identifies any party subject to the proceeding. But Lilly's point is not correct (much less obviously so) because to be a party to a case means to have one's rights adjudicated.[11] *Safari Club*, 878 F.3d at 333 (explaining that "adjudications immediately bind parties by retroactively applying law to their past actions"). Lilly's rights were not adjudicated in the Delisting Action: both before and after, it was authorized to manufacture, market, and distribute Mounjaro and Zepbound. And the governing statute does not even contemplate a proceeding involving a manufacturer. It simply requires a listing and notice to Congress. *See* 21 U.S.C. § 356e(a) and (d). In these ways, a shortage declaration is unlike new-drug approval, where a party establishing it has satisfied various statutory criteria, utilizing a statutory avenue made for such parties, is enabled to manufacture, market, and distribute a product where all of that was formerly forbidden.

---

[11] Lilly yet again argues against a straw man in contending this point depends on the caption of the decision. Lilly Opp. 5.

**2.** FDA is unpersuasive in arguing that the FDCA displaces the APA. FDA Opp. 14. The question is whether the FDCA does so "in a 'clear' or 'plain' way." *Mann Constr., Inc. v. United States*, 27 F.4th 1138, 1145 (6th Cir. 2022). FDA's arguments fall short. Setting aside that the agency has not implemented an "up-to-date" list—since Lilly's paper surplus is set in amber—FDA's argument that this requirement displaces the APA's notice-and-comment requirements for rulemaking was not a ground for its action, Order 8 (arguing instead for adjudication), and is therefore unavailable here, *see Chenery*, 318 U.S. at 87. That requirement is also not preclusive of notice-and-comment rulemaking. Section 506E expressly contemplates that shortages may result from events providing more-than-adequate time for notice and comment, including "[d]iscontinuance of the manufacture of a drug," delays in bringing compliant manufacturing capacity online, regulatory delays, and demand growth. 21 U.S.C. § 356e(b)(3). Consistent with that understanding, the related reporting requirement of Section 506C allows "30 calendar days" and "40 calendar days" for action in instances where manufacturers may have failed to provide notification of a shortage. 21 U.S.C. § 356c(e) and (f)(2)–(3). Those periods far exceed those necessary for expedited notice-and-comment procedures. *See Omnipoint Corp. v. FCC*, 78 F.3d 620, 629 (D.C. Cir. 1996) (approving seven-day comment period where Congress directed agency to act "without…delays"). In any event, "Congress's intent to make a substantive change [must] be clear" before the APA's default requirements may be disregarded. *Ass'n of Data Processing Serv. Orgs. v. Bd. of Governors of Fed. Rsrv. Sys.*, 745 F.2d 677, 686 (D.C. Cir. 1984). The shortage statute does not meet this standard. FDA also has no response to Plaintiffs' point that confidentiality is not mutually exclusive with notice-and-comment processes. SJ Mem. 31–32.

Lilly similarly ignores the law in suggesting that Congress must expressly incorporate the APA for it to apply. Lilly Opp. 3–4. This is exactly backwards. 5 U.S.C. § 559. While Lilly notes that parts of the FDCA require notice-and-comment rulemaking, Lilly Opp. 4, Lilly misses that Section 506C—an adjacent provision FDA contends is directly relevant to shortage determinations—expressly *exempts* FDA from the APA's default notice-and-comment requirements for its implementing regulations, *see* 21 U.S.C. § 356c(i)(5) ("Notwithstanding any other provision of Federal law, in

implementing this section, the Secretary shall only promulgate regulations as described in paragraph (4)."). Congress knew how to liberate FDA from the APA's dictates but did not do so in Section 506E.

**3.** Lilly dismisses the prejudice of FDA's APA violation with the quip: "the less said the better." Lilly Opp. 6. That shows only how little Lilly has to say. Even if Plaintiffs were aware of the supposed adjudication of their rights, they were not aware of the panoply of parameters and criteria FDA would adopt and disclose only after banning compounding by an entire industry. Lilly mocks the "scattershot submissions" of all the parties, except Lilly, who were in the dark about FDA's intentions, Lilly Opp. 7, and then contends no prejudice resulted from FDA's partnership with Lilly in securing Lilly's strategic goals. The error of Lilly's argument should be apparent on its face.

## VI. Summary Judgment Should Be Granted to Plaintiffs on the Sixth Claim

For the same reason Plaintiffs are entitled to summary judgment on the first claim, they are entitled to summary judgment on the sixth claim, which challenges FDA's failure to publish the Delisting Action in the Federal Register. Am. Comp. ¶¶ 103–107. Defendants' responses fail with their positions on the first claim.

## CONCLUSION

The Court should enter summary judgment in favor of Plaintiffs, set aside the Delisting Action, and permanently enjoin FDA from taking action based on the Delisting Action.

Dated: April 22, 2025

*/s/ Ty Doyle*
TY DOYLE (Texas Bar No. 24072075)
BAKER & HOSTETLER LLP
811 Main Street, Suite 1100
Houston, TX 77002
(713) 646-1374
tgdoyle@bakerlaw.com

ANDREW M. GROSSMAN*
RICHARD B. RAILE*
RENEE M. KNUDSEN*
MARC N. WAGNER*
BAKER & HOSTETLER LLP
1050 Connecticut Ave., N.W., Suite 1100
Washington, D.C. 20036
(202) 861-1697
agrossman@bakerlaw.com

* admitted *pro hac vice*

*Attorneys for Plaintiffs*

**Certificate of Service**

I hereby certify that this document, filed through the CM/ECF system on this day, will be sent via electronic mail to the registered participants as identified on the Notice of Electronic Filing.

Dated: April 22, 2025

*/s/ Ty Doyle*

TY DOYLE (Texas Bar No. 24072075)
BAKER & HOSTETLER LLP
811 Main Street, Suite 1100
Houston, TX 77002
(713) 646-1374
tgdoyle@bakerlaw.com

*Attorney for Plaintiffs*