1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE NORTHERN DISTRICT OF TEXAS

3                     FORT WORTH DIVISION

4   OUTSOURCING FACILITIES        )     CASE NO. 4:24-CV-00953-P
    ASSOCIATION, ET AL            )
5                                 )
                                  )     FORT WORTH, TEXAS
6   vs.                           )
                                  )     APRIL 24, 2025
7   UNITED STATES FOOD AND DRUG   )
    ADMINISTRATION, ET AL         )     1:50 P.M.
8

9                        VOLUME 1
       TRANSCRIPT OF MOTION FOR SUMMARY JUDGMENT
10       BEFORE THE HONORABLE MARK T. PITTMAN
            UNITED STATES DISTRICT COURT JUDGE
11

12  **A P P E A R A N C E S:**

13  FOR THE PLAINTIFF:        ANDREW MICHAEL GROSSMAN
                              BakerHostetler, LLP
14                            1050 Connecticut Avenue NW
                              Suite 1100
15                            Washington, DC  20036
                              Telephone:  202.861.1697
16
                              TYLER GEOFFREY DOYLE
17                            BakerHostetler, LLP
                              811 Main Street
18                            Suite 1100
                              Houston, Texas  77002
19                            Telephone:  713.646.1374

20

21  FOR THE DEFENDANT:        OLIVER MCDONALD
    U.S. Food and Drug        Consumer Protection Branch
22  Administration            450 Fifth Street NW
                              Room 6400-South
23                            Washington, DC  20530
                              Telephone:  202.305.0168

24

25

```
1                                JULIA LOVAS
                                 Office of Chief Counsel
2                                10903 New Hampshire Avenue
                                 White Oak 31
3                                Silver Spring, Maryland  20993

4

5
     FOR THE INTERVENOR:         ERIN E. MURPHY
6    Eli Lilly                   Clement & Murphy, PLLC
                                 706 Duke Street
7                                Alexandria, Virginia  22314
                                 Telephone:  202.742.8900
8
                                 JAMES R P HILEMAN
9                                Kirkland & Ellis, LLP
                                 300 N. LaSalle Street
10                               Chicago, Illinois  60654
                                 Telephone:  312.862.7090
11
                                 IAN BRINTON HATCH
12                               Kirkland & Ellis
                                 1601 Elm Street
13                               Suite 2700
                                 Dallas, Texas  75201
14                               Telephone:  214.972.1781

15

16   COURT REPORTER:            MONICA WILLENBURG GUZMAN, CSR, RPR
                                 501 W. 10th Street, Room 310
17                               Fort Worth, Texas  76102
                                 Telephone:  817.850.6681
18                               E-Mail:  mguzman.csr@yahoo.com

19

20   Proceedings reported by mechanical stenography, transcript
     produced by computer.
21

22

23

24

25
```

1                                    **INDEX**

2                                                    PAGE   VOL.

3    Appearances ................................4     1

4

5    By Mr. Grossman ............................5     1

6

7    By Mr. McDonald ...........................36     1

8

9    By Ms. Murphy .............................56     1

10

11   By Mr. Grossman ...........................69     1

12

13   Court's Ruling Withheld ...................72     1

14

15   Proceedings Adjourned .....................74     1

16

17   Reporter's Certificate ....................75     1

18

19

20

21

22

23

24

25

4

**P R O C E E D I N G S**

*(April 24, 2025, 1:50 p.m.)*

1    *THE COURT:*  We're here on the matter of Outsourcing

2    Facilities Association, et al vs. the FDA.  We have an

3    intervenor party that's been added, Eli Lilly.  We're here on

4    parties' motions for summary judgment.

5    And I would like to begin by asking the counsel for

6    plaintiffs to introduce themselves for the record.

7    *MR. DOYLE:*  Thank you and good afternoon, Your

8    Honor.  Ty Doyle of BakerHostetler for plaintiffs, alongside

9    my partner, Andrew Grossman.

10    *THE COURT:*  Okay.  And, Mr. Grossman, are you going

11    to be handling most of the argument?

12    *MR. GROSSMAN:*  Yes, Your Honor.

13    *THE COURT:*  I'm assuming this is your area of

14    expertise.

15    *MR. GROSSMAN:*  In general, yes, Your Honor.

16    *THE COURT:*  Okay.  And who do I have for the FDA?

17    *MR. MCDONALD:*  Your Honor, my name is Oliver

18    McDonald from the Department of Justice for Federal

19    defendants.

20    *THE COURT:*  Okay.

21    *MR. MCDONALD:*  With me at counsel table is Julie

22    Lovas, from the Food and Drug Administration's Office of Chief

23    Counsel.

1    *THE COURT:*  All right.

2         And who do I have for Eli Lilly?

3         *MR. HATCH:*  For Eli Lilly, it's Ian Hatch and James

4    Hileman from Kirkland & Ellis, and we have Erin Murphy from

5    Clement & Murphy as well.

6         *THE COURT:*  Okay.  Who -- who will be doing the

7    argument or most of the argument for your side, Mr. Hatch?

8         *MR. HATCH:*  Erin Murphy will be, Your Honor.

9         *THE COURT:*  All right.

10        I do have some questions, but I want you-all to be

11   able to make your presentation, so I'll try not to interrupt.

12   And I think it's best if we hear from counsel for the

13   plaintiff.  And as I said, I'll be generous with my time, so

14   don't worry about going over.  We have some time that's been

15   given back to us.

16        Mr. Grossman, I look forward to hearing from you.

17        *MR. GROSSMAN:*  Thank you, Your Honor.

18        Good afternoon.  Thank you for taking the time to

19   hold the hearing today.

20        Tirzepatide went into shortage because of surging

21   demand for the drug.  And the theory for the FDA's action

22   removing Tirzepatide from the shortage list, is that Eli Lilly

23   increased its manufacturing capacity and caught up with the

24   demand.  But even Lilly's own presentation of data showed that

25   the race was neck and neck, with supply ███████████████

6

1    ████████████████████████████████████████████.  That

2    should have led the FDA to take a hard look at Lilly's

3    presentation and decide whether the evidence satisfied the

4    agency's standard for ending a shortage.

5           But that's not what the FDA did.  Rather than reason

6    through the problem and apply its own standard, it deferred to

7    Lilly's presentation and Lilly's choices across the board.

8           Why did the FDA analyze a ████████████ of supply

9    and demand data?  Because that was the data that Lilly

10   happened to submit to the agency.

11          Why did the FDA rely on supply numbers that,

12   according to Lilly, don't reflect the actual supply available

13   to fulfill customer demands?  Because those were the numbers

14   that Lilly gave to the agency.

15          Why did the FDA determine that Lilly could ██████

16   ████████████████████████████████████████████████████

17   ██████████████████████████████████

18   Because Lilly said, without any support, that it could do so.

19          FDA's across-the-board deference to Lilly's choices

20   require vac- -- vacatur of its delisting action for two

21   reasons that I'd like to address this afternoon.  The first is

22   a lack of reasoned explanation for the agency's choices and

23   its methodology.  And the second is a lack of substantial

24   evidence supporting the agency's determination.  And if time

25   allows, which it may well do so now, I'd like to also make a

1    few points regarding the notice and comment argument as well.

2          Beginning with the lack of reasoned explanation

3    point, the agency's delisting action, the decision that it

4    issued, doesn't apply any apparent methodology.  The decision

5    announces, up top, right on page 1, that the inquiry before

6    the agency under the statute is whether demand exceeds supply

7    over a particular period of time.  That's on page 1; it's on

8    page 3, when the agency begins its analysis.

9          So what you would expect to see in the decision, is

10   that the agency would identify a period of time, and that it

11   would make findings for supply and demand over that period of

12   time.  Needless to say, the decision does not carry out that

13   methodology.  Instead, what it does is it proceeds to recite

14   each category of data from Eli -- that Eli Lilly has given it,

15   and then it states that the data, and I quote, "supports our

16   conclusion."

17         So what metric or criteria is the decision actually

18   applying in this analysis?  The decision never actually says,

19   and it certainly isn't obvious on the face of the decision.

20   It's effectively applying an I-know-it-when-I-see-it type of

21   standard, but that's not a valid methodology.

22         It's black letter law in the administrative law

23   context, as the Court is well aware, that an agency has to

24   have some type of concrete methodology so that the Court can

25   assess whether that complies with the statute, whether the

8

1   agency has carried it out, and whether the evidence actually

2   supports the agency's ultimate decision.  Without that, an

3   agency's action is inherently arbitrary.  And so that alone

4   requires vacatur.

5          But the FDA's specific choices here raise even more

6   questions that the decision doesn't even attempt to answer.

7          THE COURT:  Is it fair to say, you contend that the

8   FDA, essentially, picked and chose what type of data it wanted

9   to relate to to get to the ultimate answer?  Is that a fair

10  way to -- they got to the answer that they wanted by

11  cherry-picking the data; is that a good way to describe your

12  argument?

13         MR. GROSSMAN:  No, Your Honor.  I don't think that's

14  quite right.

15         THE COURT:  Okay.

16         MR. GROSSMAN:  Our argument is that Eli Lilly picked

17  and chose the data that it wanted to present to the agency,

18  and then the agency said, Yeah, that looks good enough to us.

19  In other words, the agency didn't say, Here's the standard

20  that we're applying and does the evidence support that

21  standard?  In other words, the agency --

22         THE COURT:  And you're correct, that's what I meant

23  to say.  You said it much more artfully than I did.

24         Go ahead.

25         MR. GROSSMAN:  So, let's begin just with the simple

9

1    issue of a period of time.  The Court, in its preliminary

2    injunction decision, and now FDA and Lilly, say that the

3    agency analyzed supply and demand over the ███████████

4    ███████████████████████████████, even though that

5    only covers one of the sets of data on which the decision

6    relies.

7            First of all, the agency made no finding of demand

8    over that period of time, that ████████████, or really over

9    any period of time.  The agency made no finding of supply over

10   the ████████████.  Instead, the decision finds ████████████

11   ██████████████████████████, even though the

12   defendants can't point to any record evidence that supports

13   that figure.  But put all of that aside for the moment.

14           Why use a ██████████████ of analysis to begin with

15   to assess whether a drug is currently in shortage?  There is

16   not a single word of explanation in the entirety of the

17   decision to justify that choice.  It certainly isn't obvious.

18   The ██████████████ is not in the statute or a

19   regulation.  FDA and Lilly can't point to any other process,

20   any business practice, or anything of the sort that typically

21   employs a ██████████████.

22           There's no explanation by the agency as to how

23   diluting current data with stale data from ████████████, is

24   somehow consistent with undertaking an up-to-date

25   determination of shortage status.  There's also no

1    consideration of obvious alternatives:  Month to month,

2    bimonthly, quarterly, six months.  We're not just making up

3    these potential alternatives, other sets of data that are in

4    the decision are framed in those formats.  So, those were

5    things that were already before the agency, and the agency

6    just didn't consider.  If it did, in fact, choose the ███████

7    ██████ of consideration, it didn't address those alternatives.

8           And I want to be clear, that this is not a minor

9    detail of the decision.  The choice of time period dictated

10   the outcome.  If you run the same methodology that the

11   decision employed, in other words, looking at this aggregate

12   supply-and-demand data, and that's at least a part of the

13   decision, if you apply that methodology over a more up-to-date

14   time period, like month to month, two months, a quarter, or

15   even the most recent six months, the results come out

16   negative.

17          And so --

18          THE COURT:  I know that one of the big things you

19   focus on is you fault the FDA for not considering Eli Lilly's

20   delays in shipping as an indicator that the shortage was

21   continuing -- I'm sorry I'm not speaking into the

22   microphone -- and you also criticize the time period.

23          Is there -- tell me a better alternative.  What

24   would be a more reasonable alternative to the time period they

25   used?  And the reason why I ask that, contrary to what you may

1    read about me or any other judge in the newspaper, I really --

2    when it comes to the Federal judge who was a political science

3    major from a state university going and telling the FDA maybe

4    they didn't do their methodology correctly, to quote our late

5    Pope, Who am I to judge?

6            What -- what's your alternative?  It's easy to

7    criticize.  It's easy to be in my position, and say, Well, the

8    time period they used was arbitrary and capricious.  But what

9    would have been a proper, reasonable time period to consider

10   in this case?  Do you have an alternative?

11           *MR. GROSSMAN:*  So, if I could, Your Honor, I would

12   give you two answers to that question.  The first is simply

13   that the agency has to justify its choice.  And I agree with

14   you that it's not the role of the Court certainly to supplant

15   the agency's exercise of discretion.

16           The Court's role is simply to determine whether the

17   agency properly exercised its discretion.  And for the Court

18   to undertake that inquiry, it has to rely on the explanation

19   provided by the agency; and in this instance, there is none.

20   So, that's kind of the problem here.

21           Maybe the agency could justify a ██████████,

22   maybe it couldn't, who knows.  But the problem is, is that the

23   agency didn't even try to do that.  That said, we think that

24   the ██████████ is, at a minimum, intentioned with, if not

25   in violation of, the statute.

12

```
1            As the Court's well aware, the statute requires an
2    up-to-date determination.  If you give equal weight to data
3    that is ███████████, as you are giving to the absolute
4    most current supply-and-demand data, that necessarily dilutes
5    the effects of the more recent data.  And so, the farther back
6    that period goes, the less up to date the decision is actually
7    going to be.  So, there may well be a statutory violation
8    here.  But, again, the agency never explained how it was to
9    reconcile its apparent choice, as the Court indicated, of a
10   ██████████████ with the statutory requirements of an
11   up-to-date determination.
12            So, it's not our place to say, Here's exactly what
13   the agency should have done.  We think there are some obvious
14   alternatives it had to consider; as I said, month to month,
15   bimonthly, quarterly, maybe six months.  Those are sort of
16   obvious.  Other data is in those formats.  A reasonable agency
17   would look at those and say, Maybe that's better, maybe that's
18   worse, let's work through it and come to a reasonable answer.
19            THE COURT:  And at the same time, it's not the
20   Court's job, if I grant your summary judgment, to say, A
21   better alternative would have been X, quarterly or whatever.
22            MR. GROSSMAN:  That's correct, Your Honor.
23            Well, except I would say, that there is at least --
24   so, again, I apologize, in blurrily fashion, for giving two
25   answers, but they're different --
```

1    *THE COURT:* No, that's fine.

2    *MR. GROSSMAN:* But they're different theories.

3    *THE COURT:* Yeah.

4    *MR. GROSSMAN:* So, it would be enough for the Court

5    to say that the agency's choice of a time period is simply

6    unreasoned. And it would be enough for the Court -- that

7    would be enough for the Court to vacate and say, You have to

8    provide some type of explanation, if you can explain this

9    choice.

10         If the Court wanted to reach the statutory issue,

11   again, we think there's a real problem with choosing a

12   ██████████████████ that looks back so far. And so the Court

13   could also say, That, at least as the agency has failed to

14   explain it on this record, that it is -- that it is in

15   violation of the statute for the agency to choose that time

16   period.

17         But I want to stress, in that instance the Court

18   would not be in a position to supplant the agency's discretion

19   and say, Here's the time period you have to use. It would be

20   just be enough to say, The one that you selected does not

21   comport with the statute.

22         So, as I said, this is not a minor detail. This

23   choice of time period actually drives the outcome, at least

24   with respect to the supply-and-demand data. But, again, I

25   think there's a problem with that data. The agency relied on

1  ██████████████████████████████████████████████

2  ██████████████████████  But Lilly conceded on the record, as

3  well as in its briefing, those figures ██████████████████

4  ███████████████████████████████████████

5  ███████████████████████

6         So, when Lilly, in its briefing, talks about a

7  ██████████████████████████████████████  and things

8  like that, its submissions to the agency, as well as its

9  briefing, admit that, no, █████████████████████

10 ████████████████████  They don't correspond with any

11 real-world fact.

12        So the question here, in other words, is, Why use a

13 statistic to represent supply that doesn't match the ordinary

14 meaning of that word or the purpose of the statutory inquiry?

15 Maybe the agency has some kind of answer for that, but it's

16 not on the record, it is not in the decision.  The agency had

17 to explain that.

18 ████████████████████████████████████████████

19 ████████████████████████████████████████████

20 ████████████████████████████████████████████████

21 ██████████████████████  Again, there's no explanation to justify

22 that choice.

23 ████████████████████████████████████████████

24 █████████████████████████████  Again, there's no

25 explanation.

1          And why accept Lilly's unsupported assertion of

2     being able to supply █████████████████████, which is ████

3     █████████████████████████████████, according to its own

4     data, in any month?  Again, there's no explanation whatsoever.

5          Now, FDA, in its briefing, emphasizes its discretion

6     in addressing shortages.  In other words, it gets to make

7     policy with respect to shortages.

8          *THE COURT:*  Let me ask you on the ████████████████

9     Because I think the FDA counsel is going to come and say,

10    Mr. Grossman is wrong, that was not totally the FDA relying on

11    Eli Lilly data, rather that was the FDI -- I'm so sorry -- the

12    FDA taking the projected data given them by Eli Lilly and they

13    came up with the ███████████.

14         *MR. GROSSMAN:*  That's not correct, Your Honor.

15         The actual ██████████ was in response to a question

16    provided by the FDA.  And the letter response from Lilly, from

17    which that number is drawn, stated that Lilly is █████████████

18    ███████████████████████████████████████████████████████████

19    ████████████████, and that that would -- that number was going

20    to be explained later in the letter; which, in fact, it never

21    is explained.  And so, there's actually nothing in the record

22    that supports that.

23         The evidence that is in the record is Lilly's

24    actual -- at least Lilly's reported ██████████████ supply,

25    none of which actually come close to ████████████ --

1    THE COURT:  I think that's a very important

2  argument.  I hope my defense counsel, particularly FDA

3  counsel, addresses that.

4        Go ahead, sir.

5    MR. GROSSMAN:  And I will note, in addition, in its

6  briefing, the only thing that the FDA is able to say about

7  that, is that it considered Lilly's representation of that to

8  be "credible."

9    THE COURT:  And why isn't -- why do you feel it's

10  unreasonable for them to be able to rely on the

11  representations of Eli Lilly with regards to the -- for

12  example, the ███████████████?

13    MR. GROSSMAN:  Well, first of all -- I mean, for

14  something that is such a key factor in the inquiry, that's

15  something where evidence is actually needed, rather than

16  simply the assertion of a self-interested party.

17        Second, that number conflicts, because it is ████

18  ███████████████████████████████████████████████

19  ████████████████████████████████████████████████

20  ███████████████████████████████████.

21        And then -- and then third, Lilly's projections,

22  Lilly has one projection for ██████████████ that is

23  substantial -- that is ████████████████, I believe it's

24  ██████████████, or thereabouts.  But then every other supply

25  projection, ████████████████████████████████

1  ████████████████████

2            So, I think it would be enough to say that it's not

3  credible.  Because if the agency simply looked at Lilly's

4  other submissions, it would, at a minimum, raise questions

5  about how this comports with what the -- with what Lilly has

6  actually done to date, as well as what Lilly projects going

7  into the future.

8            But I think the bottom-line point here is that in

9  all of these choices, or lack of choices, the agency was

10 exercising its discretion.  And we don't disagree with the

11 agency that it has discretion here, it gets to make policy

12 with respect to shortages, it gets to make a shortage policy.

13 But when an agency is making policy in this fashion and it's

14 exercising its discretion, it has to explain how and why it

15 exercised its discretion; and the FDA failed to do that at

16 every turn.

17           So, I'd like to move on to addressing some of the

18 record evidence here.  First, Lilly's data, and then second,

19 some of the data that was supplied by other parties.  As I've

20 described, Lilly's supply-and-demand data, this cumulative

21 data that was supplied to the agency is not up to date, but

22 it's stale.  Any reasonably up-to-date listing, or any

23 reasonably up-to-date tally that uses the last six months, or

24 any period shorter than that, would show demand outpacing

25 supply.  In other words, what the FDA has defined as a

1    shortage.

2         There is, as I described, no record evidence

3    supporting FDA's finding of a █████████████████████████

4    ████████████████.  Lilly admits in its briefing it never has

5    manufactured that much.  And the FDA's point is, Well, it

6    deems that to be credible.  The FDA -- I'm sorry, the APA

7    requires substantial evidence.  Here, there is literally

8    nothing.

9         But I want to emphasize to the Court why that figure

10   actually matters.  Lilly's demand projections -- if you look

11   at its ████████████████████████████████████████████████████████

12   ████████████████████████████████████████████.  And

13   that's without even considering the demand that was being

14   currently satisfied at that point by compounded products.

15        FDA's rationale for its conclusion that compounded

16   supply ultimately didn't matter in the analysis, was that

17   Lilly could ████████████████████████████████████████████,

18   which it said was enough to meet any potential supply that

19   would transition from compounded products to Lilly's products.

20   But, as I said, there's simply no support for that -- for that

21   underlying -- for that ████████████████████████ figure in --

22   in the record evidence.

23        Then there are Lilly's inventory snapshots.  The

24   problem here is that they measure supply, not demand.  I want

25   to make clear, they do net out orders that were open at the

19

```
 1    precise moments that the snapshots were taken, but they aren't
 2    paired up with any commensurate measure of demand.
 3            And Lilly admits in its briefing, as well as on the
 4    record, ████████████████████████████████████████████████
 5    ███████████████████████████████████████████
 6    ████████████  ██████████████████████ at a time.  And that's likely
 7    why, if you go through the record, ███████████████████████████
 8    ████████████████████████████████████████████████
 9    █████████████████████████
10            Lilly's shipment data shows a ████████████████
11    ████████████████████████████████ -- again, Lilly
12    reported demand -- in ████████████████████████████ a ███████████████
13    ████████████.  The FDA's briefing -- and this is FDA's opposition
14    brief -- says, Well, who knows, it's possible that those data
15    sets might cover different time periods.  Lilly's opposition
16    brief, and this is page 17 of that brief, ████████████████████████
17    ████████████████████████
18            THE COURT:  Let me ask --
19            (Court Reporter interrupts)
20            MR. GROSSMAN:  I apologize, page 17.
21            THE COURT:  And I interrupted, I apologize, too.
22            Let me -- let me take you back to this contention
23    about the -- █████████████████████████ and the ██████  ████████
24    ████████████████  that you're contending there that is evidence
25    that I should rely on to show that they acted arbitrary and
```

20

1    capricious.  But in looking and comparing, I think it was

2    chart four and five in your brief, one of those charts dealt

3    with ██████████████████████████; and on the second chart,

4    it dealt only with ██████████████████.

5            So, is that something that's really as important as

6    you are arguing?  In other words, would that account for the

7    difference in the ██████████████, because you're not

8    comparing the same shipments in both of the charts?

9            MR. GROSSMAN:  Your Honor, the answer is we don't

10   know, because the agency never asked them and that data isn't

11   in the record.  The -- according to Lilly, the difference

12   between the two data sets is that the -- is that one of them

13   includes -- I'm sorry, ████████████████████████████████

14           THE COURT:  Yeah.

15           MR. GROSSMAN:  ████████████████████████████████

16   ████████████████████████████████████████.  Is it

17   plausible that there is a ████████████████████████████████

18   ████████████████████████████████████████████████████

19   ██████████████████████?  I don't know.  I think, at the very

20   least, one could say that that raises serious questions that

21   the agency should have asked.  And it's the kind of thing

22   that you would expect to see addressed on the record,

23   particularly --

24           THE COURT:  In other words, more -- more evidence

25   that they didn't act reasonably when it came to making a

1    decision?

2              *MR. GROSSMAN:*  That's exactly --

3              *THE COURT:*  Reasonable agency action would have

4    asked those questions.

5              *MR. GROSSMAN:*  There was all kinds of indicia on the

6    record that there were problems, that there were shortages in

7    different areas, that people were having problems obtaining

8    access to these products.  And that's sort of -- that would

9    prompt any reasonable agency to do as much as it could to

10   compare the different sorts of data that it receives and see

11   how they line up.  In other words, see if there's consistency.

12             If Lilly is reporting shipments, well, of course you

13   look and see how that matches up against demand.  And if

14   there's some discrepancy there, as there was in this instance,

15   a very large one, the natural thing would be to ask -- to ask

16   Lilly why.  That's something the agency never did in this

17   instance.

18             And then, finally, the decision relies on Lilly's

19   completely unsupported claim that wholesalers, by ████████████

20   ████████████████████████████████████████████.  That is directly

21   contradicted by the screenshot data, which shows that

22   wholesalers limit orders when they lack stock.  In other

23   words, a pharmacy cannot place an order from any of the major

24   wholesalers, when the wholesaler lacks the capacity to fulfill

25   that order.

1          And so, the fact -- so the agency was relying on a

2    fact from Eli Lilly that has, effectively, no significance

3    whatsoever, as demonstrated by evidence that was on the record

4    by the agency.

5          And I think that's a good segue to talk about some

6    of the evidence from the wholesalers.  To begin with, this

7    so-called screenshot data shows widespread unavailability in

8    November and December.  Many of these screenshots are

9    identified by the FDA and by Lilly as being from ███████

10   ██████ .  ███████████████████████████████████████

11   ████████████████████████████████████████████████████

12   ███████████████████████

13         FDA and Lilly claim that these low-stock and

14   out-of-stock situations were short lived --

15         THE COURT:  Well, counsel, if the test here is just

16   really reasonableness, why -- why would it not be reasonable

17   for them to -- at least I'm anticipating what they're going to

18   argue, the FDA, that rather than relying on the screenshots we

19   relied on the comprehensive data.

20         How do you respond to that argument?

21         MR. GROSSMAN:  Because there's an inconsistency.  If

22   you have major -- if you have major wholesalers that are

23   supplying, in this instance about a third of the market, and

24   that according to the record, materials distribute through

25   effectively a hub-and-spoke system, a centralized system, and

1    they have pervasive, ongoing shortages, that shows that there

2    is something seriously wrong with the supply of the drug.  And

3    again, at a minimum, you would expect that to prompt the

4    agency to make further inquires.

5        We think looking at it that if one of the Big Three

6    Wholesalers has extended periods of a drug unavailability,

7    that, in and of itself, under the statute, in all likelihood,

8    would support a finding of shortage itself.

9        But I think the real -- but I think a more direct

10   answer to Your Honor's question, is the way the Court should

11   look at this is to evaluate the FDA's analysis of this

12   question.  Part of the FDA's analysis was simply saying, We

13   think Lilly's data is better, and that it doesn't detract --

14   that this evidence doesn't detract from the weight of that.

15   But, of course, we've already discussed some of the

16   deficiencies and shortcomings of Lilly's data.

17       But it has more specific responses that, I think if

18   you look at them closely, don't actually hold water.  For the

19   ██████████████████████████████████████████████████████████

20   ████████████████████████████████████████████.  But

21   that actually says nothing about whether a given dose, a given

22   product, is in shortage or not.  In other words, if that

23   supply across all wholesalers is less than the demand on the

24   market, well, then, of course, there is a shortage.

25                    *(Court Reporter interrupts)*

1        THE COURT:  And, really, I'm going to be generous

2   with the time.  I know that you feel like you're rushed.  I'm

3   going to give you all the time to make your argument that you

4   need, okay?

5        MR. GROSSMAN:  Thank you, Your Honor.

6        THE COURT:  And it may just be, we're southerners,

7   so we speak slower.  I'm married to a New Yorker, so I get it.

8        MR. GROSSMAN:  I will try, Your Honor, to arrive at

9   a happy medium.

10        THE COURT:  No, it's okay.  It's all right.

11        And my New York wife, she's also Sicilian.  So, I'm

12   used to being told that, I can't understand you, you speak too

13   slow.  So -- but don't take any offense to it.

14        In fact, I got in trouble last night because we

15   wanted to order some Greek food.  And I told the -- when I

16   called it in, I said I wanted ten pita bread, and I only got

17   two.  And my wife chewed me out and she said, Nobody ever

18   understands you, you've got such a hick accent.

19        So, don't take offense.  I get it.  We talk slow, we

20   think slow, but we'll get everything down, I promise you.

21        MR. GROSSMAN:  No offense, Your Honor.  And Your

22   Honor's rulings have been fast -- in fact, been very, very

23   expedient.

24        The FDA, with respect to these November screenshots,

25   part of its response also cites Lilly's assertion that it

1    ███████████████████████████████████████████████

2    █████████.  But even accepting that to some extent, there's

3    nothing to show that Lilly did provide or even was able to

4    provide enough supply to meet the demand so that pharmacies

5    actually obtain the products in question.  And, in fact, the

6    evidence shows that they can't.

7         First, there are, as I mentioned, a wrath of

8    screenshots from December, including from the same exact

9    wholesalers.  So, in other words, these December screenshots

10   show unavailability a month after Lilly said that it resolved

11   the issues.

12        Second, and I think this is even more telling, many

13   of the December screenshots from ██████████ identified,

14   not only when a notice of unavail- -- excuse me,

15   unavailability was updated, but also how long the "product

16   issue" was being tracked by ████████  So, for example,

17   there's a screenshot at page 668 of the plaintiffs' appendix,

18   and it shows that the specific dosage at issue had a product

19   issue, which specifically was being out of stock, that began

20   on October 23rd, and that it was most recently updated on

21   December 10th.

22        Similar screenshots, showing extended product

23   periods of unavailability running through December 10th,

24   shortly before the decision in this case, are in the

25   plaintiffs' appendix at pages 680, 667, 669, 679, 682, and

1    714.

2         *THE COURT:*  Tell me that -- I want you to tell me

3    those one more time, counsel.

4         *MR. GROSSMAN:*  Yes, Your Honor.

5         *THE COURT:*  Go ahead.

6         *MR. GROSSMAN:*  So, 668.

7         *THE COURT:*  Yes, sir.

8         *MR. GROSSMAN:*  And then 680.

9         *THE COURT:*  Uh-huh.

10        *MR. GROSSMAN:*  667, 669, 679, 682, and 714.

11        *THE COURT:*  All right.  Thank you.

12        *MR. GROSSMAN:*  And that's in addition to the

13   notations in many of the screenshots from ██████████

14   indicating that the products in question wouldn't be available

15   either from an undetermined period of time or for months.

16        Now, none of those specific -- specific dates and

17   representations that are on the face of this screenshot

18   evidence, none of those are actually addressed in the decision

19   itself.  The FDA simply waived away this entire category of

20   evidence without even attempting to address or explain what it

21   shows on the face of it.

22        Finally, I'd like to briefly address, or at least

23   make a few points, with respect to our notice and comment

24   claim.  The agency's position here is that this was not a

25   legislative rule, but it was instead an adjudication.  We

```
1    think that as a legal matter it couldn't be an adjudication
2    for at least two reasons.  The first is that the action -- the
3    agency action here makes prospective law by prohibiting
4    certain types of compounding going forward by all compounders,
5    including pharmacies that aren't even compounding today.
6            I mean, the way an adjudication works, is that it
7    adjudicates the rights of a person who is before the agency --
8            THE COURT:  Tell me what you think your best case is
9    on that argument.
10           MR. GROSSMAN:  Our best case on that argument, we
11   cited all over the place, Your Honor, but it is the Safari
12   Club.  We think that Safari Club is effectively
13   indistinguishable, in that it concerned a factual
14   determination by the agency that was made outside of the
15   context of an adjudication involving the rights of a
16   particular party.  And then that factual determination
17   triggered legal consequences that applied in subsequent
18   proceedings.  That's exactly what happened here.
19           The agency made a factual determination, based on
20   its policy views, that, in turn, triggers legal consequences,
21   so that makes it a rule, in general, and those apply only
22   prospectively.  In other words, what people were doing up
23   until that day is not affected whatsoever by the agency's
24   determination.  It could -- that new rule could only be
25   applied prospectively to future conduct.
```

1        For example, if an outsourcing facility were to

2   continue compounding from Tirzepatide, then it would be

3   presumably an enforcement proceeding where this new rule would

4   then be applied against it.

5            THE COURT:  Okay.

6            MR. GROSSMAN:  But here, nothing was applied against

7   any party whatsoever, because -- and this is a novel thing

8   about this -- the agency's argument in this case, there were

9   no parties before the agency in this proceeding.

10           We've argued this consistently, and the FDA has

11  never disputed in its briefing that there were no parties to

12  the proceeding that it conducted.  It just says that that

13  doesn't matter, even though it can't identify a single

14  adjudication in the history of the Administrative Procedure

15  Act that involved an adjudication with no parties before the

16  agency at all.

17           THE COURT:  Let me stop you, counsel.

18           One of the things that I would like FDA counsel, and

19  maybe my in-house FDA counsel, could enlighten me on, when we

20  have been doing our research when it comes to this case, is

21  the frequency in the history of FDA, this type of proceeding

22  involving shortages, we haven't been able to find any.  I'm

23  not saying that it doesn't happen, it may be the first time

24  that this has been challenged in this type of context.  But

25  I'd like to know, I think it would just help me.  I'm not

1    making any judgment one way or another, I'm just curious.

2            Go ahead, counsel.

3            *MR. GROSSMAN:*  Thank you.

4            Lilly, in its opposition brief, for the first time

5    claims that it was actually a party to this proceeding.  The

6    FDA, evidently, at least going by its briefing, disagrees with

7    that.  And for what it's worth, the delisting action here

8    doesn't adjudicate Lilly's rights whatsoever.  Lilly can still

9    do everything that it did before the action was issued.

10           Second, the Court relied, in its preliminary

11   injunction decision, on the statutory language that the

12   shortage list be kept up to date.  We think that that

13   particular requirement doesn't really have anything to do with

14   whether a proceeding is a rulemaking or an adjudication, which

15   concerns the forum of the proceedings.  At most, the right way

16   to frame this, the right way to think about it, would be

17   whether -- whether that requirement somehow abrogates and

18   overcomes the APA's ordinary default notice and comment

19   provisions.  But that's not a ground of the decision here.

20   That is not what the agency argued in its order.

21           Also, the language here, up to date, doesn't satisfy

22   the standard for expressly departing from the APA's

23   standard -- standard procedures for rulemaking or for anything

24   else.  The statute, on its face, identifies bases for shortage

25   -- for shortages, liked planned discontinuations of

1    manufacturing, that allow more than enough time for notice and

2    comment.

3           There are -- there is the related shortage

4    notification provision of Section 506C, that contemplates

5    proceedings that unfurl over a period of weeks or months, not

6    just days.

7           For example, it provides, on its face, 30 days for a

8    manufacturer to respond to an FDA determination, that the

9    manufacturer has failed to report a shortage and failed to

10   provide the needed information to the agency.  So, this isn't

11   unfurling at a breakneck speed, it's going a more leisurely

12   pace that is commensurate with the time available for

13   rulemaking under standard procedures.

14          But I would note that courts -- that when Congress

15   has commanded that something be done expeditiously, courts

16   have not insisted on the standard rulemaking timelines.  When

17   Congress has used words like expedited or without delay, the

18   courts have allowed comment periods of as little as 15 or

19   7 days.

20          We cited, as an example, the *Omnipoint* decision by

21   the D.C. Circuit, but that cites a number of other decisions

22   along similar lines.  And if even that was not feasible, a

23   seven-day comment period, then in that particular instance the

24   agency would clearly have good cause under the APA itself to

25   forgo notice and comment.  So, there's nothing in here that on

1    its face conflicts with, let alone dis- -- expressly displaces

2    the ordinarily applicable notice and comment provisions.

3              The Court also addressed the use of confidential

4    materials in -- in certain types of shortage decisions.  The

5    confidentiality provision in the shortage statute simply says

6    that it does not abrogate generally applicable laws that apply

7    to all rulemakings.  In fact, one of those -- one of those two

8    statutes that it cites, the generally applicable ones, one of

9    those is part of the APA itself.  There's simply no indication

10   that by citing generally applicable statutes that apply,

11   again, to every single rulemaking that occurs, that that

12   manifests any sort of intent to override the APA and its

13   standard default procedural provisions.

14             Moreover, the statute contemplates delays that

15   likely would not even involve any confidential information.

16   For example, shipping delays, regulatory delays,

17   discontinuance of manufacturing.  And I will note, as well,

18   that the use of confidential material in rulemakings is

19   incredibly common.

20             I, myself, just the other day, went to

21   federalregister.gov, and I just did a search for confidential

22   business information and final rules and proposed rules, there

23   were over 1,000 hits from 2024 alone.  Most of those -- or at

24   least many of them, hundreds of them, cite one or both of the

25   two generally applicable statutory confidentiality provisions

1    that are note -- that are referenced in the statute that's at

2    issue here.

3              I will also note in my own experience, as well as in

4    case law, the use of confidential information does not prevent

5    meaningful public participation through notice and comment.

6    Agencies do this all the time.  What agencies will do when

7    they're relying on confidential information, they will

8    summarize, they might put it in aggregate form, they can

9    describe it qualitatively.  For example, Lilly's data show

10   that on a cumulative basis, supply is outrunning demand.

11             *THE COURT:*  Believe me, I get it.  I couldn't even

12   access the Fifth Circuit decision in this case until -- what

13   was it, John?

14             *LAW CLERK:*  Ten days.

15             *THE COURT:*  Ten days after it was made.  So, I get

16   it.  I get your point.

17             *MR. GROSSMAN:*  The point is, agencies do this every

18   day of the week.

19             *THE COURT:*  Yeah.

20             *MR. GROSSMAN:*  And not only can they discuss data in

21   that way, when disclosing the data itself would be

22   confidential, what they could also do is they could disclose

23   their methodology, their proposed conclusions, and they can

24   identify what information the agency considers relevant to the

25   question before it and how it's going to consider that

33

1    information.

2         *THE COURT:*  I'm very familiar.  I bet Ms. Lewis

3    *(sic)* is familiar with another case -- or another two cases

4    that I have involving FOIA requests and the FDA.  So, I get

5    what you're saying.  I get the point.

6         Let me get you to wrap up, if you can, and then I'll

7    maybe ask you a couple of questions that come from my old

8    Court of Appeals days.

9         So, go ahead, sir.

10        *MR. GROSSMAN:*  Yes, Your Honor.

11        I just have one final point to make, and that's

12   regarding what the Court called the lose/lose scenario.  In

13   that, the original shortage action was not undertaken through

14   notice and comment.

15        *Perez* makes clear that the process -- that the

16   procedure that's required to amend or repeal a rule is the

17   same that was required to enact it, to promulgate it in the

18   first place.  So, this isn't an instance where two wrongs make

19   a right.  And that can't possibly be the result, because it

20   would mean that all kinds of tax regulations would be invalid

21   instantly.

22        But even going beyond that, the Supreme Court's

23   decision -- let me say two other things on this.  One, the

24   agency, in its delisting action, didn't identify the validity

25   of the original shortage -- the original shortage action as a

1    basis for its decision, and that original action is not before

2    the Court in this case.  So, nobody has challenged it, we

3    think that probably nobody would have standing to challenge

4    it, but that would have to be some other case.

5              And even if the agency had mentioned that as a

6    ground, it couldn't simply say, We're going to disregard it or

7    abandon it, or something like that.  The Fifth Circuit

8    explained as much in the recent decision *Louisiana vs.*

9    *Department of Energy*.  That even when a rule may be invalid,

10   the agency can't simply say, We're getting rid of it for that

11   reason, it has to consider alternatives.  For example, fixing

12   whatever the legal problem might be.

13             So, we don't think the issue is properly before the

14   Court of the validity of the original action in this instance.

15   But even if it were, I don't think it would change the result

16   in this case.

17             *THE COURT:*  All right.  Not to pin you down, but I'm

18   just curious, what you think -- what do you think, out of your

19   many arguments in favor of summary judgment, what do you think

20   is the most compelling of the counts you've presented to the

21   case?  What would you say is your best argument or your --

22   point me in the record your best piece of evidence to show

23   that the FDA fouled things up?

24             *MR. GROSSMAN:*  Your Honor, the way I would answer

25   that question is to identify what I think is the easiest

1    ground for the Court.

2         *THE COURT:*  That's what I like, easy stuff.

3         *MR. GROSSMAN:*  And I think that is really going to

4    be our second claim, which is simply lack of reasoned

5    explanation.  There's a reason we led with that in our summary

6    judgment briefing, and that's because it's apparent on the

7    face of the decision.  The FDA inherently made all kinds of

8    determinations and undertook a methodology that is never

9    described and doesn't appear to have substance to it

10   whatsoever.

11        *THE COURT:*  So, could I grant your motion for

12   summary judgment on Count 2 and leave the notice and comment

13   versus adjudication, going down that route, could I leave that

14   alone and still get to where you want to go?

15        *MR. GROSSMAN:*  Yes, Your Honor.

16        The Court could do that, and that would be a basis

17   to vacate the rule, and in that -- I should say, vacate the

18   action.  And in that instance, that would resolve the case.

19        *THE COURT:*  Okay.  I appreciate it.  I may have some

20   more questions for you.  But thank you for your thorough

21   argument, sir, I appreciate it.

22        *MR. GROSSMAN:*  Thank you, Your Honor.

23        *THE COURT:*  All right.

24        I guess now I'll hear from FDA counsel,

25   Mr. McDonald.

1        MR. MCDONALD:  Good afternoon.  Thank you, Your

2   Honor, for the --

3        THE COURT:  And I'll do my best not to interrupt,

4   but I do have some questions.

5        MR. MCDONALD:  Sure.  Well --

6        THE COURT:  And hopefully some of my questions to

7   Mr. Grossman may have prompted -- you can tell what I'm

8   curious about.

9        MR. MCDONALD:  With the Court's permission, I'd like

10  to start with the statute --

11       THE COURT:  Yeah.

12       MR. MCDONALD:  -- because I think that answers some

13  of the questions before the Court.

14       THE COURT:  Yes, sir.

15       MR. MCDONALD:  The statute directs the FDA to

16  determine whether there is a shortage.  And it says, A

17  shortage is when the demand or projected demand for the drug

18  within the United States exceeds the supply of the drug.  The

19  statute itself gives the FDA the parameters it needs to make

20  the decision it is tasked with making.

21           And here are the facts on those parameters at the

22  time of the agency's decision.  The most recent information

23  available to the agency was that after fulfilling all open

24  orders, the manufacturer had ███████████████████████

25  ███████  on hand.  And at that same time, the manufacturer also

1    had ████████████████████████████, which the

2    manufacturer said could quickly be made into finished product

3    to adjust to the variations in demand.

4        Those snapshots of net inventory had a increasing

5    trend over the period of time that the agency evaluated it, it

6    had several months of those snapshots, but that wasn't all the

7    agency looked at either.  It also looked at the cumulative

8    data that showed that over a longer period of time, Lilly had

9    improved its ability to adjust to the demand and continued to

10   meet the demand.  Some of those cumulative figures also

11   projected into the future, and indicated that Lilly could also

12   meet the increased -- anticipated increased demand in the

13   future.

14       FDA had good reason to rely on those projections,

15   because it received that information over a period of time and

16   was able to see that the projected numbers for one month

17   ultimately ████████████████████████████████████

18   █████████████████████████████

19       *THE COURT:*  Can you describe to me as a general

20   matter -- I'm assuming -- back in the old days when I was a

21   DOJ attorney, I was responsible for doing -- oh, my main area

22   was doing anti-dumping cases, tariffs, products from China,

23   specifically garlic and pencils from China, of all things.

24   So, I presume you -- it's fair to say that you have an area of

25   expertise at DOJ and I presume it's these FDA actions; is that

```
 1   fair to say, sir?
 2              MR. MCDONALD:  It's reasonably fair to say.
 3              But to answer one of the Court's questions, to
 4   anyone's knowledge, this is the first time a drug shortage
 5   decision has ever been litigated.
 6              THE COURT:  Well, you're smart, because that was the
 7   question I was going to ask.  How many of these have you had,
 8   how often do we have these?
 9              I have not been able to locate one, so you've
10   answered my question.  I shouldn't have told you the
11   long-winded story about Chinese garlic.
12              Go ahead, sir.
13              MR. MCDONALD:  Well, to answer the Court, it's only
14   the two pending before Your Honor, are all the ones I'm aware
15   of.
16              THE COURT:  And that's the same thing from my FDA
17   counsel?
18              MS. LOVAS:  Yes, Your Honor.
19              THE COURT:  So, it's fair to say this is not
20   something that's, at least in your experience, is commonly
21   done at the agency?
22              MS. LOVAS:  Litigating this issue?
23              THE COURT:  Just in general, not even litigated.
24   I'll take your word for it, this is the only two that have
25   ever been litigated.
```

1              Just in general, is this -- I don't -- this is the
2    first -- well, that and the companion case that I have, the
3    APA challenge I've had involving FDA.  So, just educate me.
4    Taking litigation out of it, garden-variety case like this.
5    Do these go on often, where the FDA is determining whether the
6    shortage is over?  I guess that's a good way to say it, maybe
7    not.
8              MR. MCDONALD:  Your Honor, the more --
9              THE COURT:  Outside of litigation or that they've
10   been challenged.
11             MR. MCDONALD:  Your Honor, the more common scenario
12   is when there's some sort of event that disrupts the ability
13   to manufacture.  Like a tornado takes down the only
14   manufacturing facility and that drug is, as a result, in
15   shortage for a period of time.  That's the more typical
16   instance of a drug shortage and --
17             THE COURT:  And I guess in a case like that, it
18   would be much easier to determine whether to end the shortage
19   because the Skyrizi factory is back online or whatever, right?
20             MR. MCDONALD:  Or at least it would be different
21   criteria.  I'm not sure how difficult it would be, since that
22   hasn't come across my desk.
23             THE COURT:  Okay.  So, it's fair to say that this is
24   -- I can't think of another word -- but fairly unprecedented
25   for everyone involved.  I don't -- certainly in my lifetime, I

40

1    can't think of products similar to the Tirzepatide and also

2    the semaglutide products that have had the popularity that

3    they have had and the demand that's out there.

4         And I would -- that's helpful to me.  I was just

5    curious if y'all had been down this road before.  I would

6    assume this is fairly unprecedented due to the popularity of

7    these drugs; is that fair to say?

8         *MR. MCDONALD:*  I look to agency counsel to correct

9    me, but it is typical to assess the volume of the demand and

10   when the supply comes back online, whatever the reason was for

11   the shortage in the first place.  What would be unusual here

12   is just the runaway demand for the drug --

13        *THE COURT:*  And that's what I was trying to say.

14        *MR. MCDONALD:*  That's accurate, Your Honor.

15        *THE COURT:*  Okay.  I didn't want to get you off your

16   argument, I just -- it's helpful for me.

17        Go ahead, sir.

18        *MR. MCDONALD:*  Not at all.

19        So, I wanted to actually circle back to that

20   snapshot, the most recent snapshot evidence, and respond to

21   something opposing counsel mentioned.  It does reflect, in

22   some sense, the demand for the drug.  Because Lilly

23   represented that it was not limiting the wholesalers' orders

24   at all.  So, when that -- when those numbers reflect that it

25   is net inventory, that all open orders have been fulfilled,

1    that means every wholesale order we have as of that time has

2    gone out.  So, it's not accurate to say it doesn't reflect

3    demand, at all.

4          So, I described some of the snapshot evidence and

5    some of the cumulative evidence.  That -- that was ample

6    evidence for the agency to conclude -- looking back at the

7    statute, whether at that moment was supply now outstripping

8    demand and was supply projected to outstrip demand.

9          *THE COURT:*  Okay.  So it --

10          *MR. MCDONALD:*  That's the --

11          *THE COURT:*  It's helpful for me, because remember

12    we're here on summary judgment.  I asked similar questions to

13    plaintiffs' counsel.  But can you point me to the most salient

14    evidence that you would have that FDA could rely on to show

15    that this surplus would continue past the projected window

16    that they looked in?

17          Like, is there evidence on the record, do you know

18    of a -- what's the best thing that the Court can look at, and

19    I can say, Yeah, you bet, the FDA was reasonable here, looks

20    like it's reasonable to believe that this surplus would carry

21    on past the time period they looked at.  What do you think is

22    the best piece of evidence that I can look at?

23          *MR. MCDONALD:*  To confirm I understand Your Honor's

24    question, the projected charts in the decision memo that the

25    FDA relied on, they were projected through ███████████.

1    Is Your Honor asking about a period ███████

2   ██████

3    *THE COURT:*  Yeah, because I think that's important.

4   That if you're saying the shortage is over, Eli Lilly has the

5   exclusive right to do this, we're not going to allow people to

6   compound it anymore, seems like to me you'd have to have a

7   basis that the shortage was over for a reasonable time period.

8    *MR. MCDONALD:*  Well, as of the decision, that

9   projection was ██████████.  So, ██████████

10  ██████ that Lilly would continue to meet the demand.

11   And something that --

12   *THE COURT:*  What about in ██████████ it

13  looks like they're not meeting the demand?

14   *MR. MCDONALD:*  Well, that's something that FDA --

15   *THE COURT:*  Everybody is trying to get in shape for

16  their bathing suits to go to the beach this summer.

17   *MR. MCDONALD:*  Of course.  Well, that's something

18  FDA addressed in both the declaratory order and the underlying

19  decision memo.  It said in both places, the agency is going to

20  continue to monitor the supply and demand.

21   And there is possibility that it's ██████, the

22  prediction didn't prove correct, FDA could have declared a new

23  shortage.  But in that intervening time when Lilly was -- the

24  FDA reasonably found that Lilly was meeting demand, at least

25  for those ██████████, going to meet - continue to

43

 1   meet demand, that's no reason to maintain that a shortage

 2   exists simply because we can't look six months in advance.

 3   It's better and more faithful to the statute for FDA to

 4   continue to monitor and declare a new shortage if that comes

 5   out.

 6              THE COURT:  Okay.

 7              MR. MCDONALD:  So, that's -- I'm happy to answer

 8   more questions about Eli Lilly's data, but otherwise I'd like

 9   to turn to some other information.

10              THE COURT:  No, I want you to make your argument.

11              MR. MCDONALD:  Sure.  So, the agency had a number of

12   other pieces of information before it.  Much of it was third

13   party or anecdotal, unverifiable, otherwise not probative, and

14   does not show the sort of pervasive shortage that plaintiffs

15   are alleging it does.

16              Turning to the screenshot evidence, as set out in

17   our briefs, some of those screenshots are duplicates of each

18   other.  Some of them aren't dated, some of them are.  Some of

19   them are about a different drug entirely.  And some aren't

20   about the wholesalers at all.

21              So, I'll focus on the ones that plaintiffs brought

22   up, in the most recent briefing and just now.  I'm looking at

23   plaintiffs' appendix 682, one of the cites that counsel just

24   invoked.  That's also administrative record 1544.  It's -- it

25   shows the stock for Mounjaro and Zepbound.  For the

1    5-milligram dose of Mounjaro, says it's in stock.  For the

2    7.5-milligram dose of Mounjaro, says in stock.  And I can go

3    all the way down the list, it's in stock as of that moment.

4           Now, sure, there's a -- there's a notation on the

5    website that warns a visitor that -- my read is that supply is

6    tight.  But to say that this screenshot that shows the product

7    in stock, or seven other screenshots shows a pervasive

8    shortage, is stretching the evidence pretty far, Your Honor.

9    And FDA reasonably relied on the much more detailed and

10   reliable information from the manufacturer.

11          Some of the other third-party evidence suffers from

12   similar defects.  Like the surveys where there was not

13   information before the FDA about who was allowed to complete

14   the survey, were multiple people allowed to complete the

15   survey, what do the questions on the survey even mean.

16          The most important third-party information before

17   the agency was about the volume of compounding.  And just to

18   address that briefly, FDA accurately used that to evaluate

19   whether Lilly would be able to continue meeting the projected

20   demand.

21          *THE COURT:*  Is it reasonable for the agency to rely

22   so much on the representations of Eli Lilly?

23          Couldn't you make an argument that given the demand

24   for this product, given the large percent of the population

25   that needs it for health reasons, it would be arbitrary just

45

1    to rely upon the numbers that you were given by Eli Lilly,

2    rather than other third parties, or for that matter, greater

3    level of interaction with Eli Lilly where you have boots on

4    the ground verifying versus, all right, this is what their

5    charts show us?  Why is that not the more reasonable thing to

6    do?

7              *MR. MCDONALD:*  I disagree.  I don't think it could

8    be per se unreasonable or arbitrary and capricious to rely on

9    information from one party.

10             But here, the record shows that FDA interrogated the

11   responses it got from Eli Lilly.  And in some instances, it

12   refused to consider some of the information that Eli Lilly put

13   before it.

14             For example, Eli Lilly ███████████████████████

15   ████████████████████████████████  And FDA said, Well,

16   we don't have comprehensive information about that to rely on

17   it, we're not going to rely on it.

18             Eli Lilly said, Look, ██████████████████████████

19   ████████████████████████████████████████████████████████

20   ████████████████████████████████████████

21   ████████████████████████.  And FDA said, ████████████████████

22   ████████████████, and we're not going to consider that for the

23   purposes of our decision.

24             In another instance, Eli Lilly provided information

25   that was simply drug by drug and not broken down by dosage.

1    And the FDA came back to them and said, We actually need to

2    see this disaggregated, broken down.

3           And further, the credibility of the information from

4    Eli Lilly was, as I mentioned before, proved out over time.

5    It wasn't only one tranche of evidence taken from Eli Lilly.

6    There was instances where Eli Lilly said, We think this is

7    going to happen, and then time went by and FDA was able to go

8    back and verify that it was reliable.

9           So, under all of those circumstances, it was

10   completely reasonable for the agency to rely to the extent it

11   did.  And I'd add that it had very little choice, other than

12   to get the information from the manufacturer and interrogate

13   it as it did.

14          For a couple of reasons, due to the nature of this

15   shortage it was the most important information.  The person

16   with the information was Eli Lilly.  And the second reason is

17   that FDA was under a statutory obligation to act quickly.  The

18   list must be kept up to date.

19          So, it's easy for us to sit here with the luxury of

20   time now that the baseball game is cancelled and think of ways

21   that Eli Lilly could have looked at this -- or sorry, FDA

22   could have looked at this, could have asked Eli Lilly this

23   question, but the agency was under that time pressure.

24          So, once it had information that reasonably showed

25   that the shortage was over, it was under a statutory

1    obligation to -- to issue that decision.

2              THE COURT:  I would rather be at the baseball game,

3    by the way.

4              (Laughter)

5         MR. MCDONALD:  I don't blame you, Your Honor.

6         THE COURT:  Or maybe not.  They got -- as bad as

7    they're playing, I doubt if they'd win if they did play.

8              (Laughter)

9         MR. MCDONALD:  Well, we've set out --

10        THE COURT:  They got a run ruled the last game and

11   somehow they have like a four and ten record, but they made

12   the playoffs.  I don't know who is doing the math on that, but

13   I don't know.

14             MR. MCDONALD:  Well, we had some more detailed

15   arguments in our briefs about, for example, the rulemaking

16   versus adjudication point.  I'm happy to address, if the Court

17   has a question.

18             THE COURT:  Yes.

19             If you couldn't tell by the answer -- or rather by

20   the question that I asked Mr. Grossman, I understand the

21   arguments made arguing that this is -- whether its

22   adjudication versus notice and comment.  I spent some time

23   reviewing the Safari case.  But I am a little bit hesitant to

24   go deep into that argument.

25             I do feel, to a certain extent, it would be plowing

48

1    some new ground, which -- I'm certainly not afraid to get

2    reversed, I get reversed all the time.  But I am loathed to

3    try to go out and essentially -- a Judge shouldn't say this,

4    but I can't think of any other way to say it, make new law,

5    interpret laws in ways it hasn't been interpreted before.

6          And I've never seen -- and I know, taking the *Safari*

7    *Club* out of it, I do think that this case is distinguishable.

8    But at the same time, I understand the plaintiffs' arguments,

9    and it does bother me.

10         So, make your argument there.  I'd like to hear from

11   the Government.

12         *MR. MCDONALD:*  Well, I don't think your Honor has to

13   worry, in part, because that case is distinguishable.  One

14   important feature of the dispute in that case, is that the

15   challenged decision had purely perspective effects.  It said,

16   In the future if somebody wants to do this thing, they're not

17   allowed to do it.

18         Whereas, in this case and similar cases, there's

19   ongoing conduct here.  And this is something plaintiffs have

20   mentioned ad nauseam, ongoing conduct that must cease because

21   of the resolution of this dispute.  And that's not purely

22   perspective at all.

23         And the second reason, is that the Fifth Circuit has

24   addressed declaratory orders a number of times, as in the

25   *American Airlines* case cited in our brief.  There's also a FCC

1    case that has to do with citing certain communications

2    equipment and local -- local approvals of that, and setting

3    time limits for how quickly a local government has to act on

4    certain applications.

5           And those, similarly, just going -- going to the

6    declaratory adjudication statute, that's 5 U.S.C. 554(e),

7    that's the agency "in its sound discretion" issuing a

8    declaratory order to terminate a controversy or remove

9    uncertainty.

10          And the declaratory order in the adjudication

11   context serves a really useful purpose.  Because it prevents

12   the agency from needing to go out and doing an adjudication as

13   an enforcement action just to answer, for example, a

14   jurisdictional question about the agency; or in this case, no

15   compounder needed to risk enforcement, just for anyone to find

16   out whether the shortage was over or not.  That didn't need to

17   go through an enforcement action.

18          *THE COURT:*  I was actually one of the attorneys on

19   the *American Airlines vs. D.O.T.* case way back in the day.

20          *MR. MCDONALD:*  Really?

21          *THE COURT:*  I was.  That involved the expansion of

22   flights from Love Field airport.

23          What else you got?

24          *MR. MCDONALD:*  This was also a useful --

25          *THE COURT:*  And, John, if you have any questions,

1    pass them up.

2              *MR. MCDONALD:*  It is also a useful procedure because

3    of the statutory constraints on the agency.  As this Court

4    recognized, up to date means up to date.  The rulemaking takes

5    time, even if you're using the good cause exception.

6              And that's especially true in this public health

7    context, where if a drug is in shortage, somebody needs the

8    drug, the agency needs to add that drug to the -- to list in

9    a -- in a brisk manner.  And once the shortage is over, it

10   needs to be similarly quick to take it off.

11             Similarly, importantly, the statute goes out of its

12   way to preserve the confidentiality of the information at

13   issue.  And it also addresses a public health circumstance

14   that I don't think we've talked about yet, which is, it gives

15   the Secretary of HHS the discretion to keep the entire thing

16   under wraps at the risk that folks might go and try to horde

17   the drugs.  It says, in that instance, HHS Secretary is

18   allowed to keep the entire existence of the shortage secret.

19   How is the agency supposed to have a rulemaking if the entire

20   proceeding is secret?

21             But even if that -- even if that provision isn't

22   invoked, this -- this kind of controversy is unlike ones cited

23   in plaintiffs' brief.  And it doesn't call for the sort of

24   best practices for handling sensitive or confidential

25   information that plaintiffs have cited to.  We agree,

1    administrative agencies consider confidential information all

2    of the time, it's perfectly -- it's perfectly right that they

3    do that.

4            Here, however, every piece of material information

5    is confidential.  If the agency is not allowed to disclose the

6    supply and disclose the demand, how is any member of the

7    public supposed to comment on whether supply is meeting

8    demand?

9            These are statutory constraints on the agency that,

10   in this case, made a rulemaking impossible.  So --

11           *THE COURT:*  I -- I understand.  Honestly, I don't

12   like it.  But what I like and don't like doesn't affect what

13   my ruling is going to be.

14           But I get it.  I understand it.

15           *MR. MCDONALD:*  If I could have one moment, Your

16   Honor.

17           *THE COURT:*  Yeah.

18           John, do you have any questions?  *(No response)*

19               *(Brief pause)*

20           *MR. MCDONALD:*  Your Honor, I thought of two more

21   things I wanted to --

22           *THE COURT:*  Go ahead.

23           *MR. MCDONALD:*  -- leave the Court with.

24           The Court had asked about the ███████████.

25           *THE COURT:*  Yeah.

52

1    *MR. MCDONALD:*  I wanted to clarify, that Lilly

2    represented to the agency that it was capable of producing

3    that amount as of the time of the representation; not that it

4    was doing so or had done so in the past.  And that's the way

5    that the agency considered it.

6        *THE COURT:*  John, my claw clerk, had reminded me

7    this, this was in my notes that I wanted to ask you about.  I

8    think that plaintiffs had a very good point, that the FDA, as

9    well as Eli Lilly, needs to show that there's the capability

10   to store the surplus justifying the decision to take this off

11   the shortage list, and that, obviously, not only that you have

12   the capability to store it -- maybe this is a better question

13   for Eli Lilly, but it would go to FDA, because you should know

14   your record.

15        And if you-all can't show the ability that Eli Lilly

16   has -- can store this, you can't really make the argument that

17   there's not a shortage anymore.  Therefore, the decision would

18   be invalid.

19        What's the best piece of evidence that you have that

20   you contend FDA was reasonable to rely on Eli Lilly's

21   representation with regards to storage?

22        And my Eli Lilly counsel, I want you to point that

23   out as well when you come up.

24        *MR. MCDONALD:*  Your Honor, I think -- I think the

25   best evidence is the -- the charts and the decision memo,

1    which show not just a large demand, but ability to meet that

2    demand.  Which means, there's not a warehouse sitting

3    somewhere full of doses not being touched.  Those doses are

4    being moved out of the warehouse at a rapid rate.

5              THE COURT:  The fact that they can -- not

6    necessarily storage, but the fact that they can meet the

7    manufacturing demand -- they can meet the demand via their

8    increased manufacturing capability?  Did I say that correctly?

9              MR. MCDONALD:  That's right.  And that -- that sort

10   of churn of inventory meant that the manufacturer wasn't

11   shipping out only the newest doses and holding back older

12   doses that might go out -- expire.  Of course, like any, you

13   know, rational business, it was sending out the doses of --

14   the older doses that were still within expiration to be used

15   then.

16             THE COURT:  Okay.

17             MR. MCDONALD:  So --

18             THE COURT:  I get your argument.  I just wanted to

19   know if you could point -- point me to somewhere on that.

20             I had asked the question about the difference in the

21   charts, from ████████████████████, and the ████████████

22   And do you have -- you heard Mr. Grossman's --

23             MR. MCDONALD:  I did.

24             THE COURT:  -- contention with that?  How do you

25   respond to that?

1          *MR. MCDONALD:*  I did.  I'd only emphasize that
2    ultimately we're talking about, in those ███████████████
3    ████████████████████████████████████████████████████████
4    ████████████████████████████

5          And so, when you take data from one table and
6    another table that aren't meant to be compared, there's going
7    to be some -- some difference in how they're reported.  And
8    also, we pointed out in our brief that there are going to be
9    doses -- doses that are ordered at the end of one month, but
10   not shipped till the next.

11         And so, for example, using those timeframes, there
12   are going to be orders in September that are then shipped the
13   beginning of October.  So, even assuming it's a fair
14   comparison, you're only seeing the shipments of those orders.
15   And then on the other end, you're going to get orders at the
16   very end of November that aren't shipped until December.

17         Something that plaintiffs pointed out in their reply
18   was, Well, isn't that a wash?  You have some shipments without
19   orders and some orders without shipments.  It's not a wash
20   when the demand is going up.  You've got fewer orders at the
21   end of October than you did at the end of -- I'm sorry, at the
22   end of September, than you did at the end of November.  That's
23   going to be a higher number of orders without shipments.

24         So, perhaps that's where this ███████████████ comes
25   from.  But I object to the premise at the outset that these

```
 1   numbers are fairly comparable to begin with.
 2             THE COURT:  Okay.
 3             MR. MCDONALD:  So --
 4             THE COURT:  I bet a lot of you guys have flights
 5   today and I've asked too many questions.  I do want to hear
 6   from Eli Lilly.
 7             Would you like to wrap up very briefly?
 8             MR. MCDONALD:  I would.
 9             One thing I want to leave the Court with is one of
10   the things I started with.  At the time of the decision, █████
11   ████████████████████████████████████  that -- were prepared to react
12   to that demand.  And I believe plaintiffs' reply brief
13   referred to the existence of those doses, but I didn't discern
14   any sort of response regarding their significance ever in the
15   briefing.  And I think that absence of any response casts a
16   long shadow over the rest of plaintiffs' arguments.
17             THE COURT:  Okay.
18             MR. MCDONALD:  Thanks very much.
19             THE COURT:  Well, let me cast my shadow on to
20   Mr. Hurst -- Ms. Hurst -- what's your name?
21             MS. MURPHY:  Murphy.
22             THE COURT:  Ms. Murphy.  I'm so sorry, ma'am.  Erin
23   Murphy.
24             MS. MURPHY:  That's correct.
25             THE COURT:  Okay.
```

1          *MS. MURPHY:*  No worries at all.

2          So, thank you for -- for the opportunity to speak on

3     behalf of Lilly.  I don't want to rehash a bunch of things

4     that the Government has already covered, so I'm going to try

5     and just stick to, you know, a few specific points, some of

6     the things that Your Honor asked about and a few things that

7     are --

8          *THE COURT:*  I think if you haven't figured it out,

9     there's a few salient points that I'm sticking on.

10          *MS. MURPHY:*  Yes.

11          *THE COURT:*  And Mr. Grossman and Mr. McDonald did a

12     great job, but if you can enlighten me it will be helpful.

13          *MS. MURPHY:*  Yep.  No, and I will --

14          *THE COURT:*  I think you can probably tell what

15     bothers me.

16          *MS. MURPHY:*  Yep.  And I am happy to talk about a

17     few record-specific things.

18          I do want to make one overarching point at the

19     outset, which is the nature of the relationship with Lilly's

20     data here and all of that and this accusation we keep seeing

21     from plaintiffs of FDA outsourced this, we just provided

22     whatever we wanted, there was just kind of some of arbitrary

23     one day we'll give you this, one day we'll give you that.

24     That is just not borne out by the record.

25          If you look at the record, from the very first

1    submission that we made in the record, at page 290 of the

2    administrative record, the email in which we're providing

3    information to the Government begins with the words, In

4    response to your request.  And you see over and over again,

5    when we are providing data and providing it in a different

6    format or some additional data, it's because FDA asked us for

7    it.

8           So, take, for instance, table five, the wholesaler

9    focus data.  That didn't just materialize out of nowhere, one

10   day we said, Oh, we'll give you this.  FDA asked us.  If you

11   look at -- particularly, there's a bunch of back and forth.

12   There was ████████████████████████████████

13   ████████████████, you can find at 422 through 37 of the

14   administrative record and 459 through 92 of the administrative

15   record.

16          FDA asked us about a dozen questions over the course

17   of a couple of months.  Many of which are, Can you also supply

18   this data?  We'd like to know what you know about wholesaler

19   inventory.  We'd like to know more about what you know about

20   wholesaler inventory.  We see that you've given us cumulative

21   on the basis of both drugs, we'd like you to disaggregate it

22   for the two medicines.  We'd now like you to disaggregate it

23   by dosage.

24          They are the ones who are driving what they want

25   from us.  And, of course, we are supplying the data.  But this

1    notion that we just kind of gave them whatever we felt like

2    and they never asked any questions, the reason we have

3    different types of data in the record is because FDA wanted

4    different types of data so it could make sure it was looking

5    at this question through all different angles, looking at

6    what's happening right now, ▬▬▬▬▬▬▬, what does

7    that look reflect in terms of the trends that we've seen over

8    the ▬▬▬▬▬▬? Does supply look different now than it

9    did in ▬▬▬▬▬▬, when there was a shortage going on?

10   You know, what is -- what has changed, has it changed over

11   time?

12       Totally reasonable for an agency that's trying to

13   make a present-day and predictive judgment to say, Well, we

14   don't just want to look at what's going on today or what's

15   going on yesterday, we also want to put that in the context of

16   what's been going on ▬▬▬▬▬▬▬ so we can look at all

17   of that.  And I think that really boasts -- gives the lie to

18   this notion that we're driving the process, and really just

19   kind of destroys this argument that there's something

20   arbitrary about the time period here.

21       FDA's doing what a rational, reasonable agency would

22   do when trying to make predictive judgments; which is, say, We

23   want to look today, and we want to look at today in context to

24   make sure that what we're getting ▬▬▬▬▬▬▬ is

25   consistent with what we've seen ▬▬▬▬▬▬, is

1   consistent with the way trends have changed over ███████████

2   ██████.

3          And as the Government's counsel pointed out, doing

4   the very reasonable thing of saying, Keep giving us data.  We

5   went -- and █████████████████████████████████████████, so

6   that they always are able to look at it and say, We're not

7   taking your word for it.  █████████████████████████████████

8   ████████████████████████████████████████████████████████████

9   ██████████████████████████████████████████████

10  ████████████████████████████████████  And that is, in

11  fact, what happened.

12         If you look -- in particular I focus -- you know,

13  you asked about kind of what's -- what's the best evidence in

14  the record?  I think a good place to start is table one.

15  That's the focus on the ████████ stock reports that are

16  showing where this is -- you know, once the FDA does its

17  voluntary remand it says, we are taking another look, we want

18  to make sure we're looking closely at this, ████████████████

19  ████████████████████████████████████████████████████████████

20  █████████████████████████

21         Okay, maybe it is the case that sometimes, early in,

22  you know, ███████████████████████████████████████████

23  ████████████████████████████████.  Let's look at that,

24  let's see what happens over the course ████████████████████

25  ████████████, and see if you're right when you're telling us, you

60

1  know, that had to do with a particular day the snapshot was

2  taken and ███████████████████████████████████.  We've

3  ████████████████████████████████████████████████

4  ██████████████████████.  They're able to check our work and

5  say, Okay, what you did actually proved out that you are, in

6  fact, producing enough to meet this demand.

7          So, I think that's a really good place to start.

8  And just to be clear about something that I think plaintiffs

9  have kind of sown some confusion about here, that is

10 absolutely a table that reflects both supply and demand.  It

11 is a table that is focused on net inventory balance, net

12 inventory balance is net of demand.  It's the balance that's

13 left after we've fulfilled demand and after we've taken into

14 account open orders at the time.

15         So, it is the number -- it is the supply figure that

16 it bakes in the demand and shows that, yeah, there were a

17 ██████████████████████████████████████████████

18 ████████    But ████████████████████████████████████.

19 And by the time we get to the █████████████ stock reports

20 and the ██████ ones, ████████████████████████████████

21 ███████████████████████████.

22         Now, I do think it's important to take that and

23 understand the difference between what's in table one and the

24 cumulative tables two through four.  The cumulative ones are a

25 little bit different measure.  You have a little bit different

numbers because they're -- not because the cumulative tables aren't using an inventory or supply figure at all.

But because, as we explained when FDA asked us exactly this question, why are these numbers a little bit different, we explained in correspondence, at page 477 of the administrative record, that it's because [redacted]

But as we represented all throughout the proceedings and FDA said in its decision memo, [redacted] Finished product inventory is often going to be a little bit bigger than net inventory balance on a given day, for the reasons we laid out at page 477, that have to do with when you're doing a snapshot of net inventory balance on a particular day, you adjust for open orders, things in transit, a few other dynamics.

That doesn't mean that the cumulative numbers are -- are somehow not a measure of supply or have absolutely nothing to do with inventory. We never said, These have nothing to do with inventory and these don't reflect real numbers of product we have. But there's accounting terminology here and we have to use it accurately. And when we're using one phrase here and one phrase there that's, you know, that's going to be slightly different and you might get a slightly different

1    number.

2            And when it happened, FDA didn't just say, Oh, who

3    knows, and throw their hands ████████████████████████

4    ████████████████████████████████████████████.  If

5    you look at that correspondence I referred to earlier,

6    ██████████████████████████, that's exactly the type of thing

7    they're asking about.

8                  ████████████████████████████████████████

9    ████████████  ████████████████████████████████

10   ████████████████████████████████████████████████

11   ████████████?  And we're engaging with them.  And all of that,

12   again, goes back to the point of they are not simply just

13   saying, Well, Lilly says there's no shortage, so there must

14   not be a shortage.

15           They're asking us for more information, they're

16   probing us about anything they identify -- they're probing us

17   about some of the very same things plaintiffs are still

18   talking about today.  You can't ignore all of the things that

19   are in the administrative record.  The arbitrary and

20   capricious standard does not require the agency to answer any

21   conceivable questions someone might come up with after the

22   fact in its decision memo.  It requires it to be based on

23   evidence that's in the record.  And there's evidence in the

24   record that shows that these types of questions were answered

25   and dealt with repeatedly throughout the process.

```
1            I do want to say a few words about the ██████████

2    ██████.

3               (Court Reporter interrupts)

4          MS. MURPHY:  But the ███████████████ of the

5    capacity representation in ████████, so, again, as Government

6    counsel said, this was a representation about the capacity

7    that Lilly has.  It is not a representation that's wildly off

8    base from what was being produced in months leading up to it.

9    We have months that are ██████████████  So, it's not like

10   we've been producing, you know, ██████████ and all of a sudden

11   we're saying tomorrow we'll produce ████  It's very --

12         THE COURT:  Slow down just a tad, okay?

13         MS. MURPHY:  Sure.

14         THE COURT:  I'm not going to put you on the rack and

15   stretch you until you slow down or speed up, okay?  You're

16   not -- you're not in trouble.  You're not -- I want to give

17   you your time.

18         MS. MURPHY:  I'm a Midwesterner and we just kind of

19   talk fast unintentionally.

20         THE COURT:  That's fine.  My brain is slow to

21   process.

22         MS. MURPHY:  So -- but, you know, we -- when we were

23   focusing on that figure, its not something that's radically

24   different from what we've been doing in the past.  It's pretty

25   close to what had been manufactured.
```

1          It is something, also as Government counsel pointed

2    out, ████████████████████████████████████████████

3    ██████████████████████████████████████

4    ████████████████████████████████████████████████

5    ████████████████████████████████████████████

6    ████████████████████████████████████████████?

7          And, in fact, they have found the opposite.  That

8    we, ██████████████████████████████████████

9    ██████████████████████████████████████████████████

10   ██████████████████████.  And so, they have a ███████████

11   ████████████████████████████████████████████

12   ████████████████████████████████████████████

13   ██████████████████████.

14         And then on top of that, FDA says, We're going to

15   keep monitoring all of this ███████████████going forward.

16   So, if it turns out we're saying we can produce this much and

17   we're radically wrong, and you have some other -- you know,

18   some numbers that don't prove out, they're going to be there

19   to be able to step in.  And to this day, we're giving them the

20   data.  And if they, you know, reach a point where they have a

21   concern, they'll be able to act on it.  But at this point,

22   it's completely reasonable of the agency to say, We have a

23   ████████████████████████████████████████████

24   ██████████████████████████████.

25         I would also note that a significant part of the

1    argument that they're making about the ███████ comes back

2    to the same flaw that kind of pervades a lot of the arguments

3    they're making; which is, they keep ignoring the surplus that

4    carries over from month to month.  So, we don't have to

5    produce all of the supply to meet demand in a given month,

6    because the whole point that we're showing across all these

7    different types of data, and the cumulative in particular, but

8    also the net inventory balances in table one, is that there is

9    ████████████████████████████████████████████████████

10   ████████████████████████.  So, when you look at supply, you have to

11   think about both supply capacity and existing supply.

12           Now, that goes to the question Your Honor asked

13   about kind of like the shelf-life question.  Now, you know, if

14   you're asking me to somewhere in the record I can show you

15   that says what we have said in our briefs, which is there's a

16   two-year shelf life for these products, I'm not sure there's

17   somewhere that actually, you know, specifically came up of

18   tell us the shelf life.  But the representations that we're

19   making when we provide the Government -- the FDA with data

20   here, are not just here's, you know, in the abstract some --

21   some product we have.  It is representations about product

22   that is available to be shipped.

23           We're not going to count product as available to

24   serve demand if it's not product that's actually able to serve

25   demand.  We're not sending out expired products that are not

1    something that can still be used to serve demand.

2           So, the FDA, quite reasonably, understood that when

3    we're giving them figures about what we have in inventory that

4    can serve demand, of course we're talking about inventory

5    that's viable inventory that can actually be sent out to serve

6    demand, and we are explaining what carries over in a given

7    month and all of that.

8           So, again --

9           THE COURT:  One of the big complaints that plaintiff

10   has is that -- it's easy to say, Well, we relied on charts or

11   whatever.  But they contend that in this case that not enough

12   was put on the record to -- big 10,000-foot overview versus

13   putting everything that FDA relied on in the decision and

14   listing it or pointing it out in the actual decision that they

15   made in this case.

16          Do you have a case that says they don't essentially

17   have to put everything and the kitchen sink in for the

18   decision not to be arbitrary and capricious?  I'm sure there

19   has to be, that seems like a general proposition of law.

20          MS. MURPHY:  I'm sorry I don't have a case at hand.

21   Because, to me, that's just sort of like the point of the

22   arbitrary and capricious standard is you have to say enough so

23   that people understand what you're doing, but you don't have

24   to answer every conceivable question someone might later look

25   at the evidence and say, Well, what about this, what about

1    that, what about this, what about that?  Especially in the

2    context, as Government counsel reminded, that this is

3    something -- you know, there's a statutory mandate to keep

4    this up to date.  You can't sit around writing the decision

5    memo for five months.  You've got to take what you got and

6    work with it.

7            And what they did is entirely reasonable.  With each

8    table they explained, here's what this data was, here's what

9    it showed, and here's why that supports our ultimate

10   conclusion.  And they explained each type of data supports it

11   for a little bit different reasons.

12           And that's why, you know, I do think going back to

13   that table one is kind of a really useful way to see how

14   they're showing, you know, if you might be worried about

15   high-level numbers, we've got some low-level numbers, too.

16           And I also would just take issue with this notion

17   they didn't show a lot of their work here.  I mean, they did.

18   They -- they addressed a lot of these issues.  A lot of the

19   things that plaintiffs accuse FDA of not addressing, FDA did

20   address in their decision memo.  They spent five pages talking

21   about demand for compounded products and the extent to which

22   demand for compounded products would translate into demand for

23   Lilly's drugs.  And they ultimately assumed that even though

24   there was evidence that it wouldn't translate, they assumed

25   that most of it would, and said, Even if it would *(sic)*, we're

1    comfortable about the supply here.

2           And then on that very same page of the decision

3    memo, when FDA ultimately reaches that conclusion, We feel

4    comfortable about supply, they close out their discussion by

5    saying, We're going to keep request -- we're going to keep

6    monitoring this ███████████████████ so that if it

7    turns out we were mistaken about just how much demand would

8    increase as the compounding products are taken off the market,

9    we'll be able to see that.

10          *THE COURT:*  Okay.  I know this is a stupid question.

11   I assume that that's continuing to be done at the moment, and

12   FDA continues to stand by their decision as of April the 24th,

13   that there continues to be a surplus rather than a shortage;

14   is that fair to say?

15          *MS. MURPHY:*  I think that's --

16          *THE COURT:*  Or my FDA counsel?

17          *MR. MCDONALD:*  That's accurate, Your Honor.

18          *THE COURT:*  Okay.  All right.

19          I think I'm good to go.

20          *MS. MURPHY:*  I just wanted to make sure.  I thought

21   there was one other question you might have asked that I

22   wanted to make sure I addressed.

23          *THE COURT:*  I would like to give Mr. Grossman, since

24   he's taken on two attorneys here, a final chance to say

25   something.

1    *MS. MURPHY:* Could I make one last just final point

2    on one thing you had said was bothering you --

3    *THE COURT:* Certainly.

4    *MS. MURPHY:* -- which is the rulemaking issue.

5    *THE COURT:* Yep.

6    *MS. MURPHY:* And I would simply say, while I

7    absolutely stand by everything FDA said about why this is not

8    rulemaking. I would also say, it should bother you a little

9    bit less, given that they did, in fact, have notice and

10   opportunity to comment and provide all sorts of material of

11   their own to FDA here.

12         They could have provided hard data about

13   compounding. They are compounders. They chose not to because

14   they didn't want to share all of their own information about

15   exactly what market they are supplying. So, this is really

16   the last case in which you should be kind of having a lot of

17   sympathy for them, in particular, as the party that's before

18   Your Honor saying they wished they had had more notice and

19   opportunity to participate.

20         *THE COURT:* Thank you, ma'am.

21         Mr. Grossman, I'll give you the last word.

22         *MR. GROSSMAN:* Thank you, Your Honor.

23         There are only three points I wanted to make in

24   response. The first is my friend representing the FDA started

25   off his discussion by reciting the statutory standard that

1    appears at the very top of the decision about demand exceeding

2    supply over a time period, and then proceeded to talk about

3    all kinds of other things that are in the record that don't

4    actually measure up to those three elements that he started

5    off with.

6            In that sense, his discussion does match what is in

7    the decision, and so I guess that's consistent at least.  But

8    at the same time, I think it only underscores the

9    arbitrariness of what the agency did here, that it sort of --

10   you can't exactly figure out what metric or standard or

11   approach the agency was taking.  It just considered a whole

12   lot of stuff and decided, We kind of know it when we see it.

13   But that's not the standard that my friend began with, and

14   it's not the standard that the statute begins with or that the

15   decision does.

16           Second, the Court has asked several questions.

17   Everybody has had a chance to answer the question about the

18   ███████████████████████████████████████████  I think

19   there's a clarification that is needed here.  So, that figure

20   comes from a ███████████████████████████████  Both

21   of my friends represented that that represents Lilly's

22   capacity and not what Lilly is, in fact, doing; that is

23   incorrect.

24           The letter from Lilly says that Lilly ████

25   ████████████████████████████████████   ████████████

1    ██████████████████████████    This is at plaintiffs'

2    appendix page 116.  That -- as I said, that letter was on

3    ████████████████████    In the month of ████████████

4    ████████████████████████████████████████████████████

5    ████████████████████████████.  So, that's a

6    little bit less, I would say, than ████████████████.

7         And then third and finally, the Court has asked a

8    number of questions, and I think appropriately so, about the

9    meaning of the aggregate supply data and how that corresponds,

10   if it corresponds in any way, to the inventory that is

11   available to satisfy customer demand.  My friend representing

12   the FDA referred to that figure as representing stored

13   surplus.  I believe the decision refers to it similarly.

14   Lilly in its briefing has referred to that figure as

15   representing surplus.

16        But I want to read to you -- this is from

17   plaintiffs' appendix page 122, and this is, again, from the

18   same letter from Lilly.  It says, ████████████████████

19   ████████████████████████████████████

20   ████████████████████████████████████████████.

21   And then it goes on to explain all the different things that

22   ████████████████████████████████████████████

23   ██████████████████████.  ██████████████████████

24   ████████████████████████████████████

25   ████████████████

1      Those are the only points that I wanted to address.

2 Of course, I'm happy to answer any questions the Court might

3 have.  Otherwise, we would simply ask the Court to grant the

4 plaintiffs' motion and to deny the others.  And to thank the

5 Court for its time today.

6      THE COURT:  If I grant summary judgment on your

7 third claim, does that take care of the case?  Do you win on

8 everything?

9      MR. GROSSMAN:  Yes, Your Honor.

10      We think that the way that the claims have been laid

11 out, if the Court -- that any of them would provide an

12 appropriate basis for vacatur -- for vacatur of the action

13 here.  And so, the Court need not address other -- other

14 claims if it doesn't feel the need to reach them.

15      THE COURT:  Okay.  I think I don't have any

16 additional questions.  I appreciate everyone's arguments here

17 today.  And you guys were very diligent, even though I gave

18 you some extra time, I thought you did a great job laying it

19 out very succinctly.

20      I will say, though, I am not smart enough to make a

21 decision on this until I get the transcript.  So, I would like

22 to go and study your arguments more, some of the statements

23 you guys made today, and then went back and tying them to the

24 brief and also the administrative record.

25      I do not think that I will take long to make a

1    decision, but, then again, I want to be sure that I do the

2    best job.  And as I said, I understand, one way or another, it

3    will go on to the next court, so I want to try to give them as

4    much of my reasoning as possible.  And like I said, I'm just

5    trying to do my best here, and I really don't care if I get

6    reversed.

7            But I do want to see the transcript.  But I do

8    understand also that time is of the essence and you-all want a

9    decision.  But as soon as we get that transcript -- another

10   thing I would ask from you, I dropped a footnote in the

11   previous decision, I do take it seriously.  I don't want to be

12   -- honestly, don't want to be criticized for trying to close

13   public hearings.  I really feel strongly about that.

14           So, you should expect that once Monica is able to

15   give us the transcript that you'll -- if you can get together

16   in three days and give me your proposed redactions, I would

17   like to get it out there.  We have had several inquiries,

18   folks that have been calling up here, members of the general

19   public, as well as members of the media that, I'm assuming,

20   did want to attend the hearing today.  And I'd like to get the

21   transcript out there as quickly as possible, okay?  But we

22   need to did get that to you.  And I know Monica will work

23   diligently to do that.

24           Unless you-all have any more questions for me, I'm

25   prepared to go off the record, okay?  No?  *(No response)*

1                    *(Proceedings Adjourned)*

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          REPORTER'S CERTIFICATE

2

3       I, Monica Willenburg Guzman, CSR, RPR, certify

4  that the foregoing is a true and correct transcript from

5  the record of proceedings in the foregoing entitled matter.

6       I further certify that the transcript fees format

7  comply with those prescribed by the Court and the Judicial

8  Conference of the United States.

9       Signed this 28th day of April, 2025.

10

11                    /s/Monica Willenburg Guzman
                      Monica Willenburg Guzman, CSR, RPR
12                    Texas CSR No. 3386
                      NCRA No. 32278
13                    Official Court Reporter
                      The Northern District of Texas
14                    Fort Worth Division

15

16  CSR Expires:        7/31/2025

17  Business Address:   501 W. 10th Street, Room 310
                        Fort Worth, Texas  76102
18
    Telephone:          817.850.6681
19
    E-Mail Address:     mguzman.csr@yahoo.com
20

21

22

23

24

25